**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SHARON FINGER and MANUEL MARTÍN, Individually and on Behalf of All Others Similarly Situated,** | **Case No.1:17-cv-01422-RJS** |
| **Plaintiffs,** | **Hon. Richard J. Sullivan** |
| **v.** | **CLASS ACTION** |
| **PEARSON PLC, JOHN FALLON, ROBIN FREESTONE and CORAM WILLIAMS,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATION OF THE FEDERAL SECURITIES LAWS**

LEVI & KORSINSKY, LLP
Shannon L. Hopkins (SLH-1887)
Sebastiano Tornatore (ST-0304)
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Tel.: (203) 992-4523
Facsimile: (212) 363-7171

*Lead Counsel for Lead Plaintiffs and the Class*

TABLE OF CONTENTS

I.   SUMMARY OF THE ACTION ...................................................................................... 1

II.  JURISDICTION AND VENUE .................................................................................... 5

III. THE PARTIES ............................................................................................................. 6

   A.  Plaintiffs ................................................................................................................. 6

   B.  Defendants ............................................................................................................. 6

IV.  FACTUAL ALLEGATIONS ....................................................................................... 9

   A.  Company Background ............................................................................................ 9

      1.  Pearson's Education Business Is Heavily Dependent on Textbook Sales from Its North American Business Segment ..................................................................... 10

      2.  Pearson's Interest in Penguin Random House ............................................... 11

   B.  Throughout the Class Period, Numerous Market Factors Indicated Textbook Sales Would Quickly Become A thing of the Past ........................................................... 12

      1.  Declining Student Enrollment ....................................................................... 13

      2.  Textbook Prices Have Soared Ahead of Inflation Causing Students to Seek Cheaper Alternatives ..................................................................................... 13

   C.  Pearson's Competitors Successfully Shift to Digital While Pearson Lags Behind .......... 16

   D.  In a Panic to Catch Up to Competitors and Avoid Losing Further Market Share, Pearson Rushes to market with its Fundamentally Defective Digital Product Offerings ............... 19

      1.  Technical Issues Within Pearson's Digital Offerings .................................... 20

      2.  Pearson Executives Do Nothing to Address the Root of their Digital Problems .......... 22

   E.  Pearson's Reactive Rather than Proactive Approach to Structural Changes in the Textbook Market and in response to the Technical and Customer Service Issues Impacting its Digital Products Results an Unprecedented Impairment to Goodwill ............................... 25

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS ........................................................................................................... 30

   A.  Defendants' Materially False and Misleading Statements in the January 21, 2015 Trading Update ................................................................................................................... 31

   B.  Materially False and Misleading Statements in the 2014 Full Year Results ................... 31

      1.  Materially False and Misleading Statements Concerning the Transition to and Market for Digital Courseware ..................................................................... 32

   C.  Materially False and Misleading Statements in the 2014 Annual Report ........................ 36

      1.  Materially False and Misleading Statements Concerning the Company's Internal Controls Related to Financial Reporting ........................................................ 37

   D.  Materially False and Misleading Statements in the 2015 Half-Year Results ................... 46

      1.  Materially False and Misleading Statements Regarding the Company's Transition to Digital Products and the Market Therefor .................................................. 47

i

2.    Materially False and Misleading Statements Concerning Goodwill, Goodwill Impairment .............................................................................................. 48

3.    Materially False and Misleading Statements Concerning the Company's Compliance with IFRS .............................................................................. 51

VI.    THE TRUTH IS REVEALED OVER THE COURSE OF SEVERAL PARTIAL DISCLOSURES ............................................................................................... 52

A.    October 21, 2015 Nine-Month Interim Management Statement ....................................... 52

B.    Defendants' Continuing False and Misleading Statements in the January 21, 2016 Trading Update and Investor Call ..................................................................... 53

1.    Materially False and Misleading Statements Regarding the Company's Transition to Digital Products and the Market Therefor ........................................................ 54

2.    Materially False and Misleading Statements Regarding the Impact of Increased Returns of Physical Textbooks and Digital Products on the Company's North American Higher Education Revenue and the Company's Ability to Meet its Guidance ........................... 55

C.    Defendants' Continuing False and Misleading Statements in the Full Year 2015 Results 56

D.    Defendants' Continuing Materially False and Misleading Statements in the February 26, 2016 Investor conference Call ..................................................................... 58

E.    Defendants' Continuing Materially False and Misleading Statements in the 20-F ........... 61

1.    Materially False and Misleading Statements Concerning the Transition to and Market for Digital Courseware ........................................................................... 62

2.    Materially False and Misleading Statements Concerning Goodwill, Goodwill Impairment and Compliance with IFRS ........................................................... 63

3.    Materially False and Misleading Statements Concerning Internal Controls .................. 65

F.    Defendants' Continuing False and Misleading Statements in the July 29, 2016 – First Half of 2016 ................................................................................................. 69

G.    Defendants' Continuing False and Misleading Statements in the July 31, 2016 Investor Conference Call ......................................................................................... 70

H.    October 17, 2016 Nine Month Interim Management Statement and Investor Call Revealing Inventory Returns are far More Than Previously Represented ....................... 73

I.    January 18, 2017 Trading Update Slashing 2018 Guidance and Revealing Pearson's .. Inventory Return Problems Were Far Worse Than Defendants Had Previously Disclosed ............................................................................................... 76

VII.    POST-CLASS PERIOD EVENTS ............................................................................... 83

VIII.    PEARSON'S IFRS ACCOUNTING AND INTERNAL CONTROL VIOLATIONS ........ 85

A.    Defendants Violated IFRS by Failing to Timely Record Goodwill Impairment .............. 87

B.    Defendants' Failure to Disclose the Product Defects from Its MyLabs Digital Courseware Violated IFRS and SEC Regulations ................................................................ 93

C.    Defendants' Internal Control Violations .......................................................... 94

IX.   ADDITIONAL SCIENTER ALLEGATIONS .................................................................. 97

   A.   The Individual Defendants' Knowledge and/or Recklessness ............................. 98

X.   LOSS CAUSATION ........................................................................................................ 107

XI.   PRESUMPTION OF RELIANCE ................................................................................ 110

XII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS
     CAUTION DOCTRINE ................................................................................................ 111

XIII. CLASS ACTION ALLEGATIONS ................................................................................. 112

XIV.   CAUSES OF ACTION ................................................................................................ 113

COUNT I ..................................................................................................................................... 113

COUNT II .................................................................................................................................... 115

XV. PRAYER FOR RELIEF ..................................................................................................... 117

XVI.   JURY DEMAND ............................................................................................................ 117

Court-appointed Lead Plaintiffs Sharon Finger and Manuel Martín ("Lead Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other persons or entities who purchases or otherwise acquired American Depository Shares ("ADSs") of Pearson PLC ("Pearson" or the "Company") between January 21, 2015 and January 17, 2017 (the "Class Period").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, among other things, the ongoing independent investigation of Court-appointed Lead Counsel, Levi & Korsinsky LLP ("Counsel"). This investigation includes, among other things, a review and analysis of: (i) public filings by Pearson with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movements and pricing data; (v) transcripts of investor calls and conferences with Pearson senior management; (vi) consultation with relevant experts and consultants; (vii) interviews with former Pearson employees; and (viii) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting Lead Plaintiffs' allegations are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiffs believe that further evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.   SUMMARY OF THE ACTION

1.     This securities fraud class action is based upon an extensive fraud, orchestrated by Defendants, who sought to conceal Pearson Plc's ("Pearson" or the "Company") mounting print

textbook and defective digital product returns in order to artificially inflate the value of a Company that was overexposed to a deteriorating print textbook market while simultaneously being left behind by competitors that had beaten it to the punch with respect to the switch from analog to digital media.

2.      Pearson Plc ("Pearson"), headquartered in the U.K., is a multinational education company with its principal operations in the education and consumer publishing market.  The Company operates in three geographic segments -- North America; Core Markets (including the United Kingdom, Australia, and Italy); and (iii) Growth Markets (Brazil, China, India and South Africa) – with North America comprising approximately 65% of its annual sales.

3.      Defendants admittedly closely monitored industry factors affecting Pearson's business.  Prior to throughout the Class Period, higher education student enrollment has been on the decline and students that are in college are taking advantage of cheaper alternatives to pricey textbooks, such as digital courseware.  Accordingly, colleges, bookstores and other retailers increasingly began returning textbooks that were no longer needed.  Rather than have to record a charge for the mounting book returns, throughout the Class Period Pearson deferred the charge hoping its new flagship MyLab digital courseware would dwarf any impairment charge the company had to take.

4.      Unfortunately for Defendants, Pearson was years behind its competitors in transitioning to the digital market.  In order to remain competitive, Pearson was forced to rush to market with new digital products (while continuing to push its flagship MyLabs suite) that were not ready for prime time as a result of numerous fundamental defects ranging from simple issues related to answer input to server and access issues that rendered the product inaccessible.  Accordingly, sales of these digital products did not take off the way Defendants had planned.

Rather, retail customers were returning the defective product and/or refusing to purchase it. Lower than expected digital revenues and unprecedented product returns caused Pearson to miss its financial projections.

5.      Rather than disclose these issues to investors, Defendants made numerous materially false and misleading statements and omitted material facts concerning, inter alia: the Company's product returns, defects relating to its digital products, including its lead MyLabs product, goodwill impairment relating to "inventory corrections," internal controls over financial reporting and financial condition and prospects, including the following:

- A consistent overstatement of goodwill and expected earnings

- "good growth in digital and services"

- An increase in sales reflected "***growth in North America***" and "***strength*** in digital services"

- Assured investors that "[t]he key cyclical and policy factors that have hurt us – US college enrolments and UK Qualifications – [***would] stabilise by the end of 2017 and grow modestly thereafter helped by new product launches***."

(Emphasis added). As a result of Defendants' false statements, Pearson ADSs traded at artificially inflated prices throughout the Class Period.

6.      As set forth herein, Defendants' statements were each materially false and misleading because, among other reasons: (1) there existed known defects related to Pearson's digital products, particularly MyLabs, which was riddled with technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (ii) lower textbook demand and digital product defects caused returns to increase negatively impacting the Company's North American Higher Education Revenues necessitating a goodwill

impairment that would impact the Company's financial statements; (iii) as a result of declining student enrollments and defective digital product, the Company would experience materially less sales orders than projected; (iv) as a result of the Company's failure to adequately assess its goodwill impairment throughout the Class Period, Pearson was in violation of applicable accounting standards; and (v) the Company's internal controls were deficient to protect against the Company's misstatements.

7.      Defendants acted with knowledge and/or with reckless disregard for the fact that their Class Period statements were materially false and misleading when made.  As alleged herein, Defendants were aware throughout the Class Period that Pearson was experiencing significant product returns necessitating an earlier and larger inventory write-down as a result of, among other things: (1) Defendants' own admission that the "inventory correction" was the result of the "cumulative" impact of "prior years," necessitating an earlier impairment charge to Goodwill or restatement; (2) known product defects that plagued the Company's digital products resulting in depressed sales and product returns; (3) Defendants' admitted active communications with retailers regarding product returns; (4) Pearson's North American Higher Education courseware is its "core" business; (5) Defendants admittedly, actively monitored industry trends and the Company's competitors throughout the Class Period; and (6) Defendants admitted knowledge of market factors indicating the imminent and rapid decline of textbook sales.

8.      Investors would ultimately begin to learn the truth about the Company's loss exposure relating to textbook returns and defective digital product beginning on October 21, 2015 when Pearson began to admit to significantly "higher returns affecting the US higher education market," causing the Company do decrease its guidance.

9.      Upon the news, Pearson's ADS price dropped 17% from $18.39 per ADS on October 20, 2015 to $13.69 on October 23, 2015 on extremely high trading volume.

10.     On October 17, 2016, investors were stunned by the Company's partial revelations that the inventory correction that saddled the Company's financial performance in 2015 was not an anomaly and was far more widespread than previously disclosed.  On this news, the price of Pearson ADSs dropped significantly, from $10.10 per ADS on October 14, 2016 (the last trading day before the announcement) to $9.27 on October 17, 2016 – a loss of more than 8%.

11.     Finally, on January 18, 2017, Pearson reported that U.S. sales in its education business for fourth quarter and year 2016 were down 30% and 18%, respectively citing a "further unprecedented decline in Q4 2016 in our North American higher education courseware business." As a result, Pearson stated the Company would no longer achieve its 2018 operating profit forecast.

12.     Upon the news, Pearson's ADS price dropped dramatically from a close of $9.99 on January 17, 2017 to $7.13 on January 18, 2017 – a loss of more than 28% -- on unusually high trading volume of almost 3.5 million ADSs transacted (compared to 284,000 the prior day), causing Plaintiffs and the Class to suffer damages.

## II.    <u>JURISDICTION AND VENUE</u>

13.     The claims asserted herein arise pursuant to Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated herein, 17 C.F.R. § 240.10b-5.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in

this District.  Pearson transacts in this District, and the Company's securities trades in this District on the New York Stock Exchange in the form of ADSs, evidenced by depositary receipts under a sponsored ADR facility with the Bank of New York Mellon Corporation, a corporate entity that maintains its executive offices within this district at 225 Liberty Street, New York, New York 10286.  Additionally, Pearson maintains its North American headquarters in this district at 330 Hudson Street, New York, New York 10013.

16.      In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    THE PARTIES

### A. PLAINTIFFS

17.      Court-appointed lead plaintiff Sharon Finger purchased Pearson ADSs during the Class Period at artificially inflated prices and has been damaged thereby, as previously set forth in her PSLRA Certification, filed with the Court on April 25, 2017 (ECF No. 10), incorporated herein by reference.

18.      Court-appointed lead plaintiff Manuel Martín purchased Pearson ADSs during the Class Period at artificially inflated prices and has been damaged thereby, as previously set forth in his PSLRA Certification, filed with the Court on April 25, 2017 (ECF No. 10), incorporated herein by reference.

### B. DEFENDANTS

19.      Defendant Pearson is a multinational education company with its principal operations in the education and consumer publishing markets originally incorporated and registered in 1897 under the laws of England and Wales as a limited company and re-registered under the UK Companies Act as a public company in 1981.  Pearson maintains its global

6

headquarters in London, England, with executive offices for Pearson North America located at 330 Hudson Street, New York, New York 10013.  The principal trading market for the Company's ordinary shares is the London Stock Exchange ("LSE") with ordinary shares are also traded in the United States on the New York Stock Exchange ("NYSE") in the form of ADSs under the ticker symbol "PSO," evidenced by ADRs under a sponsored ADR facility with the Bank of New York Mellon as depositary.

20.     Defendant John Fallon ("Fallon") is the current Chief Executive Officer ("CEO") of the Company, having been appointed on October 3, 2012 and assuming the position on January 1, 2013.  Fallon has worked for Pearson since 1997, first as a director of communication before being promoted to president of Pearson Inc. in 2000, followed by an appointment to the CEO position of Pearson's educational publishing businesses for Europe, Middle East and Africa.

21.     Defendant Robin Freestone ("Freestone") was the CFO of Pearson from June 12, 2006 until August 1, 2015, having previously filled the role of Deputy Chief Financial Officer for the Company from 2004 until 2006.  Defendant Freestone sits on the Board of the Institute of Chartered Accountants in England and Wales ("ICAEW") as an Advisory Group Member, Financial Reporting Faculty and is a Member of the Confederation of British Industry ("CBI") Economic Growth Board.  He previously qualified as a Chartered Accountant with Touche Ross.

22.     Defendant Coram Williams ("Williams") is the current CFO of Pearson, having been appointed to the position on August 1, 2015.  Williams joined Pearson in 2003, acting in a number of senior positions including finance and operations director for Pearson's English Language Teaching business in Europe, Middle East & Africa, interim president of Pearson Education Italia, head of financial planning and analysis for Pearson, and as CFO of the Penguin

7

Group and Penguin Random House.  Prior to joining the Company, defendant Williams was employed at Arthur Andersen in both the auditing and consulting practices of that firm.

23.    Defendants Fallon, Freestone and Williams are collectively referred to as the "Individual Defendants" and, together with Pearson, as the "Defendants."

24.    Each of the Individual Defendants, by virtue of his or her high-level position with Pearson, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential and proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his or her respective tenure with the Company, as alleged herein.  As alleged herein, the materially false or misleading information conveyed to the public resulted from the collective actions of the Individual Defendants.  Each of these individuals, during his or her tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, and knew or recklessly disregarded that these statements were being issued regarding the Company.

25.    As executive officers of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

26.     Each of the Individual Defendants, because of his or her positions of control and authority as an executive officer of Pearson, was able to and did control the content of the SEC filings, press releases, and other public statements that Pearson issued during the Class Period, was provided with copies of the statements at issue in this action before they were made to the public, and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the materially false or misleading public statements alleged herein.

27.     Each of the Individual Defendants, because of his or her positions of control and authority as an executive officer of Pearson, had access to the adverse undisclosed information about Pearson's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Pearson officers and employees, attendance at Pearson management meetings, and via reports and other information received in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the representations made by or about Pearson materially false or misleading.

28.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of Pearson securities by disseminating materially false or misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding Pearson's products, business, operations, and management, and the intrinsic value of Pearson common stock; and (ii) caused Lead Plaintiff and members of the Class to acquire Pearson common stock at artificially inflated prices.

## IV.   FACTUAL ALLEGATIONS

### A.   COMPANY BACKGROUND

29.     Originally incorporated and registered in 1897 under the laws of England and Wales as a limited company and re-registered under the UK Companies Act as a public company

in 1981, Pearson has evolved into a multinational education company with principal operations in North America in the education and consumer publishing markets.

30.     Since its founding, Pearson has existed in various iterations operating in, *inter alia*, the construction, publishing, television production and broadcasting, and education industries.

31.     Pearson operates in three geographic segments: (i) North America; (ii) Core Markets (including the United Kingdom, Australia, and Italy); and (iii) Growth Markets (emerging and developing economies, with investment priorities in Brazil, China, India and South Africa).

32.     Pearson is heavily reliant on its North American operations, from which it derived 65%, 63% and 61% of its annual sales for 2016, 2015 and 2014, respectively.

33.     As discussed below, Pearson presently consists of its global educational business and a 47% interest in Penguin Random House publishing.

   **1.   Pearson's Education Business Is Heavily Dependent on Textbook Sales from Its North American Business Segment**

34.     Through its educational business, Pearson provides test development, processing and scoring services to governments, educational institutions, corporations and professional bodies around the world.

35.     The educational group can be broken down into three functions: (i) courseware; (ii) assessment; and (iii) services, accounting for more than £4.5 billion in sales in 2016 and £4.46 billion in 2015.

36.     *Courseware*.  Pearson provides educational content for use in both traditional and digital learning, including curriculum textbooks and other learning materials.

37.     *Assessment*.  As the largest provider of education assessment services in the United States, Pearson has a variety of assessment products, including test development and scoring.

Through this function, Pearson scores large-scale school examinations for the US federal government and more than 25 American states, claiming to score billions of machine-scorable test questions and evaluating more than 111 million essays, portfolios and open-ended test questions ever year.

38.     Through Pearson VUE, Pearson operates a professional testing business that provides electronic testing for regulatory and certification boards, including, *inter alia*, the NCLEX exam for the national Council of State Boards of Nursing, the GMAT for the Graduate Management Admissions Council and numerous IT exams such as Cisco and CompTIA.

39.     *Services*.  Pearson also operates Connections Education -- a virtual school business with over 68,000 full time equivalent students through full-time virtual and blended school programs.  Connections Education manages 30 virtual public schools with three full-time state-wide virtual public schools approved for the 2016-2017 school year for students in Arkansas, Washington and New Mexico.

## 2.  Pearson's Interest in Penguin Random House

40.     In October 2012, Pearson and Bertelsmann SE & Co. KGaA ("Bertelsmann") entered into an agreement to create a new consumer publishing business by combining its Penguin publishing business with Bertelsmann's Random House.  That transaction was completed on July 1, 2013, with Pearson emerging as a 47% stake holder in the newly created Penguin Random House.

41.     Penguin Random House comprises the adult and children's fiction and nonfiction print and digital book publishing businesses of Penguin and Random House in the US, UK, Canada, Australia, New Zealand and India, Penguin's publishing activity in Asia and South Africa,

as well as Dorling Kindersley worldwide, and Random House's companies in Spain, Mexico, Argentina, Uruguay, Columbia and Chile.

42.     Penguin Random House employs more than 10,000 people globally across almost 250 editorially and creatively independent imprints and publishing houses that collectively publish more than 15,000 new titles annually. Its publishing list includes more than 70 Nobel Prize laureates and hundreds of the world's most widely read authors.

43.     Penguin Random House sells directly to bookshops and through wholesalers. Retail bookshops normally maintain relationships with both publishers and wholesalers and use the channel that best serves the specific requirements of an order. It also sells through online retailers such as Amazon.com, as well as its own websites and direct to the customer via digital sales agents.

44.     For the fiscal year ending December 31, 2016, Pearson's share of Penguin Random House profit after tax was £98 million.

45.     On February 24, 2017, Pearson announced that it had issued an exit notice regarding its stake in Penguin Random House to Bertelsmann with a view to selling its stake or recapitalizing the business and extracting a dividend, reflecting a Company-espoused intention to focus entirely on its education business.

### B.   THROUGHOUT THE CLASS PERIOD, NUMEROUS MARKET FACTORS INDICATED TEXTBOOK SALES WOULD QUICKLY BECOME A THING OF THE PAST

46.     Educational publishing comprises elementary through high school and college texts.  The process of developing instructional materials for elementary and secondary schools is complex, time consuming and expensive. A full-scale instructional program in any subject area usually consists of a series of textbooks and ancillary materials in various formats, such as workbooks and study aids.

47.     Key market factors that Defendants admittedly monitored[1] prior to and throughout the Class Period, as well as Defendants' own discussions with retail customers, indicated Pearson's financial projections were unrealistic and not achievable and its assets were overstated because, among other reasons, the print textbook market was shrinking as a result of: (i) declining student enrollment; and (ii) increased textbook prices causing students to seek cheaper alternatives.

48.     As a result of these known market factors, retailers, with whom Pearson admits to communicating regularly in connection with setting its forecasts, have been buying less print textbooks, "destocking" and returning textbooks at a significant rate. Yet Pearson continued to maintain its unrealistic guidance and reassure investors throughout the Class Period that book returns would either remain flat or decrease.

49.     These known economic factors, particularly when coupled with Pearson's saturated 40% share of the print textbook market and slow transition to digital content, rendered Defendants' financial projections unrealistic and without reasonable basis and warranted a much sooner write-down of Goodwill.

### 1. Declining Student Enrollment

50.     For years, America's college campuses swelled with more and more students. But enrollment peaked in 2010 at just over 21 million students. Attendance has dropped every year since. By the fall of 2014, according to the most recent year government data available, there were 812,069 fewer students walking around college campuses equating to an approximate 4% decrease

---

[1] On the July 20, 2015 Analyst Call with financial analysts (available at https://seekingalpha.com/article/3357095-pearsons-pso-ceo-john-fallon-on-q2-2015-results-earnings-call-transcript?part=single), Defendant Fallon admitted that "[w]e're able on a monthly basis to track our performance and competitive performance of both at the gross and net basis against the industry as a whole."

from 21 million students in 2010 to 20.2 million in 2014.  Over the last two years, college enrollment has continued to decline by approximately 3%.[2]

51.     The two types of colleges with the biggest declines according to government data are community colleges and for-profit universities – Pearson's two main customers.

52.     Further, unemployment has steadily declined from 9.3% in December 2009 to 4.7% in December 2016, indicating more people are going to work, rather than enrolling in post-secondary education, causing further decline in enrollment.[3]

53.     As a result of declining enrollment, few textbooks are being purchased and retailers have been engaging in a "destocking" process. Destocking is an active decision by retailers to reduce the inventory they hold. For example, there is no need for bookstores to buy new books if they already have too many on their shelves.[4] Bookstores will maintain their current inventory until the deadline of the return policy approaches, which is 15 months for Pearson. Compared to competitors, this is extremely long as most publishers use 30 days.[5,6]

## 2.     Textbook Prices Have Soared Ahead of Inflation Causing Students to Seek Cheaper Alternatives

54.     Textbook prices have been raised ahead of the rate of inflation for the past 10 years, making textbooks less and less affordable for students.  Accordingly, many students can no longer afford books and are seeking cheaper alternatives, such as book rentals, piracy and e-books. For example, a 2014 survey cited by Deutsche Bank found that 65% of students said they did not purchase required textbooks due to excessive cost.[7]

---

[2] January 18, 2017 Deutsche Bank Market Research Report at 3.
[3] https://data.bls.gov/timeseries/LNS14000000
[4] Barclays Pearson Analyst Report. January 19, 2017. Page 3
[5] https://www.cengagebrain.com/shop/faq (Last accessed June 23, 2017).
[6] http://www.hmhco.com/customer-care/faqs (Last accessed June 23, 2017).
[7] January 18, 2017 Deutsche Bank Market Research Report at 3.

55.     According to the College Bookstores Association as of 2016, student per capita spending on learning content, both print and digital, is in decline. Students are moving away from over-priced textbooks to less expensive book rentals, online e-books and digital content.

56.     A recent PwC Global Entertainment and Media Outlook Report for 2017-2021 similarly reported that U.S. college print textbook revenue has been in decline and is expected to continue to decline over the forecast period of 2012 to 2021 (the "Forecast Period"), with print/audio specifically declining 7.3% during the Forecast Period.

57.     On the other hand, education electronic book revenue is expected to increase at a compound annual growth rate ("CAGR") of 9.4% over the Forecast Period, reaching 17.7% of total education book revenue by 2021.

58.     Accordingly, revenue for book publishers has been suffering as consumers substitute industry products with other resources and reading materials that are readily available online. Therefore, publishers have been forced to adjust pricing and develop new products, including e-books.

59.     Moreover, students' lack of textbook purchases is stimulating book rental and Open Education Resources ("OER") and enhancing piracy issues. Book rental services is the concept of renting chapters in a specific textbook as needed. Pearson's problems are attributed to the overstocked bookstores, the neglect to account for book rental trends and the several years of not accounting for the declining demand for textbooks.

60.     As several analysts, such as Deutsche Bank, have noted, Pearson's projections have failed to account for the above known market factors, indicating the Company's "guidance" was "far too optimistic" and without reasonable basis.

61.     As discussed below, in response, Pearson's competitors began shifting away from a revenue base that is primarily dependent on traditional print towards digital advertising and subscriptions, in the latter case embracing the paid subscription model in masses. Heavy capital demands and erratic income flow serve as barriers to entry that have tended to keep the educational book publishing industry highly concentrated, as only well financed firms can afford both the upfront costs and periodic big losses.

62.     Pearson, on the other hand, is behind the curve on this transition to digital products with 35% of revenue still from textbooks.

## C. Pearson's Competitors Successfully Shift to Digital While Pearson Lags Behind

63.     According to the Company's 2015 Annual Report on Form 20-F, "Pearson competes with other publishers and creators of educational materials and services" including "Cengage Learning, McGraw-Hill and Houghton Mifflin Harcourt, and services companies, such as K-12 Inc., alongside smaller niche players."  While Pearson was lagging behind in its transition to digital products, the Company's competitors recognized the trend, and by early 2015, had transitioned a material portion of their business away from the textbook industry to digital content.

64.     For example, while the textbook industry accounted for approximately 35% of Pearson's total revenue for the 2016 fiscal year, *for the same year*, Pearson's direct competitor, Cengage Learning, reported more than 75% of its domestic research revenues from digital products. Similarly, John Wiley and Sons printed textbook revenue represents 30% of its education business, or a 9% decrease from the 39% of 2015 textbook revenue.

65.     Further, while Pearson consistently described its revenue outlook throughout the 2016 fiscal year as "stable" and continued to maintain its unrealistic guidance and reassure

investors throughout the Class Period that book returns would either remain flat or decrease, Cengage Learning greatly tempered its public statements regarding the textbook industry, noting "[f]iscal 2016 markets [a] transition from a traditional print publisher to a digital education company" and further expressed only measured optimism about its digital platform, stating:

> Our financial turnaround is well underway, fueled by significant digital growth over the past year.  At our core, we are committed to improving the student experience, which has focused and inspired every aspect of our organization.

66.     Pearson's other self-identified competitors followed a similar trajectory in terms of reducing their reliance on textbooks in favor of alternative digital platforms, and tempering the optimism of their public statements. In fact, while Pearson continually reaffirmed its guidance, many of Pearson's competitors adjusted their earnings estimates throughout the 2016 fiscal year to accurately reflect the now well-materialized risk of a reduced textbook market.

67.     Houghton Mifflin, for example, recognized the disappointing market share performance for an already reduced 2016 fiscal textbook market, stating: "[w]e are disappointed with the Company's performance year to date, especially in the domestic education market…[w]e are taking necessary steps to remedy issues which resulted in loss of market share in California this year, as well as accelerate growth in our adjacent markets in order to create greater value for shareholders." Reflecting this risk, Houghton Mifflin's own revenues, EBITDA and free cash flow fell meaningfully below third quarter 2016 expectations, causing that company to reduce its fourth quarter 2016 estimates by approximately 11% to fit revised guidance and competitive challenges.

68.     Pearson, by contrast, broke with industry standards by, *inter alia*, failing to reduce its substantial position in the textbook industry, failing to diversify its portfolio with a digital platform, and woefully failing to temper its public statements and guidance to reflect the now well-materialized risk of a reduced textbook market. In fact, while Pearson's own competitors were

17

describing the textbook market as "disappoint[ing]," "challeng[ing]," and "pressure[d]," Defendants described the same market as "stable" and assured investors that book returns would either remain flat or decrease, despite their repeated insistence in public filings that they monitored industry trends, including "the digitization of content and proliferation of distribution channels, either over the internet, or via other electronic means, replacing traditional print formats."

69.     Indeed, as Pearson's own competitors were largely shifting the focus of their revenue production to digital products, warning that the textbook industry was in a decline, and significantly reducing their 2016 estimates, Pearson projected a relatively stable fourth quarter 2016 financial performance and even reaffirmed its unrealistic guidance.

70.     Despite assurances that Pearson was on board with the transition to digital, Pearson was slow to react, well behind its competitors. Pearson has not transitioned into digital through acquisitions or strategic partnerships.   Houghton Mifflin, on the other hand, invested approximately $575m in EdTech[8] software and John Wiley & Sons spent approximately $329m in acquisitions.[9]  Pearson stated in its 2013 20-F that it "expect[ed] additional product investment of approximately £50m in 2014 in digital, services and emerging markets to accelerate growth."[10] This figure is very low for a company that generates over £4BN a year in revenue.  And, in fact, rather than invest in new business to make the transition to digital, Pearson began selling business unites such as its 47% stake in Penguin Random House in 2017 and the Financial Times and The Economist Group in 2015.

---

[8]   Houghton Mifflin Harcourt. (2015). Form 10-K 2015. Retrieved from SEC EDGAR website http://www.sec.gov/edgar.shtml Page 32.
[9] John Wiley & Sons (2014). Form 10-K 2014. Retrieved from SEC EDGAR website http://www.sec.gov/edgar.shtml
[10]  Pearson, plc. (2013). Annual Report 2013. Retrieved from www.pearson.com/corporate/investors/investor-information/reports-and-presentations.html. Page 21

71.     Thus, despite its failure to take the actions needed to successfully transition to digital content, Pearson maintained overly optimistic projections based upon unsupported assumptions. Specifically, while competitors adjusted for a shrinking textbook market, Pearson maintained that textbook returns sales would remain flat and actually improve in 2016. This caused Pearson to significantly understate returns and overstate Goodwill throughout the Class Period.

**D. IN A PANIC TO CATCH UP TO COMPETITORS AND AVOID LOSING FURTHER MARKET SHARE, PEARSON RUSHES TO MARKET WITH ITS FUNDAMENTALLY DEFECTIVE DIGITAL PRODUCT OFFERINGS**

72.     Realizing it was significantly lagging behind competitors in the transition to digital products, Pearson rushed to market with new digital products while increasing the push of its flagship MyLab digital product, none of which were ready for prime time are they were plagued with numerous defects and kinks that needed to be addressed, rendering the products limited in use (or unusable) and hardly ready for the widespread adoption.

73.     Pearson's MyLab software is supposedly leading the way for the Company's digital transition – digital products that comprised 68% of total sales in 2016 and 65% in 2015 -- with over 11 million student subscriber users annually across the Kindergarten through 12 and college segments in North America.  Each MyLab is customized for a teacher's particular course and offers an adaptive learning environment that is said to outpace any traditional textbook from an efficacy standpoint.

74.     Yet, despite the Company's newfound reliance on its digital offerings as a lifesaver for its otherwise floundering textbook business, Pearson failed to address both product defects and customer service issues that regularly rendered these product inoperable.  Accordingly, customers

were returning defective product and/or refusing to purchase additional MyLab courseware as a result of its numerous problems.

### 1. Technical Issues Within Pearson's Digital Offerings

75.     Technical issues across Pearson's entire suite of digital products fell across the spectrum from inconveniences to rendering the entire system inoperable.

76.     For example, from a user standpoint, the MyLabs program regularly marked otherwise correct answers as incorrect.[11]



❌   Sorry, that's not correct.

Sorry, your answer is not correct.

Correct answer:  $\dfrac{4-x-y}{1}$

Your answer:    $4-x-y$

77.     On the other end of the spectrum, as corroborated by Confidential Witness ("CW") 1, former strategic account manager in higher education for Pearson North America between August 2013 and February 2016 responsible for sales to for-profit college customers in the United States, throughout her employment MyLabs would often crash or refuse to allow users to log in, despite their supplying the correct credentials.  As described by CW 1, the nature of MyLabs as a baseline technology for multiple products across multiple disciplines was a disaster for the Company, as "[t]he technology did not work.  It was just one thing after another."

78.     The result was a sales team forced to peddle digital products with known issues; a problem compounded as colleges and universities across the country flagged Pearson digital

---

[11] https://www.reddit.com/r/EngineeringStudents/comments/63qnrj/i_3_mymathlab/

products as inferior.  According to CW 1, "You still talk to colleges and they do not want to [deal] with the Pearson MyLabs technology."

79.     In her role as account manager, CW 1's division was directly responsible for managing the relationship with for-profit colleges, including the University of Phoenix and those schools under the Educational Management Corporation ("EDMC") umbrella: Argosy University, the Art Institutes, Brown Mackie College and South University.  During the early years of her employment with the Company, CW 1's division brought in nearly $16 million per year in revenue from its for-profit clients, despite the division's relatively small size.  Yet by the time of her departure in 2016, CW 1 saw her accounts drop a full 25% to $12 million.

80.     The reason, according to CW 1, was the technological failures of the Company's digital suite of offerings.  CW 1 describes Pearson customers as irate over MyLabs' unreliability, even leading to Pearson giving a $300,000 refund to EDMC during the first half of 2015 in an effort to atone for the defective product.

81.     According to CW 1, Defendant Fallon would sometimes participate in sales calls where the digital product issues were discussed.  On one of the 2015 summer sales calls, CW 1 recalls several sales team members expressing their frustration with the digital product, stating that the quality issues were directly effecting the sales staff's ability to effectively sell (and thus move the Company towards its goal of transitioning from analog to digital).  As stated by CW 1, "you had to live under a rock to not know" about the technical problems with the digital products.

82.     CW 2, a former Pearson North America Vice President of Customer Service from January 2013 to March 2016, corroborated these technical issues, as well as the Company's woefully insufficient response, stating that the Company's digital products "were just embedded with issues" in a manner he had never seen before in his career in customer service leadership.

21

**2. Pearson Executives Do Nothing to Address the Root of their Digital Problems**

83.     As described by CW 2, throughout his employment Pearson's customer service function throughout the Class Period left much to be desired, as it was overmatched by the deluge of complaints it received semester-in and semester-out from student users of Pearson's digital products, mainly MyLabs.

84.     Upon joining the Company, CW 2 was tasked with revamping Pearson's customer service function to accurately capture data related to customer complaints and craft the appropriate responses.  From the start, CW 2 noticed that "[a]t Pearson, big things were not working."

85.     Because Pearson's education business was directly tied to the beginning of each semester, when students would return to classes that incorporated Pearson's digital products, the majority of customer service issues occurred during the end of August and into September and against during January, as students first accessed the course-mandated Pearson digital product.

86.     After creating an analytics team to determine what caused these spikes in customer complaints, CW 2 came to a startling discovery: 70% of customer call volume was related to access code and registration issues – meaning students were not even able to get online to access the product before experiencing their first issue.  What resulted, according to CW 2, was a "hostage situation" of sorts; one where a student who has been forced to purchase the product then has to wait an hour on hold just to get in touch with someone who can address their problem.  CW 2 cited concerns where "usually these students have assignments that are due and are trying to use products such as MyMathLabs.  That is the biggest product with the largest volume."

87.     CW 2 reported on this troubling revelation to Pearson's senior management only to be met with apathy: "Everyone seemed to be aware of it, but no one really wanted to invest and do anything about it."

22

88.     CW 2 describes a senior management team whose overall interest in addressing these technical issues ebbed and flowed with the calendar, only picking up during the back-to-school periods where they showed a renewed focus on students at the Company's largest customers.  Even Tim Bozik, then the President of Higher Education at Pearson showed little interest in addressing the systemic issues related to the Company's customer service problems as he ceased attending these meetings and instead assigned surrogates to appear in his stead.  Yet this was still more than CW 2 could say for Defendant Fallon, who never participated in the customer service updates – a first for a public company CEO in CW 2's professional experience.

89.     However, this is not to say that Defendant Fallon was unaware of these issues. Instead, it was then-President of North America Don Kilburn and Global Chief Operating Officer Ziggy Liaquat who attempted to work with CW 2 to address the customer service disconnect in 2014 – after several unsuccessful attempts by CW 2 to lobby for help.  Ultimately, Kilburn was able to secure $5 million in additional funding for CW 2's revamp, an amount substantial enough to require the sign-off of both Defendant Fallon and the Company's CFO Coram Williams.  As corroborated by CW 3, the former Norther American Chief of Staff for Ziggy Liaquat from January 2014 through October 2016, customer service reports were presented to Mr. Liaquat, who in turn reported to Mr. Kilburn, who then reported directly to Defendant Fallon.

90.     Yet these additional funds would not cover the deep-seeded issues in the digital products and the Company's approach to customer service, only serving as a temporary bandage that would soon be undone by Pearson senior management.  By forcing CW 2 to address each back to school period as an independent event, Pearson management protected the Company's product, allowing them to sweep the widespread issues under the rug and maintain a façade of quality.

91.     Instead, CW 2 believed that Company management encouraged a gulf between the sales and service teams by failing to track any amount of lost revenues as a product of customer dissatisfaction with the product.  When asked about the amount Pearson lost as a result of its flawed approach to customer service and product quality control, CW 2 stated that this witness tried many times over, through different approaches and avenues, to arrive at this information, with no luck. According to CW 2, even Arthur D. Little, the outside consulting firm hired with the Fallon-approved $5 million and brought in to assist with the customer service issues plaguing the digital products, was shocked that they were required to undertake a "scavenger hunt" for what should otherwise have been standard reporting information.   CW 3 corroborated Pearson's senior management's penchant for secrecy with respect to issues in its digital products or their customers being unhappy throughout her employment, stating that "it was even difficult for Liaquat to get answer."

92.     The true issue, according to CW 2, was that senior management was content with customer service being reactive to widespread issues instead of proactive in fixing the digital products, each of which were known to suffer from similar problems.

93.     The reason for the management's want of action, according to CW 2, was because they viewed their institutional partners as sticky: "[t]he challenge in education is that once you pick a product it is hard to break up and go get something else because there is a major investment of time and money to do that.  Pearson management knows that, therefore they decide to see what happens with the problematic product."

94.     The product of such a disconnect left a customer base that was actively dissatisfied with the technology products, yet one who the Company treated as captive based on their software being made mandatory by educators.   However, as illustrated by CW 1, [above] even that

24

relationship was not one that the Company could fully depend on as Pearson's technology issues became more prevalent and large customers demanded refunds for defective digital products as sales decreased.

95.     Defendants, still, have not publicly disclosed any of the above product defect and customer service issues plaguing the Company and causing Pearson to routinely miss its projections.

> ### E. PEARSON'S REACTIVE RATHER THAN PROACTIVE APPROACH TO STRUCTURAL CHANGES IN THE TEXTBOOK MARKET AND IN RESPONSE TO THE TECHNICAL AND CUSTOMER SERVICE ISSUES IMPACTING ITS DIGITAL PRODUCTS RESULTS AN UNPRECEDENTED IMPAIRMENT TO GOODWILL

96.     By 2015, Pearson's overexposure to the higher education print market and failure to transition to digital products began to catch up with it, as each area began to show cracks in the Company's North American Higher Education business under which each fell.

97.     The first sign was returns in the Company's digital courseware products – products that Pearson management had touted as the backbone for future growth.  As described by CW 1 and set forth *supra*, the Company's digital products were beset by technical issues that often rendered them inoperable.  The result was a Company dependent on adoption by institutes of higher learning that viewed Pearson digital products as inferior to those of its competitors who had transitioned earlier and had already experienced their growing pains.

98.     These issues were exacerbated by the Company's insufficient customer service function that failed to address the root cause of problems with the digital courseware products and instead sought the quick fix, even if it was not recommended as viable in the long term.

99.     This myopic approach to digital courseware adopted by Pearson management reflected a deeper misunderstanding of the structural shift in the entire North American Higher Education courseware market, where schools, bookstores, and students alike were seeking lower cost alternatives while demanding high quality products.

100.     Never was this more evident than with college textbooks, where Pearson's bookstore partners recognized a shifting need and adjusted accordingly, leave Pearson management clamoring as they again found their Company and products behind the times.

101.     Importantly, the Company never disclosed its actual return numbers during the Class Period, instead using vague descriptors on conference calls with analysts while providing bar charts missing any vertical axis that would allow for quantification.

102.     Defendants first acknowledged the uptick in physical returns for the year in July 2015 when, on a conference call with analysts, Company management identified higher physical returns to that point as phasing profitability in the North American Higher Education Segment. Defendant Freestone attempted to downplay the issue, claiming the higher returns to be "a market trend" that increased because the Follett chain of bookstores "returned quite a bit of books in the first half."

103.     When pressed as to whether there existed a structural change causing this shift, Defendant Freestone shed any Company responsibility and instead pinned the increasing numbers on bookstores for over-purchasing and instructing the analyst questioning his points that "your visibility in asking [the bookstores] is just as good as my visibility."

104.     Recognizing an issue in Defendant Freestone's admission of lack of visibility into the physical returns space, Defendant Fallon interjected to assure investors that "the returns in the

first half of this year are not out of kilter with any sort of trend or pattern if you went back to '11, '12, '13, essentially."

105.    Yet as the Company would admit in October 2015, this was simply not true as the industry was trending towards higher book returns across the board.  J.P. Morgan acknowledged as much in its October 22, 2015 research note on the Company wherein it downgraded the Company to neutral on the basis of its low visibility on returns.

106.    By January 2016, other analysts were echoing this sentiment, as, during the January 21, 2016 analyst call, an analyst from Nomura questioned why the investing public should now believe Pearson management capable of predicting enrollments and returns when they had consistently failed to accurately do so in the past.  Defendant Fallon responded defensively, asserting that the Pearson management was "provid[ing] [its] shareholders with as much clarity and transparency as [they] possibly can."

107.    This claim, too, would ring hollow as on the same call, Defendant Fallon again attempted to attribute the increase in physical returns to the actions of just one partner rather than an industry-wide issue – a fact that would play out over the next several months.

108.    By October 2016, the "destocking" shift was dramatic – as bookstore partners not only returned exceptionally high levels of physical textbooks, but they also ordered less going forward.  According to Defendant Williams, "this has led to a twin effect in 2016, with higher returns in the first half of 2016, and lower gross sales in the second half."

109.    Yet, if Company management had been tracking Pearson's performance on a monthly basis and competitive performance on both a gross level and on a net basis against the industry as a whole, as claimed by Defendant Fallon in July 2015, then they should have been wholly aware of 2016 returns matching and exceeding levels from the purportedly anomalous

2015, as the Company would admit in October 2016 that cumulative returns for every month of that year to that point had actually *exceeded* the previously "unprecedented" 2015:



110.    The October cumulative returns chart, although lacking in any quantification of the return numbers, did present a visual representation of the Company's forecast for the fourth quarter of 2016, a quarter in which Defendant Williams stated the Company will see the benefit of lower returns after surveying customers:

> In terms of visibility of returns, we -- this is something where we've been working with our retailers. We do have regular and detailed conversations about the level of stock that they hold. The reason October is very important in this -- for this point is because it is the second biggest returns month that we have. And as I said in my presentation, returns are significantly down in October compared to this time last year.

111.    Yet despite management statements to the contrary, the fourth quarter of 2016 would not be better to the Company, as actual return numbers either matched or exceeded 2015 numbers for every month of the quarter:



112.    Additionally, as would be disclosed in January 2017, as of June 2016, Company management was assuming no negative revenue effect from the inventory correction despite every month to that point exceeding the same figure for 2015:



113.    The result, as would be announced on January 18, 2017, was an ***18% decline in North American Higher Education net revenues for the year***.  Tellingly, two-third of this revenue decline was attributable to the inventory correction – a correction that Defendants regularly misrepresented throughout the Class Period.

114.    Pearson's failure to address structural changes within its largest market would ultimately cost the Company £2.548 billion in a goodwill impairment as they sought to correct for years of segment management.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS[12]

115.    Throughout the Class Period, Defendants made a series of positive statements about the commercial viability of the Company's education technology offerings as well as the higher education textbook industry, among other things.  However, these statements did not paint a complete and accurate picture of the then-existing market conditions effecting Pearson's primary revenue-generating sector (higher education textbooks) nor the quality and adoption rates of the very digital technology Defendants were touting as the replacement for declining textbook sales.  In reality, Defendants knew that college enrollments would continue to worsen, negatively impacting the Company's textbook business with no viable alternative to offset the lost revenue, in turn damaging the Company's finances and Plaintiffs' and the Class' securities holdings.

116.    When Defendants elected to divulge their understanding of the college textbook market and proffer positive information about the quality of the Company's technology offerings, they were under a duty to disclose the additional negative information about each as well in order to make the positive information not misleading.  The omitted information identified herein would

---

[12] Plaintiffs contend each of Defendants' statements quoted in this section are materially false and misleading because they either affirmatively misrepresented facts or omitted facts that were required to be disclosed.  Any bolded or italicized statements in this section are included solely to provide emphasis, not to limit Defendants' false statements.

have altered the total mix of information for reasonable investors. Defendants failed to reveal such information, and instead omitted and concealed it from investors.

117.    Further, many of Defendants' statements about the market conditions facing the Company and the quality of its technology products were explicitly and materially false and misleading in themselves.  Defendants' false and misleading statements and omissions are detailed in this section.

### A. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE JANUARY 21, 2015 TRADING UPDATE

118.    On January 21, 2015, the Company issued a press release providing its January trading update for 2014 and 2015 guidance.

119.    Therein, Defendants stated Pearson's "preliminary guidance for 2015 adjusted earnings per share is 75p to 80p."

120.    The above statements were materially false and misleading when made because Defendants' projections were unrealistic and without basis in light of: (i) known defects related to Pearson's digital products, particularly MyLabs, which was riddled with technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (ii) the fact that lower textbook demand and digital product defects caused returns to increase; and (iii) as a result of declining student enrollments and defective digital product, the Company would experience materially less sales orders than projected.

### B. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE 2014 FULL YEAR RESULTS

121.    On February 27, 2015, Pearson issued a press release, also filed with the SEC on Form 6-K, announcing financial results for 2014 (the "FY2014 Form 6-K").[13]

122.    Also on February 27, 2015, the Company hosted an investor call with analysts to discuss the results set forth in the FY2014 Form 6-K (the "FY2014 Analyst Call").

123.    Throughout the FY2014 Form 6-K and related conference call, the Company made several categories of materially false and misleading statements concerning: (i) technical issues plaguing the Company's digital products and related returns, negatively impacting the Company's transition to digital products; (ii) increased returns of textbooks and digital products negatively impacting the Company's revenues and Pearson's goodwill; and (iii) the Company's compliance with applicable accounting standards.

### 1.    Materially False and Misleading Statements Concerning the Transition to and Market for Digital Courseware

124.    In the FY2014 Form 6-K, the Company misrepresented the  Company's transition to digital courseware and those products' ability to offset declining print revenues, including statements that:

(a)    the Company's slight sales increase reflected "good growth in digital and services," while a rise in deferred revenue evidenced "further good progress in [Pearson's] digital and services businesses";

(b)    2015 profits would reflect "stabilisation of cyclical and policy-related factors" in the Company's largest markets, which includes the North American Higher Education market;

---

[13] https://www.sec.gov/Archives/edgar/data/938323/000119163815000238/pson201502276k.htm.

(c)     That Pearson was capable of meeting the demand for "greater access, achievement and affordability in education" "by accelerating [Pearson's] shift to digital [and] services"; and

(d)     "Based on 21 January 2015 exchange rates, [Pearson] expects to report adjusted earnings per share of between 75p and 80p in 2015" driven by North American "growth in online higher education services and VUE and, with more stable college enrolments and a slower new edition year, learning services to be broadly level."

125.    Company representatives sang a similar tune on the FY2014 Analyst Call with respect to their outlook for 2015.

126.    On this call, Defendant Fallon assured investors of a positive 2015:

[T]hose cyclical and policy related forces were as bad as we expected they would be last year but they shouldn't get any worse this year and they should then start to improve and you can see updated trends in the appendix to your pack. Over the past two years, we have made Pearson into a single operating company, we've accelerated the shift from print to digital and services and slower the faster growing markets and to a more focused product strategy based on learning outcomes.

127.    Defendant Freestone echoed the sentiment, stating that the Company "expect[ed] growth in online higher education services and with more stable college enrolments and a slower new edition year, learning services to be broadly level."

128.    The above statements were materially false and misleading when made because: (i) Defendants knew that Pearson's digital products, particularly MyLabs, was riddled with undisclosed technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (ii) Pearson's customer call centers were under-staffed and ill-equipped to handle the volume and nature of calls relating to MyLabs' defects; (iii) the change in student purchasing behavior and lower enrollment had already resulted in lower than forecasted sales and higher product returns; (iii) Pearson's growth in digital courseware was not as strong as

the Company represented; and, thus, (iv) Defendants' projections for Pearson were unreasonable and lacked sufficient basis.

1. **Materially False and Misleading Statements Concerning Goodwill, Goodwill Impairment**

129.    In the FY2014 Form 6-K, the Company failed to make any mention of the ongoing "inventory correction" that would eventually lead to Pearson taking two large impairment charges.

130.    Additionally, the FY2014 Form 6-K is silent on the technical and customer service issues affecting adoption of Pearson's digital products, as the Company scrambled to play catch up with its competitors who had already established themselves in the digital space.

131.    The product of Defendants' failure to address these two key drags on Pearson's North American Higher Education revenue was the overstated goodwill asset value found in the FY2014 Form 6-K.

132.    Specifically, the FY2014 Form 6-K states that during the period, Pearson maintained goodwill of £5.03 billion GBP:

| 11.   **Non-current intangible assets** | | |
|---|---|---|
| *all figures in £ millions* | **2014** | 2013 |
| Goodwill | **5,030** | 4,666 |
| Other intangibles | **1,280** | 1,135 |
| **Non-current intangible assets** | **6,310** | 5,801 |

133.    These statements were materially false and misleading at the time they were made because: (i) the Company's weakening financial position in the North American higher education market, driven by declining textbook sales and a customer backlash against Pearson's defective digital products, had been eroding for several years to this point, necessitating a review of the

34

Company's goodwill and a corresponding write down – something that did not occur until despite the presence of a triggering event requiring review; (ii) Defendants knew that the downward trend in United States Higher Education would trigger a goodwill impairment under IFRS, yet never took the necessary steps to effect such an impairment throughout the Class Period; (iii) as a result of Pearson's failure to timely record impairment charges for Goodwill, the Company's assets were overstated, Goodwill impairment charge was understated and earnings were overstated; (iv) Pearson violated IFRS and its own internal policy; and, as a result, (v) Pearson's business and prospects were worse than represented.

### 2. Materially False and Misleading Statements Concerning the Company's Compliance with Applicable Accounting Standards

134. In addition, the FY2014 Form 6-K contained a statement identifying the basis of preparation for the document. Therein, the Company expressed its compliance with IFRS reporting standards:

### 1. Basis of preparation

The condensed consolidated financial statements have been prepared in accordance with the Disclosure and Transparency Rules of the Financial Conduct Authority and in accordance with International Financial Reporting Standards (IFRS) and IFRS Interpretations Committee interpretations as adopted by the European Union (EU). In respect of accounting standards applicable to the Group, there is no difference between EU-adopted IFRS and International Accounting Standards Board (IASB)-adopted IFRS.

The condensed consolidated financial statements have also been prepared in accordance with the accounting policies set out in the 2013 Annual Report and have been prepared under the historical cost convention as modified by the revaluation of certain financial assets and liabilities (including derivative financial instruments) at fair value. The 2013 Annual Report refers to new standards that the Group has adopted from 1 January 2014. These do not have a material impact on the consolidated financial statements.

135.    The above statements were materially false and misleading at the time they were made because the Company was not in compliance with IFRS reporting standards, thus allowing the Company to inaccurately state its goodwill for the period and misrepresent the Company's financial condition.

### C. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE 2014 ANNUAL REPORT

136.    On March 26, 2015, the Company filed its annual report for 2014 on Form 20-F with the SEC (the "2014 Annual Report").[14]

137.    In the 2014 20-F, Pearson made several categories of materially false and misleading statements concerning: (i) technical issues plaguing the Company's digital products and related returns, negatively impacting the Company's transition to digital products; (ii) increased returns of textbooks and digital products negatively impacting the Company's revenues and Pearson's goodwill; (iii) the Company's compliance with IFRS; and (iv) the Company's internal controls.

1.    Materially False and Misleading Statements Regarding the Company's Transition to Digital Products and the Market Therefor

138.    The 2014 20-F misrepresented the profit potential of the Company's digital offerings by omitting and reference to the technical and customer service issues negatively impacting the products at the time, while also misstating those products' ability to offset declining print revenues, including statements that:

(a)     "[I]n 2014 [Pearson] completed the major restructuring and product investment programme, initiated in 2013, designed to accelerate Pearson's shift towards significant

---

[14] Available at https://www.sec.gov/Archives/edgar/data/938323/000119312513121941/d498137d20f.htm

growth opportunities in digital, services and fast-growing economies" that will "provide Pearson with a significantly larger market opportunity, a sharper focus on the fastest-growing markets and stronger financial returns"; and

(b)     The Company "expect[ed] that cyclical and policy related factors stabilise in 2015," with North America experiencing "growth in online higher education services and VUE (our professional assessments business) and, with more stable college enrollments and a slower new edition year, learning services to be broadly level."

139.    The above statements were materially false and misleading when made because: (i) the Company failed to make adequate investments into its digital products during the Period to address the technical and customer service issues that would prevent it from seizing any market opportunity and negatively impact the Company's reported North American Higher Education revenues; (ii) Defendants knew that Pearson's digital products, particularly MyLabs, was riddled with technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (iii) Pearson's customer call centers were under-staffed and ill-equipped to handle the volume and nature of calls relating to MyLabs' defects; and (iv) Pearson's purported growth in digital courseware was not as strong as the Company represented.

## 2. Materially False and Misleading Statements Concerning Goodwill, Goodwill Impairment

140.    In the 2014 20-F, the Company failed to make any mention of the ongoing "inventory correction" that would eventually lead to Pearson taking two large impairment charges.

141.    Additionally, the 2014 20-F is silent on the technical and customer service issues affecting adoption of Pearson's digital products, as the Company scrambled to play catch up with its competitors who had already established themselves in the digital space.

37

142. The product of Defendants' failure to address these two key drags on Pearson's North American Higher Education revenue was the overstated goodwill asset value found in the 2014 20-F in the amount of £5.03 billion.

143. The 2014 20-F included several other materially false and misleading statements concerning Pearson's goodwill, including:

*Failure to generate anticipated revenue growth, synergies and/or cost savings from acquisitions, mergers and other business combinations, could lead to goodwill and intangible asset impairments.*

144. Further, the Company claimed to test goodwill annually for impairment:

**e. Intangible assets**

*1. Goodwill* For the acquisition of subsidiaries made on or after 1 January 2010, goodwill represents the excess of the consideration transferred, the amount of any non-controlling interest in the acquiree and the acquisition date fair value of any previous equity interest in the acquiree over the fair value of the identifiable net assets acquired. For the acquisition of subsidiaries made from the date of transition to IFRS to 31 December 2009 goodwill represents the excess of the cost of an acquisition over the fair value of the Group's share of the net identifiable assets acquired. Goodwill on acquisitions of subsidiaries is included in intangible assets. Goodwill on acquisition

**1. Accounting policies continued**

**e. Intangible assets continued**

of associates and joint ventures represents the excess of the cost of an acquisition over the fair value of the Group's share of the net identifiable assets acquired. Goodwill on acquisitions of associates and joint ventures is included in investments in associates and joint ventures.

Goodwill is tested annually for impairment and carried at cost less accumulated impairment losses. An impairment loss is recognised to the extent that the carrying value of goodwill exceeds the recoverable amount. The recoverable amount is the higher of fair value less costs to sell and value in use. These calculations require the use of estimates and significant management judgement. A description of the key assumptions and sensitivities is included in note 11. Goodwill is allocated to aggregated cash-generating units for the purpose of impairment testing. The allocation is made to those aggregated cash-generating units that are expected to benefit from the business combination in which the goodwill arose.

145.    The Company also claimed to have carried out appropriate impairment tests for cash-generating units containing goodwill, including the Company's US Education publishing business:

**Impairment tests for cash-generating units (CGUs) containing goodwill**

Impairment tests have been carried out where appropriate as described below.

Following a reorganisation of the business effective 1 January 2014 goodwill was allocated to CGUs, or aggregation of CGUs where goodwill could not be reasonably allocated to individual business units. Impairment reviews were conducted on these CGUs summarised below.

| All figures in £ millions | 2014 | 2013 |
|---|---|---|
| North America | **3,422** | 3,239 |
| Core | **618** | 624 |
| Growth (includes China, Brazil, India and South Africa) | **612** | 447 |
| Pearson VUE | **327** | 306 |
| Financial Times Group | **51** | 50 |
| **Total** | **5,030** | 4,666 |

The recoverable amount of each CGU is based on value in use calculations. Goodwill is tested for impairment annually. Other than goodwill there are no intangible assets with indefinite lives. The goodwill is generally denominated in the currency of the relevant cash flows and therefore the impairment review is not materially sensitive to exchange rate fluctuations.

Following deterioration in the market conditions for the Group's online tutoring business based in India, it was determined in the course of the impairment review that the value in use of the India CGU no longer supported the carrying value of the goodwill in that CGU. An impairment of £67m was booked, thereby bringing the carrying value of goodwill in the India CGU down to £nil. An impairment of £10m was also booked in respect of other

146.    These statements were materially false and misleading at the time they were made because: (i) the Company's weakening financial position in the North American higher education market, driven by declining textbook sales and a customer backlash against Pearson's defective digital products, had been eroding for several years to this point, necessitating a review of the Company's goodwill and a corresponding write down – something that did not occur until despite the presence of a triggering event requiring review; (ii) Defendants knew that the downward trend in United States Higher Education would trigger a goodwill impairment under IFRS, yet never

took the necessary steps to effect such an impairment throughout the Class Period; (iii) as a result of Pearson's failure to timely record impairment charges for Goodwill, the Company's assets were overstated, Goodwill impairment charge was understated and earnings were overstated; (iv) Pearson violated IFRS and its own internal policy; and, as a result, (v) Pearson's business and prospects were worse than represented.

3.   Materially False and Misleading Statements Regarding the Company's Compliance with IFRS

147.   In addition, the 2014 Form 20-F contained a statement identifying the basis of preparation for the document.   Therein, the Company expressed its compliance with IFRS reporting standards:

(a)   "We have prepared the financial information contained in this Annual Report in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") which in respect of the accounting standards applicable to the Group do not differ from IFRS as adopted by the European Union ("EU"). Unless we indicate otherwise, any reference in this Annual Report to our consolidated financial statements is to the consolidated financial statements and the related notes, included elsewhere in this Annual Report";

(b)   "The following discussion and analysis is based on and should be read in conjunction with the consolidated financial statements, including the related notes, appearing elsewhere in this Annual Report. The financial statements have been prepared in accordance with IFRS as issued by the IASB";

(c)   "These consolidated financial statements have been prepared on the going concern basis and in accordance with International Financial Reporting Standards (IFRS) and

40

IFRS Interpretations Committee interpretations as adopted by the European Union (EU) and with those parts of the Companies Act 2006 applicable to companies reporting under IFRS. In respect of the accounting standards applicable to the Group there is no difference between EU-adopted and IASB-adopted IFRS"; and

(d)     "The preparation of financial statements in conformity with IFRS requires the use of certain critical accounting assumptions. It also requires management to exercise its judgement in the process of applying the Group's accounting policies. The areas requiring a higher degree of judgement or complexity, or areas where assumptions and estimates are significant to the consolidated financial statements, are discussed in the relevant accounting policies under the following headings:

> Intangible assets: Goodwill
> Intangible assets: Pre-publication assets
> Royalty advances
> Taxation
> Employee benefits: Pension obligations
> Revenue recognition."

148.     The above statements were materially false and misleading at the time they were made because the Company was not in compliance with IFRS reporting standards, thus allowing the Company to: (i) inaccurately state its goodwill for the period; and (ii) overstate assets and understate expenses in its financial statements.

**1.     Materially False and Misleading Statements Concerning the Company's Internal Controls Related to Financial Reporting**

149.     In addition, the 2014 Form 20-F false assured investors that Pearson had designed the Company's internal controls over financial reporting that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles":

41

**Disclosure controls and procedures**

An evaluation of the effectiveness our disclosure controls and procedures as of December 31, 2014 was carried out by management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures (as defined in Rules 13a- 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) were effective as at December 31, 2014 at a reasonable assurance level. A controls system, no matter how well designed and operated, cannot provide absolute assurance to achieve its objectives.

**Management's annual report on internal control over financial reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, or persons performing similar functions, and effected by the Company' board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Management has assessed the effectiveness of internal control over financial reporting as of December 31, 2014 based on the framework in *Internal Control — Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this evaluation, management has concluded that the Company's internal control over financial reporting was effective as a December 31, 2014 based on criteria in *Internal Control — Integrated Framework* (2013) issued by the COSO.

150.    The 2014 20-F also contained the certification of Defendant Fallon, attesting to the

veracity of the annual report:

**CERTIFICATIONS**

I, John Fallon, certify that:

1.              I have reviewed this annual report on Form 20-F of Pearson plc;

2.              Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Pearson plc as of, and for, the periods presented in this annual report;

4.      Pearson plc's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Pearson plc and have:

a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Pearson plc, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      evaluated the effectiveness of Pearson plc's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      disclosed in this annual report any change in Pearson plc's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, Pearson plc's internal control over financial reporting; and

43

5.          Pearson plc's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Pearson plc's auditors and the audit committee of Pearson plc's board of directors (or persons performing the equivalent function):

    a)          all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Pearson plc's ability to record, process, summarize and report financial information; and

    b)          any fraud, whether or not material, that involves management or other employees who have a significant role in Pearson plc's internal control over financial reporting.

Date: March 26, 2015

/s/ John Fallon
_____

John Fallon
*Chief Executive Officer*

151.    Defendant Freestone submitted a substantively identical certification as that signed by Defendant Fallon.

152.    Additionally, in the 2014 Form 20-F, Defendant Fallon and Defendant Freestone submitted  separate, but substantively identical signed certifications pursuant to section 906 of the Sarbanes-Oxley Act of 2002, stating:

**CERTIFICATION PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 20-F of Pearson plc (the "Company") for the fiscal year ending December 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John Fallon, Chief Executive Officer of the Company, certify to my knowledge, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), that:

1.        The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.        The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 26, 2015

/s/ John Fallon

John Fallon
*Chief Executive Officer*

\* \* \*

**CERTIFICATION PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 20-F of Pearson plc (the "Company") for the fiscal year ending December 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robin Freestone, Chief Financial Officer of the Company, certify to my knowledge, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), that:

1.        The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.        The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 26, 2015

/s/ Robin Freestone

Robin Freestone
*Chief Financial Office*

153.    The above statements were materially false and misleading at the time they were made because Pearson's internal controls were deficient and, thus, allowed the Company to:  (i)

45

conceal known product defects and related product returns; (ii) conceal product returns for returned print product; (iii) fail to timely record goodwill impairment charges for inventory corrections related to product returns and lower demand; (iii) understated Goodwill impairment and overstate Goodwill and net income/(loss); (iv) violate its own internal policies; and (v) violate IFRSP. Accordingly, Pearson did not maintain a system of adequate controls, as represented.

### D. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE 2015 HALF-YEAR RESULTS

154.    On July 24, 2015, Pearson issued a press release, also filed with the SEC on Form 6-K, announcing financial results for the first half of 2015 (the "1H2015 Form 6-K").[15]

155.    Also on July 24, 2015, the Company hosted an investor call with analysts to discuss the results set forth in the 1H2015 Form 6-K (the "1H2015 Analyst Call").  On the call representing Pearson were defendant Fallon, then-Chief Financial Officer Defendant Robin Freestone, Chairman Glen Moreno, and Defendant Coram Williams, who would assume the office of CFO one week later.

156.    Throughout the 1H2015 Form 6-K and related conference call, the Company made several categories of materially false and misleading statements concerning: (i) technical issues plaguing the Company's digital products and related returns, negatively impacting the Company's transition to digital products; (ii) increased returns of textbooks and digital products negatively impacting the Company's revenues and Pearson's goodwill; and (iii) the Company's compliance with IFRS.

### 1. Materially False and Misleading Statements Regarding the Company's Transition to Digital Products and the Market Therefor

---

[15] Available at https://www.sec.gov/Archives/edgar/data/938323/000119163815000936/pson201507246k.htm.

157.    In the 1H2015 Form 6-K, the Company misrepresented the profit potential of the Company's digital offerings by omitting and reference to the technical and customer service issues negatively impacting the products at the time, while also misstating those products' ability to offset declining print revenues, including statements that:

(a)    An increase in sales reflected "growth in North American" and "strength in digital services";

(b)    During the period, the Company made "further good progress in [its] digital and services businesses";

(c)    The Company was "investing in courseware, assessment and qualifications, managed services, and schools and colleges";

(d)    "[C]yclical pressures will ease as curriculum change is implemented in the US and UK and US college enrolments stabilize and, in due course, return to growth"; and

(e)    "Overall, [the Company was] competing well, enabling [it] to reaffirm [its] full year guidance and increase the interim dividend."

158.    Defendants made similar statements on the 1H2015 Analyst Call with respect to Pearson's performance during the period, misrepresenting the status of the higher education print market, as well as a shrinking new adoption market for the Company's digital services on the basis of Pearson products' technical issues, while attempting to draw attention from what was known at that point – that the Company's business would again falter in 2015:

(a)    **Defendant Fallon**: "Spring U.S. college enrollments were softer than we would like, but the full figures are far more significant as that's when the big public universities enroll their students";

(b)     **Defendant Freestone:** "As John said cyclical and policy pressures are slightly worse overall than we expected at the start of the year, there are ups and downs within that U.S. state budgets and UK policy environment are on balance a bit better than we might have expected, whereas U.S. college enrollments and the U.S. policy environment looks a little bit worse. But our competitive performance in the first half has been very good, particularly in much of North America"; and

(c)     "We're seeing good growth in North America, in Brazil and in China, as well as strength in digital and services, Connections Education and Penguin online university services. This is partly offset by the smaller new adoption market in the U.S schools, later phasing of school textbook purchasing in the U.S. and UK and lower college enrollments in South Africa."

159.    The above statements were materially false and misleading when made because: (i) Defendants knew that Pearson's digital products, particularly MyLabs, was riddled with technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (ii) Pearson's customer call centers were under-staffed and ill-equipped to handle the volume and nature of calls relating to MyLabs' defects; (iii) Pearson's purported growth in digital courseware was not as strong as the Company represented; and (iv) as such, the Company knew its digital offerings were insufficient to offset the decline in the higher education print.

## 2. Materially False and Misleading Statements Concerning Goodwill, Goodwill Impairment

160.    The 1H2015 Form 6-K is silent on the technical and customer service issues affecting adoption of Pearson's digital products, as the Company scrambled to play catch up with its competitors who had already established themselves in the digital space.

161.    The 1H2015 Form 6-K  is equally lacking any information regarding the ongoing "inventory correction" – a subject that Company representatives sought to quickly glaze over on the 1H2015 Analyst Call before being prompted by call participants to discuss further:

> **Defendant Freestone**:  After additional free cash outflow was a little higher in the first-half compared to last year in part effects and impart of later sales phasing in U.S. and UK school learning services which I talked about earlier, but also reflecting adverse deferred revenue movements in U.S. testing which again is partly ***phasing higher physical returns in U.S. higher education market*** and U.S. dollar exchange rate movements.

162.    When questioned by an analyst from Liberum as to the cause of the higher physical returns, Defendant Freestone downplayed any structural change to the market and instead pointed to one Company partner as the responsible party for the increased trend:

> So on the higher physical returns and these do sort of trend up occasionally and down occasionally depending on what books stores are doing and their philosophy to working capital management. This is a market trend and actually our returns have been less than the market in the first half. But you have seen the market trend increase somewhat because Follett have returned quite a lot of books in the first half and to ask them what they have been up to frankly, so that is not just us. We can see the trend across the entire market and actually our returns have been very reasonable within the context by market. We have to make provision returns when we sale stuff, so that is all reflected in our P&L accounts.

163.    Freestone's non-answer was again met with questions from the analyst who specifically asked whether there had been a change in bookstore needs and whether this was the precursor to a larger structural shift in the physical textbook realm versus a temporary ebb, as represented by the Company.  This time, Defendant Fallon looked to history as supporting the uptick in physical returns, claiming that "[t]he returns in the first half of this year are not out of

kilter with any sort of trend or pattern if you went back to '11, '12, '13, essentially. So you got to see it through the context."

164.    Notably, the Company never sought to quantify the returns, nor parse out whether such returns were solely attributable to the physical textbook market or the digital courseware offerings – products that were lumped together by the Company under the umbrella of North American Higher Education Courseware.

165.    Instead, the 1H2015 Form 6-K misrepresented the Company's goodwill asset at that point in time so as to inflate Pearson's value.  Specifically, the 1H2015 Form 6-K states that during the period, Pearson maintained goodwill of greater than £4.8 billion GBP:

**11. Intangible assets**

| *all figures in £ millions* | **2015 half year** | 2014 half year | 2014 full year |
|---|---|---|---|
| Goodwill | **4,800** | 5,022 | 5,030 |
| Other intangibles | **1,136** | 1,058 | 1,280 |
| **Total intangibles** | **5,936** | 6,080 | 6,310 |

166.    Further, the 1H2015 Form 6-K provided a terse warning with respect to goodwill that materially failed to represent that one of the key factors identified (failure to generate anticipated revenue growth) was already triggering a goodwill impairment that the Company was failing to take:

> Failure to generate anticipated revenue growth, synergies and/or cost savings from acquisitions, mergers and other business combinations could lead to goodwill and intangible asset impairments.

167.    The above statements were materially false and misleading at the time they were made because: (i) the Company's weakening financial position in the North American higher education market, driven by declining textbook sales and a customer backlash against Pearson's defective digital products, had been eroding for several years to this point, necessitating a review

of the Company's goodwill and a corresponding write down – something that did not occur until despite the presence of a triggering event requiring review; (ii) returns were not in line with any historical trends and ,in fact, were in the midst of a year Defendants would later describe as "extraordinary;" (iii) Defendants knew that the downward trend in United States Higher Education would trigger a goodwill impairment under IFRS, yet never took the necessary steps to effect such an impairment throughout the Class Period; (iv) as a result of Pearson's failure to timely record impairment charges for Goodwill, the Company's assets were overstated, Goodwill impairment charge was understated and earnings were overstated; (v) Pearson violated IFRS and its own internal policy; and, as a result, (vi) Pearson's business and prospects were worse than represented.

3. **Materially False and Misleading Statements Concerning the Company's Compliance with IFRS**

168.    In addition, the FY2015 Form 6-K contained a statement identifying the basis of preparation for the document.   Therein, the Company expressed its compliance with IFRS reporting standards:

1. **Basis of preparation**

The condensed consolidated financial statements have been prepared in accordance with the Disclosure and Transparency Rules of the Financial Conduct Authority and in accordance with International Financial Reporting Standards (IFRS) and IFRS Interpretations Committee interpretations as adopted by the European Union (EU). In respect of accounting standards applicable to the Group, there is no difference between EU-adopted IFRS and International Accounting Standards Board (IASB)-adopted IFRS.

The condensed consolidated financial statements have also been prepared in accordance with the accounting policies set out in the 2014 Annual Report and have been prepared under the historical cost convention as modified by the revaluation of certain financial assets and liabilities (including derivative financial instruments) at fair value.

51

169.     The above statements were materially false and misleading at the time they were made because the Company was not in compliance with IFRS reporting standards, thus allowing Pearson to inaccurately state its goodwill for the period and misrepresent the Company's true financial condition.

## VI.     THE TRUTH IS REVEALED OVER THE COURSE OF SEVERAL PARTIAL DISCLOSURES

### A. OCTOBER 21, 2015 NINE-MONTH INTERIM MANAGEMENT STATEMENT

170.     On October 21, 2015, the Company issued its nine-month Interim Management Statement for the first three quarters of 2015, disclosing for the first time that Pearson's structural problems were resulting in significantly "higher returns affecting the US  higher education market:"

> Cyclical and policy related factors made some of our largest markets weaker than we expected with, in particular, lower Community College enrolments and *higher returns affecting the US higher education market*; and lower purchasing in certain provinces affecting the school textbook market in South Africa.

171.     Higher product returns was a main factor that caused Pearson to revise its 2015 guidance downward to the very bottom of the range set forth in February 2015 from 75p-80p to 70p to 75p.

172.     As a result increasing returns and resulting revised downward guidance, Pearson's ADR price dropped from $18.39 per ADR on October 20, 2015 to $13.69 on October 23, 2015 on extremely high trading volume.

173.     On October 22, 2015, JP Morgan issued a research note downgrading Pearson from OW to N[16] on the basis of "weaker industry trends and low visibility in trends" while specifically

---

[16] "OW" or "Overweight" indicates that a financial analyst views the security in question as a better value for the money than others.  "N" or "Neutral" indicates that a financial analyst views the security in question as similar to other securities in her portfolio and believes the compared securities will perform similar.

referencing concerns over a deteriorating North American higher education market and increased returns from US book retailers.

174.    Despite high product returns as a result of its saturated share of the textbook market, as well as defective digital product, Pearson falsely assured investors that the Company's "competitive performance *remained strong* in the first nine months of the year with share gains across our major markets *including US higher education courseware*, *US school courseware* and UK qualifications."   (Emphasis added). Further, even though Pearson was years behind its competitors in transitioning to digital courseware, defendant Fallon falsely claimed that Pearson was "performing well competitively and gaining share across many areas of our business."

175.    The above statements were materially false and misleading when made because: (i) Pearson's competitive position was not strong as a result of undisclosed known defects related to Pearson's digital products, particularly MyLabs, which was riddled with technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (ii) as a result of declining student enrollments and defective digital product, the Company would experience materially less sales orders than projected; and, thus (iii) Pearson's prospects were not as strong as Defendants represented.

**B. DEFENDANTS' CONTINUING FALSE AND MISLEADING STATEMENTS IN THE JANUARY 21, 2016 TRADING UPDATE AND INVESTOR CALL**

176.    On January 21, 2016, the Company issued its January Trading Update for the full year of 2015.  Also on January 21, 2016, the Company hosted a conference call with financial analysts (the "January 2016 Analyst Call").

177.    During the January Trading Update and January 2016 Analyst Call, the Company made materially false and misleading statements concerning: (i) the Company's transition to

digital products; and (ii) Pearson's increased returns of textbooks and digital products negatively impacting the Company's revenues and ability to achieve its guidance.

**1. Materially False and Misleading Statements Regarding the Company's Transition to Digital Products and the Market Therefor**

178.   In the January 21 Trading Update, Defendants continued to blame the Company's lackluster performance on "cyclical and policy related challenges" when, in fact, the Company's troubles were the result of returns from its defective MyLabs product and print courseware.

179.   Specifically, defendant Fallon was quoted as stating: "[o]ur competitive performance during the last three years has been strong but the cyclical and policy related challenges in our biggest markets have been more pronounced and persisted for longer than anticipated."

180.   Fallon echoed this sentiment during the January 2016 Analyst Call.  Specifically, after acknowledging that the challenges in the North American Higher Education space had a "more pronounced impact on [Pearson's] profitability than [management] expected," Defendant Fallon forecasted a near term stabilization:

> But these challenges are largely cyclical and over the next two years, they should finally abate. For example, as US employment stabilizes, college enrollments will start to grow again.

181.   Pearson also falsely assured investors that the worst was behind the Company:

> The key cyclical and policy factors that have hurt us – US college enrolments and UK Qualifications – stabilise by the end of 2017 and grow modestly thereafter helped by new product launches.

182.   Finally, Defendants also reaffirmed the Company's 2018 guidance, stating: "we expect adjusted operating profit to be at or above £800m in 2018."

183.    The above statements were materially false and misleading when made because Defendants' projections were unrealistic and without basis in light of: (i) known defects related to Pearson's digital products, particularly MyLabs, which was riddled with technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (ii) the fact that lower textbook demand and digital product defects caused returns to increase;  (iii) as a result of declining student enrollments and defective digital product, the Company would experience materially less sales orders than projected; and, thus (iv) Pearson's competitive performance was not "strong" and, in reality, the Company's prospects were much worse than represented.

**2.   Materially False and Misleading Statements Regarding the Impact of Increased Returns of Physical Textbooks and Digital Products on the Company's North American Higher Education Revenue and the Company's Ability to Meet its Guidance**

184.    In the 2016 January Trading Update and 2016 January Analyst Call, Defendants were silent as to the technical and customer service issues affecting adoption of Pearson's digital products, as the Company scrambled to play catch up with its competitors who had already established themselves in the digital space.

185.    Further, the Company's statements on this day misrepresented the status of the ongoing inventory correction and destocking efforts by Pearson's printed textbook industry partners, as management again tried to paint the issue as an anomaly caused by one customer rather than representing a greater industry-wide structural shift.  To this end, on the 2016 January Analyst Call, Defendant Fallon stated that:

> The encouragement we would take is that the trend in the fourth quarter was consistent with what we flagged in October that if you excluded that one customer,

returns for the rest of the industry were actually down year on year. So all that deals with the enrollments issue and segues naturally into Coram talking about market conditions and I'll come back and talk about the restructuring.

186.    Again, the Company provided no data to support its assertion that the increased return levels were not an ongoing problem and the result of a structural change, as would come to light at the end of the Class Period.

187.    These statements were materially false and misleading at the time they were made because, in actuality: (i) the Company's weakening financial position in the North American higher education market, driven by declining textbook sales and customer backlash against Pearson's defective digital products, had been eroding for several years to this point, necessitating a review of the Company's goodwill and a corresponding write down – an action the Company knew it would be taking in the coming weeks, yet failed to disclose; (ii) Defendants knew that the downward trend in United States Higher Education would trigger a goodwill impairment under IFRS, yet failed to disclose it at this time; (iii) the increased number of returns were related to an industry-wide destocking among college textbook customers, evidencing a structural shift in the area that would negatively impact the Company's financial performance, making it unlikely that Pearson would even be able to achieve the low end of its guidance.

## C.  Defendants' Continuing False and Misleading Statements in the Full Year 2015 Results

188.    On February 26, 2016, the Company released its Preliminary Full Year 2015 Financial Results reporting an overall decline in sales of 2%.  In the February Full Year 2015 Results, the Company reassured investors that the worst was over:  "With the full benefits of our restructuring programme, the launch of new products, and stability returning to US college

enrolments and the UK qualifications market by the end of 2017, we expect adjusted operating

profit to be at or above £800m in 2018."

189.    Defendant Fallon stated "[o]ur competitive performance during the last three years

has been strong, but the challenges in our biggest markets have persisted for longer than

anticipated."

190.    With respect to Pearson's North American operations, Defendants falsely assured

investors that Pearson would see growth from "new products" in the upcoming year, but failed to

disclose that its flagship MyLabs digital product, in fact, was experiencing significant product

defects:

> In North America, our largest market, we anticipate US college enrolments will be flat
> given forecast modest improvements in US employment; a smaller adoption market in K-
> 12 learning services and lower participation rate will be partially *offset by growth in Open
> Territories driven by new products*; reduced testing revenues in North America reflecting
> State and National Assessment contract losses worth approximately £100m announced in
> 2015; growth in clinical assessments and professional certification.

191.    With respect to Pearson's transition to digital products and its MyLab platform,

Pearson reported:

> Global digital registrations of MyLab and related products grew 3% to nearly 13
> million. In North America, digital registrations grew 3% to almost 11 million with
> good growth in Science, Business & Economics, Statistics, REVEL and skills
> applications like Pearson Writer, offset by softness in developmental Mathematics.
> Faculty generated case studies indicate that the use of MyLab programmes, as part
> of a broader course redesign, can support improvements in student test scores and
> lower institutional cost (http://pear.sn/IZxLE).

192.    Finally, Defendants reaffirmed its unsupported and unreasonable 2018 forecast that

operating profit would be "at or above £800m," claiming that: "[t]he key cyclical and policy factors

that have hurt us – US college enrolments and UK Qualifications – stabilise by the end of 2017

and grow modestly thereafter helped by new product launches."

193.    The above statements were materially false and misleading when made because: (i) Defendants knew that Pearson's digital products, particularly MyLabs, was riddled with undisclosed technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (ii) Pearson's customer call centers were under-staffed and ill-equipped to handle the volume and nature of calls relating to MyLabs' defects; (iii) the change in student purchasing behavior and lower enrollment had already resulted in lower than forecasted sales and higher product returns; (iii) Pearson's growth in digital courseware was not as strong as the Company represented; and, thus, (iv) Defendants' projections for Pearson were unreasonable and lacked sufficient basis.

### D. Defendants' Continuing Materially False and Misleading Statements in the February 26, 2016 Investor conference Call

194.    Also on February 26, 2016, the Company hosted a conference call with analysts to discuss the full yeah 2015 financial results and future outlook.  During the February 26 Call, Defendants continued to materially misrepresent the Company's (1) transition to digital products and guidance; and (2) severity of product returns.

#### 1.  Materially False Statements Regarding Pearson's Transition to the Digital Market

195.    Defendant Fallon reassured investors that worst was behind the Company and that things would stabilize going forward:

> The cyclical and policy-related challenges we face in our major markets are persisting for longer than we expected and they are having a bigger impact on profits than we foresaw. ***But they will start to stabilize by the end of this year*** and should then provide a modest tailwind. We're making good progress in ensuring Pearson can capitalize on the big structural growth opportunities we see in education, whilst mitigating the threats and managing our way through the transitional disruption they also bring.

196.    Defendant Williams echoed Fallon's statements and falsely assured investors that

the Company's struggles and disappointing results were not the result of any structural issues:

> The data here is pretty clear. Our U.S. college revenues have almost exactly matched total
> college enrolment declines. And that's despite our weighting towards community colleges
> and for-profits in 2010. The same is true in our UK qualifications business. So although in
> retrospect we did overestimate how quickly both markets would stabilize, *we don't think
> there are symptoms of structural pressure. Both effects have largely played out by now
> and we think that both markets will have stabilized by the end of 2017.*

(Emphasis added).

197.    With respect to the Company's belated transition from print to digital, defendant

Fallon discounted the impact of Pearson's delay in transition, blaming it on "largely cyclical"

factors, and falsely claimed that Pearson was, rather, "moving quickly and decisively" to "manage

the transition" to digital and was adequately "mitigate[ing] risk:"

> Well, as Coram said, the challenges that we faced over the last few years have been largely
> cyclical. But that's not to say that there aren't some big structural trends at work in
> education, because there are and we lay them out here. What it is to say is that we're moving
> quickly and decisively to seize the big growth opportunities that they offer, to minimize
> the risks they could pose to our analog businesses if we didn't act quickly *and to manage
> that transition from analog to digital in services effectively.*
>
> And in courseware, this is enabling us to mitigate the risk of that analog to digital transition.
> This is the third year that we've shared the data with you and it tells the same story as in
> previous years. As physical textbook sales decline and digital registrations increase, we're
> sustaining revenue per enrolment.

(Emphasis added).

## 2. Materially False Statements Regarding Print and Digital Product Returns

198.    While acknowledging the "exceptional returns" Pearson had received in 2015,

defendant Fallon claimed it was a one-off occurrence:

> So I think if you look at the whole which is what the AAP data gives you, you will see that,
> as I said, our gross revenues last year were down about 1.5% which is in line with
> enrolments. I showed you the revenue per enrolment data on a gross basis. If we had shown
> it on a net basis because of the *exceptional returns* [from] one retailer, it would depress

the 2015 number a little bit and push up the 2014 number, but the trend which is over the four-year period that revenue enrolment is growing, would be unchanged.

199.     When questioned by analyst Nick Dempsey of Barclays that Pearson's disclosure of gross revenue per enrollment, rather than net in order to account for returns may hide Pearson's structural issues, Williams backpedaled and agreed that investors need to look at gross enrollment "in conjunction" with returns:

> Q: Nick Dempsey, Barclays: So first, just to dig a bit more into this gross and net issue, am I right in thinking that your gross sales growth really is about what you predict for enrolments and, therefore, the fact that they track together it's not that surprising? But then you find out, when you get your returns, how the students have been behaving in terms of whether they've bought more second-hand books, more rental, whether they've not bought the books at all. ***Therefore, it doesn't make a lot of sense for me to track gross and going forward, if we're going to see any structural pressures there wouldn't they pop up in the net number and not the gross number***? So that's question number one.

> A: Williams: Let me start on the gross versus net, I think it's a bit more sophisticated than you've just described it. So gross is a good predictor of demand, it's a predictor of what we think the demand will be. But that's also done in conjunction with our retailers, who have a pretty good handle on the ground and our sales reps, who understand what adoptions are being made and, therefore, how many students are going to be at the courses. ***You have to look at both***, because gross is a sophisticated predictor of demand, net is, at the end of the day, the demand that's come through.

> And I think the point that we were trying to make on the ARPU is that whichever way you look at it, whether you're tracking it on gross as we have chosen to do here or you're tracking it on net, the fundamental point is still the same, that that ARPU is actually growing. ***I think that demonstrates clearly that the structural pressures are not evidenced either at a gross or a net level.***

(Emphasis added).

200.     When analyst Ian Whittaker questioned Pearson about the significant increase in returns, purportedly from one retailer, Fallon, without any basis, claimed that the retailer missed the mark and that Pearson's returns were actually declining when, in fact, Defendants knew it was actually a foreshadowing of what was coming down the pike in light of various market indicators:

Q: <u>Ian Whittaker</u>: You said that in terms of the booksellers are usually pretty good at estimating demand, but obviously in 2014/2015, they weren't because you had one bookseller that essentially seems to have overestimated demand and returns.
\*       \*       \*
A: <u>Fallon</u>: . . . They didn't adjust their pricing as much as they needed to, so although the students came in the store, they still worked out they could get it more cheaply online. That's, essentially, what happened. What gives us confidence that that is much more a specific customer issue rather than a generic industry trend is that, if you look at returns last year and strip out that one player, actually returns year on year for the rest of the industry were down. Well, for us they were down on the prior year. So that explains, I think, what was happening with that specific retailer.

201.    The above statements were materially false and misleading when made because: (i) Defendants knew that Pearson's digital products, particularly MyLabs, was riddled with undisclosed technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (ii) the change in student purchasing behavior and lower enrollment had already resulted in higher product returns that were not the result of a one-off from a single customer but, rather an industry-wide issue; and, thus, (iii) Pearson's prospects were far worse than represented.

**E. DEFENDANTS' CONTINUING MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE 20-F**

202.    On March 23, 2016, Pearson filed the 2015 20-F, with the SEC, which was signed by Defendant Williams and certified to by Defendants Fallon and Williams.

203.    The 2013 20-F contained several categories of materially false and misleading statements concerning Pearson's: (i) transition from print to digital courseware; (ii) goodwill and provision for goodwill impairment; (iii) product returns; and (iii) internal controls.

1.  Materially False and Misleading Statements Concerning the Transition to and Market for Digital Courseware

204.    In the 2015 20-F, Defendants touted the purported growth and efficacy of the Company's flagship digital MyLab product, yet failed to mention that, as a result of numerous undisclosed product defects, a material amount of the MyLab product was being returned and/or customers were declining to continue purchasing the product:

> Global digital registrations of MyLab and related products grew 3% to nearly 13 million. In North America, digital registrations grew 3% to almost 11 million with good growth in Science, Business & Economics, Statistics, REVEL and skills applications like Pearson Writer, offset by softness in developmental Mathematics. Faculty generated case studies indicate that the use of MyLab programs, as part of a broader course redesign, can support improvements in student test scores and lower institutional cost (http://pear.sn/IZxLE). We launched a suite of features that include Adaptive Practice in our MyLabs to personalize subjects including mathematics and nursing practice, Predictive Analytics Early Alerts in Mastering to help science instructors support at-risk students, gamification features in Business and rich learning analytics dashboards in numerous products that offer deep insight into students' progress, performance and engagement.

205.    Defendants also purported to warn in the 2015 20-F of the risks associated with transitioning from print to digital courseware, yet failed to disclose that certain of these risks had already materialized as Pearson was already facing difficulties migrating to digital courseware as a result of its belated entrance into the market:

> A common trend facing all our businesses is the digitization of content and proliferation of distribution channels, either over the internet, or via other electronic means, replacing traditional print formats. The digital migration brings the need for change in product and content distribution, consumers' perception of value and the publisher's position between consumers, retailers and authors.

> This is a highly competitive market that is subject to rapid change. We face competitive threats both from large media players and from smaller businesses, online and mobile portals and operators in the digital arena that provide alternative sources of content. New distribution channels, e.g. digital format, the internet, online retailers, growing delivery platforms (e.g., e-readers or tablets), pose both threats and opportunities to our traditional publishing business models, potentially impacting both sales volumes and pricing.

> Students are seeking cheaper sources of content, e.g. online discounters, file sharing, use of pirated copies, and rentals, along with open source. This change in

behavior puts downward pressure on textbook prices in our major markets, and this could adversely impact our results.

If we do not adapt rapidly to these changes we may lose business to 'faster' and more 'agile' competitors, who increasingly are non-traditional competitors, making their identification all the more difficult. We may be required to invest significant resources to further adapt to the changing competitive environment

206.    The above statements sere materially false and misleading when made because: (1) Pearson's MyLab digital courseware and platform was experiencing significant, undisclosed product defects resulting in significant product returns and reduced demand from customers; (2) Pearson's customer call centers were under-staffed and ill-equipped to handle the volume and nature of calls relating to MyLabs' defects; (3) the change in student purchasing behavior had already resulted in lower than forecasted sales; and, thus, (4) Pearson's growth in digital courseware was not as strong as the Company represented.

2.   Materially False and Misleading Statements Concerning Goodwill, Goodwill Impairment
      and Compliance with IFRS

207.    In the 2015 20-F, Defendants falsely represented that Pearson's financial statements were prepared in accordance with IFRS:

These consolidated financial statements have been prepared on the going concern basis and in accordance with International Financial Reporting Standards (IFRS) and IFRS Interpretations Committee interpretations as adopted by the European Union (EU) and with those parts of the Companies Act 2006 applicable to companies reporting under IFRS.

208.    For the year-ended December 31, 2015, Pearson reported in the 20-F Goodwill and Goodwill impairment of £4,134m and £849, respectively, as compared to £5,030 and £77, respectively, for the prior year-ended December 31, 2014.  Of the £4,134m for 2015, £3155 related to North American operations.

209.    According to the 20-F, Pearson's 20-F, Defendants claimed that Pearson's internal policy was to test Goodwill for potential impairment "at least" annually and that the Company purportedly records an impairment charge to Goodwill when the carrying value exceeds the amount that could be recovered:

> Goodwill is tested at least annually for impairment and carried at cost less accumulated impairment losses. An impairment loss is recognised to the extent that the carrying value of goodwill exceeds the recoverable amount. The recoverable amount is the higher of fair value less costs of disposal and value in use. These calculations require the use of estimates and significant management judgement. A description of the key assumptions and sensitivities is included in note 11. Goodwill is allocated to aggregated cash-generating units for the purpose of impairment testing. The allocation is made to those aggregated cash-generating units that are expected to benefit from the business combination in which the goodwill arose.
>
> *          *          *
>
> The recoverable amount of each aggregated cash generating unit (CGU) is based on fair value less costs of disposal or value in use calculations as appropriate.

210.    Regarding the 2014 and 2015 Goodwill impairment charges, £282m of the £849 impairment charge for 2015 related to North America and none of the impairment charges for 2014 related to North America. Defendants falsely represented that the 2015 North American impairment charge related to "ongoing cyclical and policy related pressures."

211.    The above statements were materially false and misleading when made because: (1) Pearson was experiencing significantly higher returns on obsolete print materials and defective digital courseware than represented; (2) under IFRS and the Company's own internal policy, Pearson was required to test Goodwill for impairment and record an impairment charge when a "triggering event" occurred, but failed to do so; (3) as a result of Pearson's failure to timely record impairment charges for Goodwill, the Company's assets were overstated, Goodwill impairment charge was understated and earnings were overstated; (4) Pearson violated IFRS and its own internal policy; and, as a result, (5) Pearson's business and prospects were worse than represented.

3.    Materially False and Misleading Statements Concerning Internal Controls

212.    In addition, the 2015 Form 20-F falsely assured investors that Pearson had designed the Company's internal controls over financial reporting that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles":

**Disclosure controls and procedures**

An evaluation of the effectiveness our disclosure controls and procedures as of December 31, 2014 was carried out by management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures (as defined in Rules 13a- 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) were effective as at December 31, 2014 at a reasonable assurance level. A controls system, no matter how well designed and operated, cannot provide absolute assurance to achieve its objectives.

**Management's annual report on internal control over financial reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. Internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, or persons performing similar functions, and effected by the Company' board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Management has assessed the effectiveness of internal control over financial reporting as of December 31, 2014 based on the framework in *Internal Control — Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this evaluation, management has concluded that the Company's internal control over financial reporting was effective as a December 31, 2014 based on criteria in *Internal Control — Integrated Framework* (2013) issued by the COSO.

213.    The 2015 20-F also contained the certification of Defendant Fallon, attesting to the veracity of the annual report:

**CERTIFICATIONS**

I, John Fallon, certify that:

65

1.    I have reviewed this annual report on Form 20-F of Pearson plc;

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of Pearson plc as of, and for, the periods presented in this annual report;

4.    Pearson plc's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for Pearson plc and have:

   a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to Pearson plc, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)    evaluated the effectiveness of Pearson plc's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

66

d)          disclosed in this annual report any change in Pearson plc's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, Pearson plc's internal control over financial reporting; and

5.          Pearson plc's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to Pearson plc's auditors and the audit committee of Pearson plc's board of directors (or persons performing the equivalent function):

a)          all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect Pearson plc's ability to record, process, summarize and report financial information; and

b)          any fraud, whether or not material, that involves management or other employees who have a significant role in Pearson plc's internal control over financial reporting.

Date: March 23, 2016

/s/ John Fallon

John Fallon
*Chief Executive Officer*

214.    Defendant Coram Williams submitted an identical certification as that signed by Defendant Fallon.

215.    Additionally, in the 2015 Form 20-F, Defendant Fallon and Defendant Williams submitted  separate, but substantively identical signed certifications pursuant to section 906 of the Sarbanes-Oxley Act of 2002, stating:

**CERTIFICATION PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 20-F of Pearson plc (the "Company") for the fiscal year ending December 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John Fallon, Chief Executive Officer of the Company, certify to my knowledge, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), that:

      1.    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

      2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 23, 2016

> /s/ John Fallon
>
> John Fallon
> *Chief Executive Officer*

<div align="center">* * *</div>

## CERTIFICATION PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report on Form 20-F of Pearson plc (the "Company") for the fiscal year ending December 31, 2015 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Coram Williams, Chief Financial Officer of the Company, certify to my knowledge, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), that:

    1.    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: March 23, 2016

> /s/ Coram Williams
>
> Coram Williams
> *Chief Financial Officer*

216.    The above statements were materially false and misleading at the time they were made because Pearson's internal controls were deficient and, thus, allowed the Company to:  (i) conceal known product defects and related product returns; (ii) conceal product returns for returned print product; (iii) fail to timely record goodwill impairment charges for inventory corrections related to product returns and lower demand; (iii) understated Goodwill impairment and overstate Goodwill and net income/(loss); (iv) violate its own internal policies; and (v) violate IFRSP. Accordingly, Pearson did not maintain a system of adequate controls, as represented.

## F. DEFENDANTS' CONTINUING FALSE AND MISLEADING STATEMENTS IN THE JULY 29, 2016 – FIRST HALF OF 2016

217.    On July 29, 2016, the Company issued a press release announcing its half-year results for the first half of 2016.  In the July 29 report, Pearson reported that North American sales declined 9%.  Despite knowledge that returns were continuing to sharply increase, Defendant Fallon also assured investors that Pearson was on track to achieve "£800 or more operating profit by 2018."

218.    Pearson also announced that the Company had belatedly made another management change to appoint Kevin Capitani President of Pearson North America "to continue our ongoing transition from analogue to digital, and from products to service."

219.    With respect to the North American unit, Defendants reported that MyLab registrations grew 2%.

Global digital registrations of MyLab and related products grew 2%. In North America, digital registrations grew 1% with good growth in Science, Business & Economics and REVEL partly offset by continued softness in Developmental Mathematics. Skill Builder Adaptive Practice, our in-house adaptive homework solution launched in six titles in Spring 2016 and will expand to 50 additional titles by Fall 2016. Faculty generated studies indicate that the use of MyLab, Mastering and REVEL programmes, as part of a broader course redesign, can support improvements in student test scores and lower institutional cost (http://pear.sn/IZxLE). Preliminary findings from an efficacy study suggest that students

in Developmental Mathematics courses who complete on average 50 of the learning objectives in MyMathLab-Developmental double their odds of passing the course and that users of MyWritingLab who complete seven topics increase their final Exam Scores by around 14%. . . .

220.    The above statements were materially false and misleading when made because: (i) Defendants knew that Pearson's digital products, particularly MyLabs, was riddled with undisclosed technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (ii) Pearson's customer call centers were under-staffed and ill-equipped to handle the volume and nature of calls relating to MyLabs' defects; (iii) the change in student purchasing behavior and lower enrollment had already resulted in lower than forecasted sales and higher product returns; (iii) Pearson's growth in digital courseware was not as strong as the Company represented; and, thus, (iv) Defendants' projections for Pearson were unreasonable and lacked sufficient basis.

### G. DEFENDANTS' CONTINUING FALSE AND MISLEADING STATEMENTS IN THE JULY 31, 2016 INVESTOR CONFERENCE CALL

221.    On July 31, 2016, the Company hosted an investor call with analysts to discuss the Company's disappointing financial results for the first half of 2016.  During the call, Fallon admitted that, despite prior assurances returns were up in 2015 as a result of a one-off related to a single retailer, consistent with 2015, returns were increasing:

As Coram will report in more detail, the decline in sales year-to-date is due to three factors, all of which are heavily weighted to the first-half: the loss of U.S. school assessment contracts last year; the impact of regulatory changes on the take-up of UK vocational qualifications; *and the phasing of sales and returns in U.S. Higher Education courseware*.

(Emphasis added).

222.    Defendant Williams blamed the increase in returns on "retailers [taking] a more cautious view on stock levels than last year."

> Unemployment is tracking very close to consensus expectations at the beginning of the year. And we said that's an important indicator for Fall enrolments, but we won't get a clear view of those enrolments until later in the year. We're assuming the H2 returns will be slightly lower than the elevated amount that we saw in H2 2015, and that gross sales will be down slightly reflecting the caution in the channel. This is consistent with the detailed discussions we've had with our physical retail partners.

223.    In response to a question from analyst Nick Dempsey from Barclays regarding whether the increased returns in the first half of 2016 will continue into the second half of the year, defendant Williams reiterated the Party line that returns would be lower because retailers were being more cautious.

> Q: Nick Dempsey, Barclays - I guess you are suggesting the weakness from the bookstores in June means you won't see such painful returns in Q3. Is it not possible that the bookstores are just reflecting lower student demand from wherever that comes from, whether it's enrollments or whether more people are renting more people secondhand books. And therefore, what you are seeing here is the start of student demand overall being a bit less than you might predict, or, at least, what gives you confidence that it isn't that one?

> A: Williams: Yes. I'll take all three of those. So in terms of the returns, as you'd expect, we are staying very close to our retailers on this. And what they are telling us is that, they are being cautious, both in terms of stock levels and in terms of their ordering patterns, because they don't want to get caught out in the way that a number of us were at the end of last year. They are not reporting any fundamental change in underlying student demand. . . .

224.    Defendant Fallon echoed Williams statements about retailer cautions and, without any credible basis, reaffirmed guidance:

> So, I mean, just to, sort of, perhaps, at the risk of flogging the dead horse a bit further, I think, Coram, just to sort of confirm was saying that we think the – what's happening in the channel is understandable cautionary hangover from last year. And the detailed guidance we set out in the investor seminar that says, we expect the higher ed courseware market to sort of average 0% to 2% growth over the next three years is still very much where we are.

225.    Despite then-existing information declining student purchasing as a result of over-priced textbooks and other cheaper alternatives such as rentals and on-line books, Fallon further claimed that Pearson was "not seeing any change in our assumptions about fundamental student purchasing behavior, which is the important factor."

226.    With respect to Pearson's transition to digital, Fallon also assured investors that Pearson would achieve "positive uptake from digital:"

> And then, as we signaled in June, *we expect some positive uptake from digital*. So, for example, the growth in REVEL and from the new institutional deals, the extra ones that we've announced today, and that gets offset a little bit by some modest further uptake in OER and a further sort of rationalization of secondary with the sort of book rental – with the growth in book rental.

227.    The above statements were materially false and misleading when made because: (i) Defendants knew that Pearson's digital products, particularly MyLabs, was riddled with undisclosed technical errors, fueling considerable dissatisfaction with Pearson's digital offerings and driving away would-be adopters; (ii) Pearson's customer call centers were under-staffed and ill-equipped to handle the volume and nature of calls relating to MyLabs' defects; (iii) the change in student purchasing behavior and lower enrollment had already resulted in lower than forecasted sales and higher product returns; (iii) Pearson's growth in digital courseware was not as strong as the Company represented; and, thus, (iv) Defendants' projections for Pearson were unreasonable and lacked sufficient basis.

## H. OCTOBER 17, 2016 NINE MONTH INTERIM MANAGEMENT STATEMENT AND INVESTOR CALL REVEALING INVENTORY RETURNS ARE FAR MORE THAN PREVIOUSLY REPRESENTED

228.    On October 17, 2016, investors were stunned by the Company's partial revelations of material financial and operational problems facing Pearson.  On that date, prior to the opening

of the American stock markets, Pearson issued a press release providing its nine-month Interim

Management Statement, providing financial results for the first three quarters of 2016 while

attempting to affirm its outlook for 2017 and beyond.

229.    Among other things, the press release revealed that the inventory correction that

saddled the Company's financial performance in 2015 and which was previously attributed to the

actions of a single retail partner was not the one-off occurrence had previously led the investing

public to believe and had since spread to several clients in the college textbook market.

230.    Later that day, the Company held a conference call with securities analysts to

discuss these financial results and their guidance affirmation.

231.    On the issue of the purported inventory correction, defendant Williams (as he and

Defendant Fallon had done the prior year) painted the higher textbook returns as an anomaly, an

easy scapegoat for the Company's underperformance:

> We are also continuing to see a significant amount of turbulence in our higher
> education distribution channel, as we flagged in July. This is partly driven by
> customers who are benefiting from new inventory management systems and
> processes which allow them to stock more efficiently on a real-time basis. But it's
> also the ongoing hangover of an adjustment to the cumulative effect of lower
> enrollments, growth in digital, and a more efficient secondary market over the last
> few years.
>
> Unfortunately for us, this has led to a twin effect in 2016, with *higher returns* in the
> first half of 2016, and lower gross sales in the second half. This *inventory correction
> will probably account for about two-thirds of the expected full-year decline in our
> higher education courseware revenues*.

(Emphasis added).

232.    When questioned about the Company's calculation of its return provision,

Williams, again, pointed to a recovery as the Company emerged from an extraordinary 2015:

> In 2016 that provision rose, partly driven by the *exceptionally high returns* that we had in
> the back end of 2015. And as we've talked about, we're seeing a reduction in returns in the
> second half of this year which should mean that we're able to reduce the provision in 2017,

which is a key part of the recovery that I think John was just talking about, and also is what allows us to reintroduce those discretionary costs into the P&L next year.

233.    Defendant Fallon also hinged the Company's ability to reach its guided 2018 financial on returns decreasing and gross sales stabilizing:

> Q: Nick Dempsey, Barclays: You said it's not as low as it would appear. You just -- I think you just told us that trends were not going to improve in Q4 in answer to I think Sami's question. So if trends aren't going to improve in Q4, why is it going to be low -- not as low as it would appear?
>
> A: Defendant Fallon: Because they will improve as I think I've said over the next six to nine months because the benefits of lower returns that we receive in the last quarter of this year and the first quarter of next year help us; and the gross sales stabilize and then start to recover in the course of 2017.

234.    On this news, the price of Pearson ADSs dropped significantly, from $10.10 per ADS on October 14, 2016 (the last trading day before the announcement) to $9.27 on October 17, 2016 – a loss of more than 8%.

235.    The stock price decline would have been even worse had Defendants revealed the true structural deficiencies within the Company's approach to the United States Higher Education textbook market and severe defects plaguing its digital courseware.  Instead, during the conference call,  Williams attempted to quell investor concern by materially misrepresenting the status of the ongoing inventory correction:

> There is growing evidence that the inventory correction is working its way through the channel. As we expected, sales were stronger in September as bookstores reordered to replenish inventories, as you can see on the left-hand chart here. In addition, as inventory levels stabilize, we expect returns levels will fall so that gross and net sales are again more closely aligned.
>
> Again, as you can see in the right-hand chart here, there is evidence that this is happening, and returns so far in October are tracking significantly lower than last year. Clearly, this is something we'll be monitoring closely over the coming months, as it is a critical component of both our 2016 results and our 2018 goals.

236.    The Company supported this assertion by projecting decreasing returns for October (which were purportedly "tracking significantly lower" than 2015), November, and December, as provided in the slides accompanying the investor call:



237.    Despite Defendants' attempts to downplay the continued distress of the Company's financial performance in the vital North American Higher Education sector, the market and analysts began to recognize the true meaning and importance of these revelations.  As a result, several analysts issued reports commenting on Pearson's failure to address the structural issues at play in the higher education textbook market and/or downgrading the Company's securities:

(a)    On November 22, 2016, Credit Suisse downgraded the Company to "Underperform" while cutting its twelve month price target and commenting on Company management's history of being "overoptimistic" on enrollments;

(b)    On November 29, 2016, JP Morgan maintained a neutral rating on the Company while cutting price targets, based on the Company's assumption that US higher education courseware returns would continue to improve for the fourth quarter of 2016; and

(c)    On October 26, 2016, Morgan Stanley decreased its forecasts for the Company while questioning Pearson management's assertion that they fully understood the higher education textbook market and that enrollments were the main cause of declining revenue, commenting that "[o]n the assumption that students are consuming roughly the same level of materials [year over year], that the number of students is down c1-2% and given that destocking already occurred in 2015, the market appears justified in attributing the underlying problem to changes in student behavior."

238.    Just three months later, the Company would finally be forced to admit the truth: Pearson had regularly misrepresented forecasts for the US Higher Education courseware market while failing to properly account for issues beyond falling enrollment numbers that would have a far greater effect on the Company's performance.

## I. January 18, 2017 Trading Update Slashing 2018 Guidance and Revealing Pearson's Inventory Return Problems Were Far Worse Than Defendants Had Previously Disclosed

239.    After months of claiming the textbook industry was stabilizing and the Company's education business was poised for renewed growth following several rounds of restructuring, on January 18, 2017, the Company issued a trading update wherein it slashed the profit guidance for 2018 on the basis of "continued challenges and uncertainty in the North American higher education courseware market."

> We expect to deliver operating profit in line with guidance for 2016, despite a further unprecedented decline in Q4 2016 in our North American higher education courseware business. Our 2016 restructuring program has been delivered in full and the financial benefits are a little higher than planned.
>
> We are today announcing actions to accelerate our digital transition in higher education, to manage the print decline, and to reshape our portfolio. Our guidance for 2017 reflects continued challenges and uncertainty in the North American

higher education courseware market and we no longer expect to reach our prior operating profit goal for 2018. The Board intends to recommend a final dividend of 34p for an overall 2016 dividend of 52p in line with our guidance, but as a result of the factors above we intend to rebase our dividend from 2017 onwards.

2016 results: we expect to report adjusted operating profit and adjusted earnings per share of approximately £630m and 57p, respectively, with revenues down approximately 8% in underlying terms primarily due to weakness in North American higher education courseware. We have continued to manage discretionary cost tightly and are accruing around £55m less than originally planned for our 2016 staff incentive programme, enabling us to report within the guidance range we had previously set.

Other than North American higher education courseware, our businesses have in aggregate performed in line with expectations. Online Program Management, virtual schools and professional certification all continued to grow. As expected US school courseware was impacted by a smaller market and lower participation rate, but benefited from share gains in Open Territories. North American student assessment profits rose slightly despite significant declines in revenue as we offset the impact of contract losses with cost reductions and the benefits of a higher weighting to digital services. In Core, our UK qualifications business is seeing a stabilisation in exam registrations as expected, and our Growth markets have returned to profitability.

The North American higher education courseware market was much weaker than expected. Our net revenues fell 30% during the final quarter resulting in an unprecedented 18% decline for the full year. We estimate 2% of this decline was driven by lower enrolment, particularly in Community College and amongst older students; 3-4% by an accelerated impact from rental in the secondary market; and approximately 12% due to an inventory correction in the channel reflecting the cumulative impact of these factors in prior years.

2017 actions: Whereas we had previously anticipated a broadly stable North American higher education courseware market in 2017, we now assume that many of these downward pressures will continue. We are the market leader in US Higher Education and will use that leadership to accelerate our shift to digital and maximise the value of our stand-alone text offerings with the following actions:

1. We are accelerating work to simplify our product technology platform and enhancing our courseware service capabilities with £50m of additional investment, which will remove barriers to faster product innovation, accelerate our product roadmap by two years and drive faster adoption of institution-wide Digital Direct Access for Pearson courseware.

2. We are increasing our participation in the courseware rental market, by:

- a. reducing eBook rental prices by up to 50% across 2,000 titles – making digital rental the best option for price-conscious students.

- b. launching our own print rental program, piloting with an initial group of 50 titles made available through Pearson's approved rental partners, ensuring Pearson is paid more often for the usage of our courseware. If successful we will scale this program rapidly.

Reshaping our portfolio: we are additionally announcing the following actions to reshape our portfolio and capital structure:

1. With the integration of Penguin Random House complete, and with greater industry-wide stability on digital terms, we intend to issue an exit notice regarding our 47% stake in Penguin Random House to our JV partner Bertelsmann in the contractual window, with a view to selling our stake or recapitalising the business and extracting a dividend.

2. We will use proceeds from this action to maintain a strong balance sheet; invest in our business; and return excess capital to shareholders whilst retaining an investment grade credit rating.

3. We will propose a final dividend of 34p for an overall 2016 dividend of 52p in line with 2015 and our guidance. For 2017 we intend to rebase our dividend to reflect portfolio changes, increased investment, and our 2017 earnings guidance.

4. We will continue to reduce our exposure to large scale direct delivery services and focus on more scalable online, virtual, and blended services, across our portfolio.

Outlook: The challenges we have faced during 2016 mean we begin 2017 with a base level of underlying profitability that is around £180m lower than we had expected in early 2016. Our preliminary guidance range is for operating profit in 2017 of £570m to £630m, driving adjusted earnings per share of 48.5p to 55.5p. This is based on our existing portfolio, a 2017 net interest charge of £74m, a tax rate of 20% and exchange rates on 31 December 2016.

This guidance is based on assumptions incorporating further declines in enrolment and other pressures in the North American higher education courseware market in 2017. The top of the range implies that this is offset as the impact of the 2016 inventory correction at key channel partners partially unwinds resulting in net revenue growth in our North American higher education courseware business of approximately 1%. The bottom of our guidance range assumes that inventory levels continue to fall resulting in a 7% net revenue decline. The rest of business is expected to perform broadly in line with trends seen in 2016.

We are withdrawing our operating profit goal for 2018 reflecting portfolio changes and challenging and uncertain markets.

78

240.    On the same day, the Company held a conference call with securities analysts to discuss its reduced guidance and newly-adopted negative outlook for the future of US higher education textbook sales.  On the call, Defendant Fallon pointed to an "unprecedented decline" in Pearson's US business, forcing the Company to "now act to address the issues and build a more sustainable business."

241.    Importantly, Defendant Fallon articulated the Company's true errors:

Since June, we've seen a very sharp decline in sales; even sharper than we saw at the time of our October trading update.  Two things changed since the time of that seminar, both of which we called wrong.  First, it is now clear that college enrollments didn't stabilize last year, in fact they fell further as the economy continued to strengthen and regulatory pressures increased. We are now assuming that they will continue to fall by around 2 to 3% per year, adjusting for our mix of students across different types of colleges, for the next couple of years. . .  Second, revenue per enrollment, which had been very stable for the previous four years, fell very sharply . . . We also think it is due to textbook rentals ramping up more quickly than we expected and that will continue for the next couple of years.

242.    It was now clear that the visibility to textbook rentals that the Company had previously touted confidence in was entirely misplaced, as Williams finally admitted that the textbook rental market was dragging the Company's sales in the market by between 3% and 4%.

243.    Defendants also admitted that as of October 2016, they knew the Company would be shifting its compensation structure for its sales staff and the effect such a shift would have, yet they did not make any of this information known at the time:

Defendant Fallon:  So I think at the end of -- when we talked in October, we were looking at revenues in our higher-education business down something like 13% for the nine months through to the end of September. And clearly, we finished the year down 18%, so they took a further significant dip.

We knew in October that we were making the shift from incentivizing our sales force on a net rather than a gross basis, and we knew that would have an impact. But we thought that would be offset by the fact by, at that point, there was significantly less inventory in the channel and, therefore, our partners would have to start stocking up ahead of January back to school.

79

Clearly, (technical difficulty) happen and clearly, as well, whilst returns did slow, they didn't slow as much by the end of the year as we thought they would in October. So that's obviously presented us with a significantly different set of challenges now than we thought we were facing in October.

244.    Finally, the issue of destocking, which had first been attributed to just one retail partner and then across the industry, but was said to have been tempered by the second half of 2016, was responsible for two-thirds of the Company's 18% sales decline for the year.   The presentation slides accompanying this call presented a far different pictures vis-à-vis returns during the fourth quarter than the estimates provided in October 2016 or management's commentary on the same.   Instead of declining for the period, cumulative returns continued to rise above 2015 levels:



245.    Importantly, on this day the Company further admitted that as of June 2016, Pearson management had zero visibility into the inventory problems facing the Company as, at that point, their assumption was that the inventory correction would have *zero* effect on the

Company's revenues (despite 2016 returns being *higher than 2015 across every month* until that point) and that the correction would ultimately lead to a 12% drag on revenues:




246. With the Company no longer able to deny the true effects of sustained lower enrollment numbers and the rising secondary textbook rental market on the Company's bottom line, the price of Pearson's ADSs dropped dramatically from a close of $9.99 on January 17, 2017 to $7.13 on January 18, 2017 – a loss of more than 28% -- on unusually high trading volume of almost 3.5 million ADSs transacted (compared to 284,000 the prior day).

247. In the wake of this news, financial analysts responded swiftly, pointing to the Company being unlikely to deliver on a return to growth in North America this decade:

(a) On January 18, 2017, Liberum reiterated its "sell" rating while cutting its target share price for the Company;

(b) On January 18, 2017, Macquarie Research downgraded Pearson from "Outperform" to "Neutral";

(c)     On March 27, 2017, Jefferies Group LLC reissued an "underperform" rating on the Company;

(d)     On April 5, 2017, Exane PNB Paribas downgraded Pearson securities from neutral to "underperform" and cut its target price;

(e)     On May 11, 2017, Kepler Capital Markets downgraded Pearson from "buy" to "hold";

(f)     On June 2, 2017, Zacks Investment research downgraded from "buy" to "hold."

## VII.    POST-CLASS PERIOD EVENTS

248.    Following the Class Period, Defendants continued to discuss the effect of the Company's declining United States Higher Education revenues, as hampered by management's poor visibility of several key factors during the Class Period and the underperformance of the Company's digital offerings.

249.    On February 24, 2017, the Company issued its preliminary results for 2016. Therein, the Company announced its goodwill impairment:

> 2016 statutory results and goodwill impairment: Statutory loss for the year of £2,335m included an impairment of goodwill of £2,548m. This impairment charge is consistent with the challenging market conditions which we disclosed in January, and which resulted in an outlook for profit which is approximately £180m lower than previously anticipated.

250.    Additionally, the Company stated that it had made progress on the rental program announced in January – representing a further admission that the higher education textbook market had undergone a structural shift that the Company had ignored to that point and which now resulted in Pearson attempting to play catch up.

251.    Finally, the Company confirmed that it had issued its exit notice regarding its 47%

stake in Penguin Random House to Bertelsmann with a view towards selling the Company's stake

or recapitalizing the business and extracting a dividend.

252.    Also on February 24, 2017, the Company hosted an earnings call with analysts to

discuss these financial results.

253.    On that call, Mr. Williams attributed the extraordinarily large goodwill impairment

charge (representing greater than 50% of the goodwill on the Company's balance sheet to that

point) as the result of a "mechanical accounting effect" despite the fact that Defendant Fallon

described on the same call a chain reaction beginning with power profitability in 2016 leading to

the Company withdrawing its 2018 guidance in January which led "directly to the GBP2.5 billion

goodwill impairment charge" announced on that date.

254.    With respect to the Company's rental program, Defendant Fallon admitted that it

will now play an important role in the Company's understanding of the textbook market: "And the

textbook rental program is, frankly, as I think we said, at best, economically neutral over the three

years; but what it does, it gives us greater visibility and transparency."

255.    Despite being at the helm for nearly a half-decade of underperformance, on March

24, 2017 it was revealed that Defendant Fallon received a nearly 20% pay increase in 2016

(boosted by a performance bonus of £343,000 as compared to no such bonus the previous year),

even as the Company slumped to its largest ever loss and shares fell to a seven-year low.

256.    On May 5, 2017, the Company issued a press releasing providing its trading update

for the first quarter of 2017.  Therein, the Company announced the latest in the string of cost cutting

measures and restructuring, this time to the tune of £300 million by the end of 2019, adding to the

approximately £650 million in cut costs in the four previous years under Defendant Fallon.

257.     The Company also confirmed that it was in ongoing negotiations with Bertelsmann regarding its plans for Penguin Random House, as well as engaging in a strategic review of Pearson's United States K-12 courseware publishing business – one that has seen a slower pace of digital adoption.

## VIII.     PEARSON'S IFRS ACCOUNTING AND INTERNAL CONTROL VIOLATIONS

258.     As alleged above, during the Class Period, the Company issued financial statements that were materially misstated and not presented in accordance with International Financial Reporting Standards ("IFRS").  The SEC requires that foreign publicly-traded companies such as Pearson present their financial statements in accordance with an internationally accepted accounting standards.  The consolidated financial statements of Pearson had been prepared in accordance with UK Generally Accepted Accounting Principal ("UK GAAP") through December 31, 2004. When preparing Pearson's 2005 consolidated financial statements, management adopted IFRS and, therefore, amended certain accounting, valuation and consolidation methods applied in the UK GAAP financial statements to comply with IFRS. The comparative figures in respect of 2004 and 2003 were restated to reflect these adjustments.

259.     IFRS   are standards issued   by   the IFRS   Foundation and   the International Accounting Standards Board (IASB) to provide a common global language for business affairs so that company accounts are understandable and comparable across international boundaries. They are a consequence of growing international shareholding and trade and are particularly important for companies that have dealings in several countries. IFRS are the rules to be followed by accountants to maintain books of accounts which are comparable, understandable, reliable and relevant as per the users internal or external.

260.     The responsibility for preparing financial statements (which include the footnotes to the financial statements) in conformity with IFRS rests with corporate management, as set forth

84

in International Accounting Standard ("IAS") 1, Presentation of Financial Statements, and the corresponding Conceptual Framework for Financial Reporting:

> management and, when appropriate, those charged with governance, have responsibility to[:]
>
>> a. "present fairly" the financial position, financial performance and cash flows of an entity. Fair presentation requires the faithful representation of the effects of transactions, other events, and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework.[17]

261.    Each of the improper accounting practices in which the Company engaged, as well as Defendants' misrepresentations and omissions, standing alone, was a material breach of IFRS, Company policy, and/or SEC regulations.

262.    As discussed below, Pearson's Form 20-Fs for the periods ending December 31, 2014 and 2015 and Form 6-K mid-year results for the periods ending June 30, 2015 and June 30, 2016 (collectively, the "False and Misleading Financial Statements") violated IFRS by failing to: (i) timely account for its goodwill impairment; (ii) disclose known trends affecting the False and Misleading Financial Statements pursuant to Item 303; and (iii) maintain sufficient internal controls over the financial reporting process to ensure the Company's financial statements were reported in compliance with IFRS and SEC regulations.

263.    In addition, the False and Misleading Financial Statements violated IFRS because they failed to adequately disclose the product defects and associated risks with the transition to digital technology that plagued Pearson's digital content, namely its MyLabs technology.

264.    Moreover, IFRS requires an entity to restate previously filed quarterly and annual financial statements to correct material errors in those previously reported financial statements.

---

[17] IAS 1.15

According to IAS 8, Accounting Policies, Changes in Accounting Estimates and Errors, an error in previously issued financial statements are:

> omissions from, and misstatements in, an entity's financial statements for one or more prior periods arising from a failure to use, or misuse of, reliable information that was available and could reasonably be expected to have been obtained and taken into account in preparing those statements. Such errors result from mathematical mistakes, mistakes in applying accounting policies, oversights or misinterpretations of facts, and fraud.[18]

265.    A Company is required to restate its previously issued financial statements by correcting all material prior period errors retrospectively."[19]   Specifically, IFRS states the following:

> An entity must correct all material prior period errors retrospectively in the first set of financial statements authorised for issue after their discovery by:
>
> restating the comparative amounts for the prior period(s) presented in which the error occurred; or
>
> b. if the error occurred before the earliest prior period presented, restating the opening balances of assets, liabilities and equity for the earliest prior period presented.[20]

266.    Thus, Defendants also violated IFRS by failing to correct prior material errors in the Company's publicly-filed financial statements.

A.  Defendants Violated IFRS by Failing to Timely Record Goodwill Impairment

267.    At the end of each reporting period, an entity is required to assess whether there is any indication that an asset may be impaired (i.e. its carrying amount may be higher than its Recoverable Amount). If there is an indication that an asset may be impaired, then the asset's Recoverable Amount must be calculated. [IAS 36.9]

---

[18] IAS 8.5.
[19] IAS 8.42.
[20] IAS 8.43.

268.    The purpose of goodwill impairment is to ensure that the company's assets are not carried at more than its Recoverable Amount.  The Carrying Amount ("Carrying Amount") of goodwill is the amount at which an asset is recognized in the balance sheet after deducting accumulated depreciation and accumulated impairment loss.  Recoverable Amount ("Recoverable Amount") under IAS 36 is "the higher of [the company's] fair value less costs of disposal [(sometimes called net selling price)] and [its] value in use (the present value of the future cash flows expected to be derived from an asset or cash-generating unit)."  If the Carrying Amount of the unit exceeds the Recoverable Amount of the unit, the entity shall recognize the impairment loss.

269.    Goodwill in this instance is allocated to each of the company's cash generating units ("CGUs").  A cash-generating unit is the smallest group of assets that generates cash inflows which are largely independent of the cash inflows from other groups of assets.

270.    Pearson allocated goodwill to CGUs, or an aggregation of CGUs, where goodwill could not be reasonably allocated to individual business units. These CGUs are North America, Core, Growth, Pearson VUE and Financial Times Group. CGUs shall be identified consistently from period to period for the same asset or types of assets, unless a change is justified.

271.    A CGU to which goodwill has been allocated must be tested for impairment annually, and whenever there is an indication that the unit may be impaired, by comparing the Carrying Amount of the unit, including the goodwill, with the Recoverable Amount of the unit.

272.    To calculate the impairment loss one must calculate the net selling price (Recoverable Amount) for each CGU. There are multiple methods to assess and allocate Recoverable Amount to each asset on the balance sheet.  After determining the value of each of the tangible and intangible assets, the remaining CGUs Recoverable Amount is attributed to

goodwill. Next, Recoverable Amount of goodwill is compared to the Carrying Amount of goodwill. An impairment is taken if the Recoverable Amount is less than the Carrying Amount. For example, if the Recoverable Amount of goodwill is $10m while the Carrying Amount of goodwill is $12m, a $2m impairment would be made.

273.    Under IAS 36 goodwill is assessed annually for impairment, unless there is a "triggering event." A triggering event is an event that makes an entity stop and think about impairment, such as a decline in market conditions, unanticipated change in structure, and cash flow loss. A triggering event is defined as any event or change in circumstance that would indicate that the Recoverable Amount of the entity (or the reporting unit) may be below its Carrying Amount.

274.    Furthermore, IAS 36.12 states in assessing whether there is any indication that an asset may be impaired, an entity shall consider, as a minimum, the following indications:

External Sources of Information:
(a) there are observable indications that the asset's value has declined during the period significantly more than would be expected as a result of the passage of time or normal use.

(b) significant changes with an adverse effect on the entity have taken place during the period, or will take place in the near future, in the technological, market, economic or legal environment in which the entity operates or in the market to which an asset is dedicated.

(c) market interest rates or other market rates of return on investments have increased during the period, and those increases are likely to affect the discount rate used in calculating an asset's value in use and decrease the asset's recovery amount materially.

(d) the carrying amount of the net assets of the entity is more than its market capitalization.

Internal sources of information:

(e) evidence is available of obsolescence or physical damage of an asset.

(f) significant changes with an adverse effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, an asset is used or is expected to be used. These changes include the asset becoming idle, plans to discontinue or restructure the operation to which an asset belongs, plans to dispose of an asset.

275.    The goodwill is generally denominated in currency of the relevant cash flows and is thus not materially affected by exchange rate fluctuations.[21]

276.    Industry trends indicated that prior to and throughout the Class Period, student enrollment was down and projected to continue to decline, students could not afford pricey text books and, thus, were turning to cheaper alternatives such as digital products, on-line books and piracy, and, as a result, bookstores and colleges were going through a "destocking" process resulting in significant returns.  Defendants began seeing increased returns as early as 2015, as recognized in a July 24, 2015 Half Year report (noting "higher physical returns in U.S. higher education market"); October 21, 2015 nine month report revising down guidance, a December 31, 2015 Goodwill impairment write-off; and October 2016 nine month report (citing depressed sales weaker than anticipated revenues primarily due to higher inventory correction by retailers in July

---

[21] Pearson, plc. (2016). Annual Report 2016. Retrieved from www.pearson.com/corporate/investors/investor-information/reports-and-presentations.html. Page 149

and August 2016). Moreover, CWs stated that throughout the Class Period, Pearson was experiencing product returns from its defective digital software.

277.    These are certainly observable indications, or "triggering events" that Pearson's Recoverable Amount has declined and should have resulted in the company performing an impairment test as defined above in accordance with IAS 36. As defined in IAS36, an indication of impairment is a significant change in the technological, market, economic or legal environment of an entity -- all of which Pearson was experiencing with the shift from the textbook industry to the digital world.  Based upon evidence of triggering event, Pearson should have tested for goodwill impairment and impaired goodwill earlier.

278.    However, Pearson delayed its impairment test until year-end and recorded £896mm reduction to goodwill in December 2015 and only one year later recorded a £2.5 billion impairment to goodwill.

279.    In violation of IFRS and the Company's own internal policy, Pearson did not take any Goodwill charge for 2014 and the charge taken in 2015 was woefully inadequate.

280.    Specifically, for the year-ended December 31, 2015, Pearson recorded a £896mm reduction to goodwill reducing the Company's goodwill asset balance to £4,134mm (£3.1 billion related to North America CGU).  Defendants claimed that the impairment charge was due to:

(1) exchange rate differences, which increased goodwill by £105mm;

(2) a goodwill impairment charge of £826mm comprised of: £507mm within the Growth CGU (Brazil, China, South Africa, and Other), £282mm within the North America CGU; and £37mm within Core CGU; and

(3) the sale of a business decreasing goodwill by £175mm.[22]

_____

[22] Pearson, plc. (2015). Annual Report 2015. Retrieved from www.pearson.com/corporate/investors/investor-information/reports-and-presentations.html. Page 164-166

90

281.    The majority of this charge was purportedly unrelated to North American operations, despite mounting returns of digital and print courseware.

282.    It wasn't until January 18, 2017, that Defendants shocked investors when Pearson announced that, during the Company's goodwill impairment review, the fair value less costs of disposal of the North America cash generating unit (CGU) no longer supported the carrying value of this goodwill and, thus, the Company would record an impairment charge to goodwill of £2.55BN.   Defendants stated the goodwill charge was mainly due to:   declining student enrollments, changes in buying patterns of students and correction of inventory levels by distributors and bookshops.[23]

283.    As Defendants would finally admit, about two-thirds of the Goodwill impairment charge for 2016 was directly the result of "the inventory correction in the channel reflecting the *cumulative* impact of these factors in *prior* years."  (Emphasis added).

284.    Despite the continued decline in student enrollment and the sale of print materials from high-priced, obsolete text books described above, Pearson's own public filings with the SEC reflect that the Company failed to take an adequate impairment charge to account for inventory corrections, in direct violation of both the Company's internal policies and information of which they were aware or should have been aware with respect to goodwill impairment, which required Defendants to consider in determining an appropriate goodwill reduction, among other things, returns of print materials, returns of defective digital courseware, declining student enrollment and refusal to pay for over-priced textbooks.

285.    In addition, Defendants misstated the Company's Goodwill asset, operating expense and earnings in the False and Misleading Financial Statements by failing to adequately

---

[23] Pearson, plc. (2016). Annual Report 2016. Retrieved from www.pearson.com/corporate/investors/investor-information/reports-and-presentations.html. Page 149

accrue for losses of which Defendants were, or should have been, aware of related to goodwill impairment.

B.  Defendants' Failure to Disclose the Product Defects from Its MyLabs Digital Courseware Violated IFRS and SEC Regulations

286.    In addition, SEC Regulation S-K required Pearson to disclose in the *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A") section of its filing with the SEC "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."  17 C.F.R. § 229.303.

287.    Regulation S-K also required Defendants to disclose in the Company's MD&A section, a discussion of "significant economic changes," "unusual or infrequent events or transactions" and "known trends or uncertainties," such as major changes in the carrying amount of the net assets that would materially affect the Company's financial statements:

 i.    [A]ny unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

 ii.    [A]ny known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations . . . the change in the relationship shall be disclosed. 17 C.F.R. § 229.303(a)(3)(i)-(ii).

288.    In violation of these principles, during the Class Period, Defendants reassured investors that "we plan to hold our dividend at the 2015 level while we rebuild cover, reflecting the board's confidence in the medium-term outlook for our business, and we are committed to

increasing total shareholder returns".[24]  Meanwhile, product returns were mounting from both print and defective digital courseware.

289.    Defendants failed to disclose the Company's defective MyLabs digital courseware that resulted in lower revenue and product returns in either Pearson's MD&A section or in the footnotes to the False and Misleading Financial Statements, reflecting known trends related in the Company's revenue, inventory and goodwill. Defendants' failure to make such disclosures violated the most basic principles of financial reporting under IFRS and SEC Regulations.

### C.  DEFENDANTS' INTERNAL CONTROL VIOLATIONS

290.    During the Class Period, Defendants falsely represented in the False and Misleading Financial Statements that Pearson maintained internal controls over financial reporting to ensure the reliability of the Company's financial reporting in compliance with the Securities Exchange Act of 1934.

291.    In addition, during the Class Period, Defendants concealed a chronic and systematic breakdown of the Company's internal accounting controls, thereby allowing the Company to, among other things, conceal product returns of print products and defective digital products, causing the False and Misleading Financial Statements to be materially misleading.

292.    As a result of Defendants' failure to maintain effective internal control over financial reporting, they were able to mask the significant undisclosed risk in the Company's digital and print products in the False and Misleading Financial Statements by manipulating and deferring the timing of when Pearson recorded losses resulting from goodwill impairment and inventory corrections.  Pearson's inadequate internal financial controls caused the Company to issue the False and Misleading Financial Statements, in violation of SEC Rules and IFRS.

---

[24] Pearson, plc. (2015). Annual Report 2015. Retrieved from www.pearson.com/corporate/investors/investor-information/reports-and-presentations.html. Page 2

293.    As the SEC has explained, internal controls are fundamental and critical for summarizing and reporting financial data . . . ." 15 U.S.C. § 78m(b)(2).[25]  Indeed, a lack of fundamental internal controls, as here, under IFRS constitutes a "material weakness" that should be immediately disclosed to investors under IFRS.

294.    The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") set forth the role of a Company's management in the preparation of an entity's financial statements. Specifically, and as excerpted below:

> management and, when appropriate, those charged with governance, have responsibility to:
>
>> a.  prepare reports in conformity with applicable rules, regulations, and standards or with the entity's specified reporting objectives;
>>
>> b.  use judgment in designing, implementing, and conducting internal control, and in assessing the effectiveness of a system of internal controls.[26]

295.    The Individual Defendants were further required under Rule 302 of the Sarbanes-Oxley Act of 2002 to provide certifications relating to the company's internal control over financial reporting in the False and Misleading Financial Statements.

296.    Additionally, Section 302 of the Sarbanes-Oxley Act of 2002 required Pearson to maintain, assess and report on the effectiveness of the Company's internal control over financial reporting.  The language provides the following, in relevant part:

> (a) REGULATIONS REQUIRED.—The Commission shall, by rule, require, for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78o(d)), that the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that—
>> (1) the signing officer has reviewed the report;

---

[25] Specifically, the SEC requires a public company to: (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer; and (b) devise and maintain a system of internal accounting controls . . . . " 15 U.S.C. § 78m(b)(2).

[26] https://na.theiia.org/standards-guidance/topics/Documents/Executive_Summary.pdf (Last accessed July 6, 2017)

(2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3) based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

(4) *the signing officers—*

> *(A) are responsible for establishing and maintaining internal controls;*
>
> *(B) have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;*
>
> *(C) have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and*
>
> *(D) have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date…*

(Emphasis added.).

297. Professional accounting standards recognize that a company's control environment sets the tone of an organization, and is the foundation for all other components of internal control, providing discipline and structure. The Committee of Sponsoring Organizations of the Treadway Commission framework also discusses a Company's control environment as being one of five interrelated components of internal control, stating:

> Control environment. Senior management must set an appropriate "*tone at the top*" that positively influences the control consciousness of entity personnel. The control environment is the foundation for all other components of internal control and provides discipline and structure.

298. The Company's most senior executive management, comprised in substantial part of the Individual Defendants herein, embraced a "tone at the top" of ignoring and/or concealing industry trends and product defects and returns necessitating a goodwill impairment review. These

practices ultimately culminated in the Company incurring but failing to record billions of dollars of losses from goodwill impairment and obsolete inventory throughout the Class Period.

299.     Furthermore, Defendants' failure to identify such control deficiencies (e.g., material weaknesses) existing at the Company rendered Management's Report on Internal Control over Financial Reporting in the False and Misleading Financial Statements materially false and misleading, and contributed to the Company's issuance of materially false and misleading financial statements.

## IX.     ADDITIONAL SCIENTER ALLEGATIONS

300.     As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

301.     The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Pearson and thus controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance. Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal material financial and operational problems facing Pearson. In particular, the Individual Defendants misleadingly downplayed the continued distress of the Company's financial performance in the vital North American Higher Education sector, and

overstated its forecasts for the US Higher Education courseware market while failing to properly account for issues beyond falling enrollment numbers that would have a far greater effect on the Company's 2016 performance.

302.   Such actions allowed Defendants to cause the Company's stock price to be artificially inflated throughout the Class Period and leverage its market position to rush out its fundamentally defective technology offerings in a haphazard attempt to catch up with its self-identified competitors. The Individual Defendants' scienter may be imputed to Pearson as the Individual Defendants were among the Company's most senior management and were acting within the scope of their employment.

## A.   THE INDIVIDUAL DEFENDANTS' KNOWLEDGE AND/OR RECKLESSNESS

303.   Prior to and throughout the Class Period, the Individual Defendants knew that Pearson's forecasts for the US Higher Education courseware market were unrealistic, not achievable and overstated and that the Company's Goodwill and Net/Income(Loss) were overstated as evidenced by: (1) Defendants' own admission that the "inventory correction" was the result of the "cumulative" impact of "prior years," necessitating an earlier impairment charge to Goodwill or restatement; (2) known product defects plagued the Company's digital products; (3) Defendants' admitted active communications with retailers regarding product returns; (4) the magnitude of the impairment charge; (5) the nature and simplicity of the accounting adjustment; (6) Pearson's North American courseware is its "core" business; (7) Defendants admittedly, actively monitored industry trends and the Company's competitors throughout the Class Period; (8) Defendants admitted knowledge of market factors indicating the imminent and rapid decline of textbook sales.

1.   **Defendants' Admission They Knew the "Inventory Correction" Related to "Prior Years" Necessitating Earlier Write-off of Goodwill or a Restatement of Pearson's Prior Financial Statements**

304.   Defendants admitted in their January 18, 2017 trading update that the Company's net revenues fell 18% for the full year, 12% of which was due to an inventory correction in the channel "reflecting the ***cumulative impact of these factors in prior years***." Emphasis added. Thus, in effect, Defendants admit that at least two-thirds of the goodwill impairment charge taken by the Company was caused by the inventory correction reflecting *years* of product returns. This is tantamount to an admission that the goodwill impairment charge was inappropriately belatedly recorded in violation of IFRS.

305.   Under IAS 36 goodwill is assessed annually for impairment, unless there is a "triggering event." Despite mounting product returns from defective digital product and obsolete print course materials, Defendants did not record any impairment to goodwill in 2014. Then, in 2015, Pearson recorded a £896mm reduction to goodwill but claimed the majority of this charge was purportedly unrelated to North American operations. Suddenly however, on January 18, 2017, Defendants shocked investors when Pearson announced that, during the Company's goodwill impairment review, the fair value less costs of disposal of the North America cash generating unit (CGU) no longer supported the carrying value of this goodwill and, thus, the Company would record an impairment charge to goodwill of £2.55BN. Given the admission in the January 18, 2017 trading update that the goodwill impairment charge reflected years of inventory correction, Defendants have effectively conceded that they violated IAS 36. This supports a finding of scienter.

**2.   The Individual Defendants Were Aware that the Significant Technical and Customer Service Issues Plaguing the Company's Digital Products Were Negatively Impacting Customer Adoption and the Ability of These Products to Offset Declining Print Revenue**

306.   As alleged herein, Defendants were readily aware that there existed significant issues with the Company's digital products, both on a fundamental technology level and with respect to the customer service function supporting these products, after reports by the former Vice President of Customer Service ultimately resulted in the Defendant Fallon approving the outlay of $5 million to address these issues.  Additionally, as stated by a former Pearson North American Strategic Account Manager in Higher Education, Defendant Fallon participated in a sales call during summer 2015 where members of the sales team expressed their frustration with the digital products and voiced the fact that the quality issues were directly effecting the sales staff's ability to sell these digital products, thus negatively impacting the goal of transitioning the Company from analog to digital.  Defendant Fallon's knowledge of the issues arising out of the technically flawed products and the Company's own customer service understaffing was corroborated by CW 3, the former North American Chief of Stagg for the Chief Global Operating Officer, Ziggy Liaquat, who confirmed that Liaquat provided reports on customer service issues to former head of Pearson North America Don Kilburn, who then reported directly to Defendant Fallon.

307.   As further detailed herein, the Company was heavily reliant on its North American Higher Education business segment, in which traditional textbook sales, combined physical textbook/digital services offerings, and pure digital services offerings were captured. Additionally, Defendants repeatedly emphasized the importance of the transition to digital as an offset to decline in traditional print revenues in press releases, on conference calls with securities

analysts (in which they answered repeated questions from analysts about such matters), and in filings with the SEC.  Therefore, a successful rollout of new digital products and improved support for existing products (such as MyLabs, the Company's flagship digital offering that was beset by glitches), especially in North America Higher Education – what was traditionally the Company's largest revenue-producing segment - were of critical important to the Company, its financial performance, and its future business prospects.

308.    During the Class Period, the Individual Defendants were high-ranking officers of the Company who were each heavily involved with the Company's operations and finances and had day-to-day responsibilities, received internal reports, and participated in meetings concerning critical matters affecting the Company's core business North American Higher Education Courseware, under which these digital products fell.  As such, the Individual Defendants were intimately aware of the problems affecting the Company and its products, particularly its critical digital products that were expected to offset declining print revenues as the Company transformed into a digital-based Pearson.  Indeed, Defendants repeatedly addressed these topics on earnings calls with analysts, boasting of the Company's growth in digital and increased subscription figures.

309.    Moreover, Defendants acknowledged that they evaluated both their own performance in the North American Higher Education courseware market and the performance of the industry as a whole on a monthly basis.  As a result, as the Company's most senior executives, the Individual Defendants knew, or at a minimum were reckless in disregarding, that Pearson's digital products were plagued with severe quality and reliability problems, exacerbated by the Company's poor customer service, that were negatively impacting sales, adoption, and segment revenue metrics.  By choosing to speak about Pearson's digital products as drivers of continued growth and an offset to declining print revenue, the Individual Defendants led investors to believe

that they had knowledge, and/or had acquired knowledge, of such matters and were speaking truthfully to the market about them.

### 3. The Individual Defendants Were Admittedly in Active Communication with Retailers Who Informed Them of Product Returns

310.    The Individual Defendants' knowledge is further evident by the fact they were holding discussions directly with their own Retailers regarding textbook demand and returns. For instance, on a February 26, 2016 conference call with analysts to discuss the full year 2015 financial results and future outlook, Defendant Williams assured analysts that Pearson was in communication with retailers directly, stating: "So gross is a good predictor of demand, it's a predictor of what we think the demand will be. ***But that's also done in conjunction with our retailers, who have a pretty good handle on the ground and our sales reps***, who understand what adoptions are being made and, therefore, how many students are going to be at the courses." Emphasis added. Then, on a June 31, 2016 investor call, Defendant Williams described his "detailed discussions we've had with our physical retail partners," and stated the Defendants were "staying very close to our retailers on this."

311.    Accordingly, Pearson's direct involvement with its retailers indicates that not only did the Individual Defendants have undisclosed inside knowledge of the decline in textbook demand and increasing rate of returns, but they held detailed discussions with their retailers over the anticipated demand rates

### 4. The Magnitude of the Impairment Supports a Strong Inference of Scienter

312.    As more fully detailed above, the $2.5 billion impairment charge to goodwill, first announced on February 24, 2017, was not the result of a few mistakes during a single quarter or even a single year. As Defendants admit, the 30% decline in revenue for 2016 and a significant

amount of the goodwill impairment charge was due to "the inventory correction in the channel reflecting the ***cumulative*** impact of these factors in ***prior*** years." (Emphasis added). The goodwill impairment charge reflected years of concealed decline in the textbook industry and mounting product returns from Pearson's defective digital product and obsolete print course materials. Further, the extraordinarily large goodwill impairment charge represented greater than 50% of the goodwill on the Company's balance sheet to that point.

313.    By belatedly recording such a large goodwill impairment charge, reflecting years of cumulative decline, the Individual Defendants not only violated IFRS but also fraudulently transformed the entire financial condition of the Company, misled investors about the success of Pearson's business and masked significant product returns and attendant losses at the Company. The sheer magnitude of the goodwill impairment charge supports a strong inference of scienter.

**5.    The Nature and Simplicity of the Accounting Manipulations Which Caused the Impairment Combined with the Individual Defendants' Years of Experience Supports a Strong Inference of Scienter**

314.    Pearson's enormous goodwill impairment charge was not due to simple mathematical errors or honest misapplication or oversight of complex accounting standards. It was due to deliberate misuse of the facts, willful ignorance or conscious disregard for industry trends, and pervasive manipulation of financial results. For example, as alleged herein, Defendants knew the Company was experiencing mounting product returns from defective digital product and obsolete print course materials, Defendants did not record any impairment to goodwill in 2014. Then, for 2015, Defendants recorded a £896mm reduction to goodwill reducing the Company's goodwill yet claimed the majority of this charge was purportedly unrelated to North American operations, despite mounting returns of digital and print courseware.

315.     Indeed, it wasn't until January 18, 2017, that Defendants shocked investors when Pearson announced that, during the Company's goodwill impairment review, the fair value less costs of disposal of the North America cash generating unit (CGU) no longer supported the carrying value of this goodwill and, thus, the Company would record an impairment charge to goodwill of £2.55BN. The goodwill charge was mainly due to declining student enrollments, changes in buying patterns of students and correction of inventory levels by distributors and bookshops – factors present well before 2015. Thus, Pearson's management knew in at least 2015 that the market was deteriorating and goodwill should have been assessed for impairment at an earlier point than the end of 2016, but refused to make the required corrective accounting adjustments because it would increase expenses and reduce net income.

316.     Further, the improper accounting corrected by this impairment did not occur as a result of good faith differences in accounting judgments, or interpretations of complicated or vague accounting rules. The accounting rules and precepts violated by Pearson were long-established, basic accounting standards and concepts, such as the fundamental rule of assessing for impairment at the end of each reporting period. The accounting violations committed by Pearson are as old and basic as they come – namely, the belated recognition of impairment charges to conceal the Company financial decline, and inflate short term results to beat Wall Street expectations.

317.     Lastly, the improper accounting was not a result of inexperienced accounting managers who did not understand accounting rules, nor can it be blamed solely on poor accounting controls. To the contrary, Pearson's former CFO, Defendant Freestone, sits on the Board of ICAEW as an Advisory Group Member, Financial Reporting Faculty, is a Member of the CBI Economic Growth Board, and was previously a qualified Chartered Accountant with Touche Ross. Defendant Williams, Pearson's current CFO, has acted as the head of financial planning at various

entities including as the CFO of the Penguin Group and Penguin Random House and as an auditor and consultant at Arthur Andersen.

318.    As such, these Individual Defendants were thoroughly versed in goodwill impairment, IFRS accounting procedures, financial reporting and internal accounting controls. Thus, they had the ability to, and did, understand and analyze the rapidly declining textbook industry and mounting product returns which warranted a goodwill impairment much earlier than the end of 2016. In fact, the Defendants' education and employment backgrounds are such that it would defy their proven professional capabilities absent fraud.

### 6.  Pearson's North American Business Segment is its "Core" Business

319.    As alleged herein, during the Class Period, Pearson was heavily reliant on its North American operations, from which it derived 65% of its sales in 2016. Indeed, the Company has stated that "[o]ur largest market is North America" and "[n]early 50% of US schools use one of our tools to aid professional development and help teachers and administrators improve their effectiveness." Further to the point, when the Company finally announced on January 18, 2017 that it was slashing its profit guidance for 2018 it attributed the significant reduction in expected earnings to "continued challenges and uncertainty in the North American higher education courseware market," and in particular, the "investor correction" problem previously discussed.

320.    Accordingly, given that textbook sales in its North American operations was Pearson's largest revenue source and the Company's financial stability depended on the continued success of the North American operations, during the Class Period textbook sales in North America constituted the Company's "core business operations" and a "vital corporate function" that Pearson's most senior executives are rightly presumed to have knowledge of as a matter of law.

**7.    The Individual Defendants Admittedly, Actively Monitored Industry Trends and Pearson's Self-Identified Competitors Throughout the Class Period**

321.    The Individual Defendants admitted as early as 2013, the beginning of the Class Period, that they were actively monitoring industry trends and the behavior of competitors reflecting the rapidly declining textbook industry and mounting product returns. For instance, the 2016 Annual Report acknowledged that "[a] common trend facing all our businesses is the digitization of content and proliferation of distribution channels" and "[w]e face competitive threats both from large media players and from smaller businesses, online and mobile portals and operators in the digital arena that provide alternative sources of content." In addition, Defendant Williams, on the Company's October 17, 2016 earnings call, attempted to quell investor concern by assuring "[t]here is growing evidence that the inventory correction is working its way through the channel. Clearly, this is something ***we'll be monitoring closely over the coming months***, as it is a critical component of both our 2016 results and our 2018 goals." (Emphasis added).

322.    Thus, Defendants conceded that they were actively monitoring industry factors such as those described above. These industry factors, beginning in 2013, showed that the college textbook industry was already showing a significant decrease in college enrollments and revenue for book publishers had been suffering as consumers substituted industry products with other resources and reading materials that are readily available online. These industry trends further showed that the Company's self-identified competitors had begun shifting away from a revenue base dependent on traditional print towards digital advertising and subscriptions, and had incurred considerable write-downs to their anticipated earnings as a result of this transition.

323.   The Individual Defendants, by their own admission, were therefore aware throughout the Class Period that an imminent and substantial decline on the Company's textbook revenue yet – unlike their direct competitors – refused to timely adjust its guidance.

### 8.   The Individual Defendants Admitted that the Company was Aware of Market Factors Indicating Textbook Sales were Rapidly Declining

324.   Defendants also admitted that they monitored market factors – including the declining student enrollment and increase in textbook prices – which would have an obvious negative effect on the Company's ability to maintain its textbook revenue. For example, each of the Company's Annual Reports represented, *inter alia* "in these markets, there is still a regular cycle of product renewal, in line with demand **which management monitor**." (Emphasis added). Further, Defendants reported detailed student enrollment statistics in each of their Annual Reports and in the 2016 Annual Report acknowledged that Pearson was experiencing "an increase in US higher education textbook returns."

325.   Not only did these market factors indicate an imminent decline, but as a result of these known market factors, retailers, with whom Pearson admits to communicating regularly in connection with setting its forecasts, had been "destocking" and returning textbooks at significant rate. Accordingly, because Defendants admitted that prior to and throughout the Class Period that they were actively monitoring certain market factors, they admittedly knew, or must have known that the statements described above (Section V, *supra*) were false at the time made. Yet notwithstanding, Pearson continued to maintain its unrealistic guidance and reassure investors that returns would either remain flat or decrease.

### X.   LOSS CAUSATION

326.   As alleged herein, Defendants engaged in a scheme to deceive investors during the Class Period by misrepresenting and omitting material facts concerning the capabilities,

performance, and profitability of the Company's North American higher education courseware segment, particularly issues related to the Company's digital offerings and structural changes within the physical textbook market. Defendants' materially false or misleading statements and omissions of material fact, alleged above in Section V, caused the price of Pearson's ADSs to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Lead Plaintiff and other Class Period purchasers of Pearson securities.

327.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about the ability of the Company's digital products to offset the declining print revenues, as well as the Company's outlook for managing said declines within the North American higher education segment.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's ADSs to be overvalued and artificially inflated at all relevant times. The materially false and/or misleading statements made by the Defendants named in this Action during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's ADSs at artificially inflated prices, thus causing the damages complained of herein.  For example:

- In response to the Company's January 21, 2015 pre-market announcement that the Company expected "stability returning to US college enrolments" and that the Company "expect[ed] adjusted operating profit to be at or above £800m in 2018," the Company's ADS price increased from $9.41 per ADS on January 20, 2016 to as high

as $11.08 per ADS on January 21, 2016 before closing that day at $10.95 – a 16%
increase over the prior day;

- In response to the Company's February 26, 2016 pre-market reaffirmation of its
  guidance for 2016 while maintaining that the Company remained on track to achieve
  2018 earnings per share of £800 million on the basis of, *inter alia*, "stability returning
  to US college enrolments" the Company's ADS price increased from $11.19 per ADS
  to $11.83 per ADS on February 26, 2016 and trending upwards from that point on to
  reach as high as $13.02 on March 21, 2016 – a 16% increase over the pre-
  announcement price.

328.    During the Class Period, as detailed herein, the Defendants engaged in a scheme to
deceive the market and perpetuate a course of conduct that caused the price of Pearson ADSs to
be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed
herein. As the Defendants' misrepresentations and fraudulent conduct were disclosed and became
apparent to the market, the artificial inflation in the price of ADSs was removed, and the price fell.

329.    For example, on October 21, 2015, when the Company announced its nine-month
management statement identifying "higher returns affecting the US higher education market" the
Company's ADS price fell from $18.39 per ADS on October 20, 2015 to $15.32 on October 21,
2015 – a drop of 17%.

330.    Further, when on October 17, 2016, the Company announced its nine-month
management statement attributed "declines in North American Higher Education courseware due
to a further inventory correction by retailers in July and August, with trends improving from

September" the Company's ADS price dropped from $10.10 per ADS on October 14, 2016 to $9.27 – a drop of 10%.

331.    Finally, when, on January 18, 2017, Pearson announced "revenues down approximately 8% in underlying terms primarily due to weakness in North American higher education courseware" that suffered an 18% decline for the full year, the Company's ADS price fell from $9.99 on January 17, 2017 to a close of $7.13 on January 18, 2017 – a drop of 29%.

332.    As a result of their purchases of Pearson ADSs during the Class Period at artificially inflated prices, Plaintiffs, and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price decline in Pearson ADSs negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## XI.    PRESUMPTION OF RELIANCE

333.    At all relevant times, the market for Pearson common stock was efficient for the following reasons:

(a)    Pearson ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a foreign private issuer, Pearson filed periodic reports with the SEC and NYSE;

(c)    Pearson regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Pearson was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

334.    As a result of the foregoing, the market for Pearson ADSs promptly digested current material information regarding Pearson from all publicly available sources and reflected such information in Pearson's stock price. Under these circumstances, all purchasers of Pearson ADSs during the Class Period suffered similar injury through their purchase of Pearson ADSs at artificially inflated prices, and a presumption of reliance applies.

335.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

336.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

337.    None of the statements complained of herein was a forward-looking statement. Rather, each was historical a statement or a statement of purportedly current facts and conditions at the time such statement was made.

338.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As alleged above in detail, then-existing facts contradicted Defendants'

110

statements, rendering any generalized risk disclosures made by Pearson were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

339.     To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading.

## XIII.    CLASS ACTION ALLEGATIONS

340.     Lead Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Pearson ADSs during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").

341.     Excluded from the Class are Pearson and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

342.     Because Pearson had millions of ADSs outstanding during the Class Period, and because its securities were actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiff believes that there are, at a minimum, thousands of Class members. Members of the Class may be identified from records maintained by Pearson or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

343.     Lead Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

344.     Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.

345.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

(a)     Whether Defendants violated the federal securities laws as alleged herein;

(b)     Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Pearson's business and operations;

(c)     Whether the price of Pearson's ADSs was artificially inflated during the Class Period; and

(d)     The extent to which members of the Class have sustained damages and the proper measure of damages.

346.     A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV.    CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against Pearson and the Individual Defendants**

347.     Plaintiffs reallege each allegation as if fully set forth herein.

348.     This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Pearson and the Individual Defendants (the "Count I Defendants").

349.    The Count I Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

350.    The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

351.    The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

352.    As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

353.    Pearson is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Pearson in taking the actions alleged herein.

354.     Plaintiffs and the Class purchased Pearson ADSs, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's financial performance or prospects.   In so doing, Plaintiffs and the Class relied directly or indirectly on false and misleading statements made by the Count I Defendants, and/or an absence of material adverse information that was known to the Count I Defendants or recklessly disregarded by them but not disclosed in the Count I Defendants' public statements. Plaintiffs and the Class were damaged as a result of their reliance on the Count I Defendants' false statements and misrepresentations and omissions of material facts.

355.     At the time of the Count I Defendants' false statements, misrepresentations and omissions, Plaintiffs and the Class were unaware of their falsity and believed them to be true. Plaintiffs and the Class would not otherwise have purchased Pearson ADSs had they known the truth about the matters discussed above.

356.     By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

357.     As a direct and proximate result of the Count I Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their purchase of Pearson common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Pearson and the Individual Defendants

358.     Plaintiffs realleges each allegation as if fully set forth herein.

359.     This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Pearson and the Individual Defendants (the "Count II Defendants").

114

360.     Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of Pearson, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act.   The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs and the Class' investments in Pearson ADSs within the meaning of §20(a) of the Exchange Act.   Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

361.     The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

362.     The Count II Defendants knew or recklessly disregarded the fact that Pearson's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

363.     By virtue of their high-level positions and their participation in and awareness of Pearson's operations and public statements, the Count II Defendants were able to and did influence and control Pearson's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

364.     The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

365.     As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act.

366.     As a direct and proximate result of the Count II Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of Pearson common stock

## XV.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class;

B.     Awarding Plaintiff and the members of the Class damages, including interest;

C.     Awarding Plaintiff reasonable costs and attorneys' fees; and

D.     Awarding such other relief as the Court may deem just and proper.

## XVI.   **JURY DEMAND**

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

Dated:  July 14, 2017          */s/ Shannon L. Hopkins*
_____

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins (SH-1887)
Sebastian Tornatore (ST-0304)
733 Summer Street, Suite 304
Stamford, CT 06901
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email:  shopkins@zlk.com
Email: stornatore@zlk.com

*Counsel for Lead Plaintiffs and the Class*

116

## **CERTIFICATE OF SERVICE**

 I hereby certify that on this 14th day of July 2017, true and correct copies of this document were served via the Court's ECF system to all counsel of record as identified on the Notice of Electronic Filing (NEF), and electronically sent to those indicated as non-registered participants.

<div style="text-align: right">

*/s/Shannon L. Hopkins*
Shannon L. Hopkins

</div>