UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

No. 17 Civ. 1422 (RJS)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/16/19

SHARON FINGER *et al.*,

Plaintiffs,

VERSUS

PEARSON PLC *et al.*,

Defendants.

MEMORANDUM AND ORDER
September 16, 2019

RICHARD J. SULLIVAN, Circuit Judge:

Lead Plaintiffs Sharon Finger and Manuel Martín ("Plaintiffs") bring this putative class action against Pearson PLC ("Pearson" or "the Company"), its Chief Executive Officer, its former Chief Financial Officer, and its current Chief Financial Officer (collectively, "Defendants"), alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Now before the Court is Defendants' motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 55.) For the reasons set forth below, Defendants' motion is GRANTED.

# I. BACKGROUND[1]

## A. The Parties

Defendant Pearson is a multinational publishing and education company

[1] The facts set forth below are taken from the Amended Complaint (Doc. No. 27 (the "Complaint" or "Compl.")), statements or documents incorporated into the Amended Complaint by reference, legally required public disclosure documents filed with the SEC, and documents upon which Plaintiffs relied in bringing the suit. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In ruling on the instant motion, the Court has also considered Defendants' memorandum of law in support of their motion to dismiss (Doc. No. 56), Plaintiffs' opposition (Doc. No. 60 ("Opp'n")), Defendants' reply (Doc. No. 58), the declarations and exhibits submitted with those briefs, Plaintiffs' notice of supplemental authority (Doc. No. 66), and Defendants' response to Plaintiffs' notice of supplemental authority (Doc. No. 68).

headquartered in London, England, the ordinary shares of which are traded on the London Stock Exchange ("LSE") and – as American Depository Shares ("ADSs") – on the New York Stock Exchange ("NYSE"). (Compl. ¶¶ 2, 19.) Defendant John Fallon has served as Pearson's Chief Executive Officer from January 1, 2013 until the present day, and Defendant Robin Freestone served as Pearson's Chief Financial Officer from June 12, 2006 until August 1, 2015, at which time Defendant Coram Williams was appointed to replace him. (*Id.* ¶¶ 20–22.) Plaintiffs are investors who purchased or acquired Pearson ADSs between January 21, 2015 and January 17, 2017 (the "Class Period") and claim to have suffered damages as a result of false or misleading statements made by Defendants. (*Id.* ¶¶ 17–18.)

B. Facts

Though Pearson is based in the United Kingdom, its principal operations are in the North American market, from which it derived more than 60 percent of its annual sales between 2014 and 2016. (*Id.* ¶¶ 29, 32.) The Company's diversified interests within the education industry include "courseware" – that is, educational content ranging from traditional textbooks to digital products. (*Id.* ¶¶ 34–36.) During the Class Period, Pearson was a major player in this space, possessing a 40-percent share of the print textbook market. (*Id.* ¶ 49.)

The education industry, and specifically the courseware market, has undergone rapid and significant changes within the past decade. These shifts are the result of a host of factors, including declining student enrollment at institutions of higher education (*id.* ¶ 50) and soaring textbook prices that encouraged students to seek less expensive alternatives, such as rentals and digital products (*id.* ¶¶ 54–55). While many of Pearson's competitors in the education industry responded to this changing market by shifting production from traditional textbooks to digital content, Pearson was slower to do so. (*Id.* ¶¶ 63, 70.) When Pearson did begin to modify its product mix, including MyLab – a suite of online educational software that was the Company's flagship digital offering – many of its products suffered from technical defects. (*Id.* ¶¶ 72–74.) Specifically, Plaintiffs contend that MyLab programs "regularly marked otherwise correct answers as incorrect" and "would often crash or refuse to allow users to log in, despite their supplying the correct credentials." (*Id.* ¶¶ 76–77.)

A slow move online, coupled with faulty products, was not Pearson's only problem; during the Class Period, Pearson also began to experience an uptick in physical returns of its print textbooks. (*Id.* ¶ 102.) Notably, textbook retailers increasingly began engaging in what is known as "destocking" – the practice of reducing a store's inventory by returning unsold products to the provider before a previously agreed-upon deadline. (*Id.* ¶ 53.) As this trend spiked across the industry in 2015 and 2016 (*id.* ¶¶ 105–106), Pearson's monthly return numbers were higher in each month of 2016 than they had been in the same month of the prior year (*id.* ¶¶ 108, 111). This increase in returns contributed to Pearson's "unprecedented decline in . . . [its] North American higher education courseware business," which ultimately forced the Company to downgrade its future profit projections. (*Id.* ¶ 239.) What follows is a brief description of the events and statements that Plaintiffs allege demonstrate fraud on the part of Defendants.

1. Pearson's Early Statements (2015)

On January 21, 2015, Pearson issued a press release with guidance regarding projected earnings per share for 2015. (*Id.* ¶¶ 118–119.) Roughly a month later, on February 27, 2015, Pearson announced its financial results for 2014 in another press release, a filing with the SEC, and an investor call. (*Id.* ¶¶ 121–122.) In its Form 6-K filing with the SEC, Pearson described "good growth in digital and services" and predicted the "stabili[z]ation of cyclical and policy-related factors" in the marketplace. (*Id.* ¶ 124.) The Company reported "sales up 2% . . . to £4.9 billion [and d]eferred revenue . . . up 10% . . . to more than £800 million" (Pearson PLC, Press Release (Form 6-K) (February 27, 2015)), as well as goodwill assets of £5.03 billion (Compl. ¶ 132),[2] and assured its compliance with International Financial Reporting Standards ("IFRS") (*id.* ¶ 134). Not mentioned in the filing, however, were the issues plaguing Pearson's digital products. (*Id.* ¶ 130.)

A month later, on March 26, 2015, Pearson filed its annual report for 2014, via Form 20-F, with the SEC. (*Id.* ¶ 136.) This filing again highlighted Pearson's purportedly solid footing of its digital product offerings while predicting that the broader market would "stabilize." (*Id.* ¶ 138.) Pearson once more stated its compliance with IFRS (*id.* ¶ 147), and the Company, Defendant Fallon, and Defendant Freestone all certified that Pearson's internal controls were adequate and that the filing was accurate and non-fraudulent (*id.* ¶¶ 149–152). The Company also addressed goodwill as required on Form 20-F, again quantifying its goodwill asset value at £5.03 billion. (*Id.* ¶ 142.) While the document contained no mention of Pearson's increasing textbook returns or issues with its digital offerings (*id.* ¶¶ 140–141), it did state that the Company tested its goodwill valuation annually and had done so to arrive at its 2014 calculation (*id.* ¶¶ 144–145).

Later that same year, on July 24, 2015, Pearson filed another Form 6-K, this time announcing its results for the first half of 2015, which was once again accompanied by a press release and an investor call. (*Id.* ¶¶ 154–155.) Both the filing and investor call painted a positive financial picture for Pearson, with Defendant Freestone calling the Company's performance "very good" and highlighting "strength in digital and services." (*Id.* ¶ 158.) Pearson reported that sales were "up 1% . . . to £2.2 billion" and "[d]eferred revenue from continuing operations [was] up 3% . . . to more than £750 million." (Pearson PLC, Press Release (Form 20-F) (July 24, 2015).) Again, no mention was made of the flaws in Pearson's digital products (Compl. ¶ 160), or of the "ongoing 'inventory correction'" resulting from destocking (*id.* ¶ 161). Pearson provided the same warning as it had in its Form 20-F regarding its goodwill, which it now valued at £4.8 billion. (*Id.* ¶¶ 165–166.) The Company again asserted its compliance with IFRS. (*Id.* ¶ 168.)

2. Pearson Begins to Report Problems (Late 2015 – Early 2016)

On October 21, 2015, Pearson issued its nine-month Interim Management Statement, recapping the first three quarters of 2015, in which it disclosed for the first time that

---

[2] Goodwill "is an intangible asset generated by the acquisition of a business for a price greater than the value of the business's net identifiable assets (e.g., cash, investments, buildings, equipment, inventory, accounts receivable, and certain identifiable intangible assets)." *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15-cv-6034 (RJS), 2016 WL 5794774, at *2 (S.D.N.Y. Sept. 30, 2016).

textbook returns had impacted its bottom line:

> Cyclical and policy[-]related factors made some of our largest markets weaker than we expected with, in particular, lower Community College enrol[l]ments and higher returns affecting the US higher education market[,] and lower purchasing in certain provinces affecting the school textbook market in South Africa.

(*Id.* ¶ 170 (emphasis omitted).) Pearson also decreased its 2015 share price guidance in light of these developments. (*Id.* ¶ 171.) Nevertheless, the Company claimed that its "competitive performance remained strong," and Defendant Fallon reaffirmed this assertion. (*Id.* ¶ 174 (emphasis omitted).) Despite this reassurance, the Company's ADS price slipped from $18.39 per share on October 20, 2015 to $15.32 per share the following day, a decrease of 17 percent. (*Id.* ¶ 329.)

Three months later, on January 21, 2016, Pearson released its January Trading Update and held an accompanying conference call with financial analysts. (*Id.* ¶ 176.) In both the Trading Update and the call, Defendant Fallon blamed Pearson's underperformance on "cyclical and policy[-]related challenges in our biggest markets [that] have been more pronounced and persisted for longer than anticipated." (*Id.* ¶¶ 179–180.) Nevertheless, the Company reaffirmed its 2018 adjusted operating profit guidance of "at or above £800 [million]." (*Id.* ¶ 182.) Once again, Pearson did not address any of the technical problems plaguing its digital products; nor did it acknowledge the general market shift towards digital content. (*Id.* ¶ 184.) Instead, the Company explained its climbing return numbers as the result of anomalous behavior by one customer, Follett Corporation ("Follett"), and asserted "that if you excluded that one customer, returns for the rest of the industry were actually down." (*Id.* ¶ 185.) Following the Trading Update and conference call, Pearson's ADS price quickly climbed from $9.41 on January 20, 2016 to $10.95 at the close of January 21, 2016 – an increase of 16 percent. (*Id.* ¶ 327.)

The following month, on February 26, 2016, Pearson unveiled its Preliminary Full Year 2015 Financial Results, in which it reported an overall decline in sales of about two percent. (*Id.* ¶ 188.) However, the Company maintained that it expected to rebound, and predicted that the market factors that had hampered its growth would soon stabilize. (*Id.* ¶¶ 188–190.) In making these claims, Pearson highlighted the status of its MyLab product suite:

> Global digital registrations of MyLab and related products grew 3% to nearly 13 million. In North America, digital registrations grew 3% to almost 11 million with good growth in Science, Business & Economics, Statistics, REVEL and skills applications like Pearson Writer, offset by softness in developmental Mathematics. Faculty generated case studies indicate that the use of MyLab program[s], as part of a broader course redesign, can support improvements in student test scores and lower institutional cost.

(*Id.* ¶ 191.)

That same day, Pearson held a conference call with financial analysts to discuss the Company's 2015 performance and its future outlook. (*Id.* ¶ 194.) Defendant Fallon again predicted that the market challenges impeding Pearson's

growth would "stabilize by the end of this year" and that the Company was "making good progress in ensuring Pearson can capitalize on the big structural growth opportunities we see in education." (*Id.* ¶ 195 (emphasis omitted).) Fallon also claimed that Pearson was "moving quickly and decisively to seize the big growth opportunities that [digital products] offer." (*Id.* ¶ 197.) Additionally, Fallon addressed Pearson's growing number of returned products, once more telling investors that the returned products were attributable to one "specific customer issue rather than a generic industry trend." (*Id.* ¶ 200.) When the markets closed that day, Pearson's ADS price increased from $11.19 to $11.83 per share; over the next few weeks, that number would swell to $13.02 per share, marking a 16% increase. (*Id.* ¶ 327.)

On March 23, 2016, Pearson filed another 20-F form with the SEC, this time regarding its financial performance in 2015. (*Id.* ¶ 202.) In that filing, Pearson highlighted the changes to the textbook industry brought on by "digitization," noting that these shifts presented both "threats and opportunities" before warning:

> If we do not adapt rapidly to these changes we may lose business to "faster" and more "agile" competitors, who increasingly are non-traditional competitors, making their identification all the more difficult. We may be required to invest significant resources to further adapt to the changing competitive environment.

(*Id.* ¶ 205.) The Company also repeated its February 26, 2016 update on its MyLab products, adding that:

> We launched a suite of features that include Adaptive Practice in our MyLabs to personalize subjects including mathematics and nursing practice, Predictive Analytics Early Alerts in Mastering to help science instructors support at-risk students, gamification features in Business and rich learning analytics dashboards in numerous products that offer deep insight into students' progress, performance and engagement.

(*Id.* ¶ 204.) The filing did not reference any of MyLab's alleged problems or flaws. (*Id.*) Pearson also adjusted its goodwill asset value in the 2015 20-F form, decreasing the value to £4.134 billion. (*Id.* ¶ 208.) This calculation included an impairment of £849 million, £282 million of which Pearson claimed was related to "ongoing cyclical and policy[-]related pressures" in the North American market. (*Id.* ¶¶ 208, 210.) In reporting this valuation, Pearson reaffirmed its policies and practices regarding goodwill.[3] (*Id.* ¶ 209.) Additionally, the Company, Defendant Fallon, and Defendant Williams all certified that Pearson's financial reporting and internal control mechanisms were sound. (*Id.* ¶¶ 212–215.)

Later that summer, on July 29, 2016, Pearson issued a press release summarizing its results for the first half of that year. (*Id.* ¶ 217.) The Company reported that sales in North America had dropped 9 percent, but it left its projected operating profit – £800

[3] *See id.* ¶ 209 ("Goodwill is tested at least annually for impairment and carried at cost less accumulated impairment losses. An impairment loss is recogni[z]ed to the extent that the carrying value of goodwill exceeds the recoverable amount. The recoverable amount is the higher of fair value less costs of disposal and value in use. These calculations require the use of estimates and significant management judgement.").

million by 2018 – intact. (*Id.*) The Company again reported growth in MyLab registrations and touted the program's ability to help students achieve improved academic outcomes. (*Id.* ¶ 219.)

Two days later, on July 31, 2016, the Company held a conference call with analysts to discuss the 2016 results, during which it admitted that textbook returns had increased in the first half of the year despite the Company's predictions to the contrary. (*Id.* ¶ 221.) Throughout the call, Defendants repeatedly blamed returns on retailers taking a cautious approach to inventory and insisted that consumer demand had not dramatically decreased. (*Id.* ¶¶ 222–224.) On this topic, Defendant Williams said:

> [W]hat [our retailers] are telling us is that, they are being cautious, both in terms of stock levels and in terms of their ordering patterns, because they don't want to get caught out in the way that a number of us were at the end of last year. They are not reporting any fundamental change in underlying student demand.

(*Id.* ¶ 223.) Defendant Fallon agreed, noting that Pearson was "not seeing any change in our assumptions about fundamental student purchasing behavior, which is the important factor." (*Id.* ¶ 225.) Defendant Fallon also went on to say that despite the company's weak performance in 2016, "we expect some positive uptake from digital." (*Id.* ¶ 226 (emphasis omitted).)

3. Pearson's Problems Become Clear (Late 2016 – Early 2017)

On October 17, 2016, Pearson once again updated investors on its financial performance for the year, this time in an Interim Management Statement and an accompanying analyst call. (*Id.* ¶ 228.) In essence, Pearson acknowledged that the "inventory correction" that had impacted the Company in 2015 had intensified, notwithstanding the company's prior predictions that it would abate in 2016. (*Id.* ¶ 229.) In spite of this, Defendants Fallon and Williams predicted that the Company would rebound in 2017 and 2018, and maintained that they expected to see a decrease in product returns and a recovery in sales numbers in the fourth quarter of 2016. (*Id.* ¶¶ 231–233, 235–236.) Despite these hopeful projections, Pearson's ADS price tumbled more than eight percent on the day of the press release and call (*id.* ¶ 234), and several financial analysts issued cautionary reports regarding the Company's status (*id.* ¶ 237).

Finally, on January 18, 2017, Pearson issued the last trading update to fall within the Class Period. (*Id.* ¶ 239.) In this statement, the Company revealed that it had experienced a continued decline in its North American business in the final quarter of 2016. While this would not impact the company's operating profit number for 2016, this weak performance forced Pearson both to alter its characterization of market trends and to decrease its profit guidance for 2018. (*Id.*) Much of this reassessment hinged on Pearson's failure to anticipate the direction of the textbook market: as Defendant Fallon noted on a conference call with analysts later that day, not only had college enrollments and the amount of revenue Pearson earned per enrollment continued to drop in the fourth quarter of 2016, but – despite Pearson's predictions to the contrary – the rental market had also boomed while returns of physical inventory increased. (*Id.* ¶¶ 241–242, 244). Altogether, the Company had seen an eight percent decrease in revenues in 2016, largely due to its struggles in the North

American market, where sales decreased 18 percent on the year and 30 percent in the fourth quarter alone. (*Id.* ¶ 239.) Pearson blamed the "cumulative impact" of the 2015 inventory correction for 12 percent of this 18 percent drop. (*Id.* ¶ 304 (emphasis omitted).) On the heels of these revelations, Pearson's ADS price dropped more than 28 percent, and at least six financial analysts issued negative reports on the Company's outlook. (*Id.* ¶¶ 246–247.)

Following the conclusion of the Class Period, on February 24, 2017, Pearson released its preliminary results for 2016. (*Id.* ¶ 249.) In this release, the Company announced a goodwill impairment of £2.548 billion. (*Id.*) While Defendant Williams blamed this number on a "mechanical accounting effect," Defendant Fallon pointed to Pearson's struggles in 2016 and its revision of its 2018 profit guidance as the principal cause of the impairment. (*Id.* ¶ 253.)

### C. Procedural History

On February 24, 2017, Daniel Chupka, who invested in Pearson during the Class Period, filed suit against the Company, Defendant Fallon, and two other high-level Pearson employees, Natalie Dale and Stephen Jones. (Doc. No. 1.) On April 25, 2017, Plaintiffs Finger and Martín moved to be named lead plaintiffs and for Levi & Korsinky LLP to be named Lead Counsel. (Doc. No. 8.) The Court granted that motion on May 9, 2017. (Doc. No. 17.) Plaintiffs then filed their Amended Complaint on July 14, 2017, which again named the Company and Defendant Fallon as parties to the case, dropped Dale and Jones as defendants, and added Defendants Freestone and Williams. (Compl.) On October 2, 2017, Defendants filed the instant motion to dismiss (Doc. No. 45), which was fully briefed on December 12, 2017.[4] (*See* Doc. No. 50.) On March 20, 2019, Plaintiffs filed a notice of supplemental authority (Doc. No. 66), and Defendants filed a response on March 22, 2019 (Doc. No. 68).

Plaintiffs allege that Pearson and the individual Defendants made a series of material misstatements and omissions during the Class Period. Specifically, Plaintiffs allege that Defendants falsely characterized market trends in the education and textbook industries, and misstated the Company's response to such trends; failed to disclose the significant flaws in its digital products and the extent of the increase in textbook returns that would materially affect Pearson's bottom line; and misrepresented Pearson's goodwill asset value and compliance with accounting standards, all in violation of federal securities laws. Defendants move to dismiss the Amended Complaint, arguing that Plaintiffs fail to allege (1) actionable misstatements or omissions, and (2) scienter. The Court agrees.[5]

## II. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns*, 493 F.3d at 98. Specifically, a plaintiff must allege "enough

---

[4] Due to a series of filing errors, Defendants refiled their motion, briefs, and supporting documents on December 7, 2017 (Doc. Nos. 55–59), and Plaintiffs refiled their briefs and supporting documents on December 12, 2017 (Doc. Nos. 60–63).

[5] Defendants also argue that Plaintiffs have not adequately pleaded loss causation. Because the Court concludes that Plaintiffs' claims must be dismissed on other grounds, the Court declines to address this argument.

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

Moreover, securities fraud claims are subject to heightened pleading standards under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b). *See ATSI Commc'ns*, 493 F.3d at 99. To satisfy Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99.

The PSLRA, in turn, requires plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). As for mental state, the statute demands that plaintiffs "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A) (emphasis added); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). A "strong" inference is one that is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Courts "consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Accordingly, even though courts normally draw reasonable inferences in the non-movant's favor when ruling on a motion to dismiss, the PSLRA creates a more stringent standard for inferences relating to mental state. *Id.* at 196 (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).

## III. Discussion

### A. Alleged Violations of Exchange Act Section 10(b) and SEC Rule 10b-5

"Section 10(b) of the Exchange Act makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Emps.' Ret. Sys. of Gov't of the*

*V.I. v. Blanford*, 794 F.3d 297, 304–05 (2d Cir. 2015) (quoting 15 U.S.C. § 78j(b)). "SEC Rule 10b-5 implements this provision of the Exchange Act and explicitly prohibits 'mak[ing] any untrue statement of a material fact'" in connection with the purchase or sale of a security. *Id.* at 305 (quoting 17 C.F.R. § 240.10b-5(b)). To establish liability for securities fraud, a plaintiff must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Dura Pharms.*, 544 U.S. at 341–42 (collecting cases). At issue here are the requirements of "a material misrepresentation or omission" and "scienter." The Court will address each in turn.

1. Alleged Misstatements and Omissions

To be actionable, a misstatement or omission must be material. *Id.* Materiality is a mixed question of law and fact. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information;" in other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 240 (1988) (quoting *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976)); *see also ECA*, 553 F.3d at 197. The Supreme Court has repeatedly eschewed bright-line rules defining materiality, instead favoring a case-by-case determination. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38–41 (2011). In the context of a Rule 12(b)(6) motion, dismissal on materiality grounds is appropriate only when the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman*, 754 F.2d at 1067.

So long as they are material, false statements of fact are actionable under Section 10(b) and Rule 10b-5. *See In re Int'l Bus. Machs. Corp. Secs. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812–13 (2d Cir. 1996). Statements of opinion are also actionable if "the speaker did not hold the belief she professed," or "the supporting fact[s] she supplied were untrue." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)). Moreover, a sincerely held opinion may be actionable if "the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.* (citing *Omnicare*, 135 S. Ct. at 1332).

An omission, by contrast, is actionable only if the speaker has an underlying duty to disclose the omitted information. *Basic*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). There is no freestanding duty to reveal "any and all material information;" in fact, absent an underlying duty to disclose, companies may remain silent "[e]ven with respect to information that a reasonable investor might consider material." *Matrixx Initiatives*, 563 U.S. at 44–45; *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 152–53 (2d Cir. 2013). A duty to disclose arises when a corporate insider trades on confidential information, a statute or regulation requires disclosure, or – as

relevant here – the company makes "a corporate statement that would otherwise be inaccurate, incomplete, or misleading" without the disclosure. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101–02 (2d Cir. 2015) (internal quotation marks omitted). Accordingly, where there is no insider trading or affirmative disclosure obligation, companies "can control what they have to disclose under [Section 10(b) and Rule 10b-5] by controlling what they say to the market." *Matrixx Initiatives*, 563 U.S. at 45.[6] Once a company chooses to speak on a topic, however, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002). Nevertheless, "[s]tatements of general corporate optimism . . . do not give rise to securities violations." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015).

Here, Plaintiffs' fraud allegations are based on both misstatements and omissions. The Court will organize Defendants' alleged misstatements and omissions by subject matter, and address them in that order.

a. Market Trends and Pearson's Overall Financial Health

Because Plaintiffs allege that Defendants repeatedly made material misstatements and omissions when characterizing the state of the textbook industry and describing the Company's footing amidst those changes, the Court divides Plaintiffs' allegations into two distinct chronological groups – "Early 2015" and "Late 2015 to Early 2016."[7]

i. Early 2015 Statements

As described above, on January 21, February 27, March 26, and July 24 of 2015, Pearson forecasted that the textbook publishing industry would "stabili[z]e" and predicted that "good growth in digital and services" would result in "adjusted earnings per share of between 75p and 80p in 2015." (Compl. ¶¶ 119, 124, 138, 157.) According to Plaintiffs, these statements were materially false and misleading because "[i]n reality, Defendants knew that college enrollments would continue to worsen, negatively impacting the Company's textbook business with no viable alternative to offset the lost revenue." (*Id.* ¶ 115.)

Although "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees[,] are supported by specific statements of fact, . . . or if the speaker does not genuinely or reasonably believe them," *In re Int'l Bus. Machs. Corp. Secs. Litig.*, 163 F.3d at 107, that is not the case here. First, Defendants' forward-looking projections were not phrased as assurances: Pearson in no way

---

[6] Moreover, as the Second Circuit made clear in *Stratte-McClure*, the *materiality* of an alleged omission must be considered in light of *Basic*'s sliding scale of materiality. 776 F.3d at 103 (holding that *Basic*'s "probability/magnitude test," rather than a regulatory definition, controls the materiality inquiry for claims based on Section 10(b) and Rule 10b-5). Under that test, "the materiality of an allegedly required forward-looking disclosure is determined by 'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Id.* at 102–03 (quoting *Basic*, 485 U.S. at 238) (emphasis omitted).

[7] While the Background section describes Defendants' statements in three chronological periods, *see infra* Section I.B, Plaintiffs do not allege that Defendants made material misstatements or omissions in the third and final window (late 2016 to early 2017), so the Court need not address that window here.

guaranteed that the industry would stabilize, that the stock price would increase, or that growth in sales would remain constant. Instead, Pearson used broad, optimistic language when it advised investors that cyclical and policy-related forces "*shouldn't* get any worse" (Compl. ¶ 126 (emphasis added)) and stated that it "*expect[ed]* . . . learning services to be broadly level" moving forward (*id.* ¶ 127 (emphasis added)).

Second, Plaintiffs identify no material misstatement of fact made in support of these forecasts. Plaintiffs allege, for example, that it was materially false for Pearson to claim it had experienced "good growth" and "good progress" because its growth was "not as strong as the Company represented." (*Id.* ¶¶ 124(a), 128.) But Plaintiffs do not allege that there was, in reality, *no* growth or *no* progress, nor do they point to documents or data contradicting Pearson's reported increase in sales up two percent over the previous year. (*See* Pearson PLC, Press Release (Form 6-K) (February 27, 2015).) Plaintiffs likewise allege that it was misleading for Pearson to claim that its "major restructuring and product investment program[] . . . designed to accelerate Pearson's shift toward growth opportunities" would "provide Pearson with a significantly larger market opportunity." (*Id.* ¶ 138(a).) But Plaintiffs do not allege that Defendants failed to pursue such a program – they merely allege that they did not do so "adequate[ly]" in the long run. (*Id.* ¶ 139.) *Compare Novak v. Kasaks*, 216 F.3d 300, 304, 315 (2d Cir. 2000) (vacating dismissal because "defendants did more than just offer rosy predictions" when they stated their inventory – which consisted of an increasing amount of "obsolete and nearly worthless" items – "was 'in good shape' or 'under control,'" at "expected levels," and the result of "growth, expansion, and planned future sales") *with Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (affirming dismissal because defendant's "broad, general statements" that it was confident in its business strategy and committed to increasing earnings would not lead a reasonable investor to believe the company had insured against all inherent risks); *see also Lasker*, 85 F.3d at 59 (finding that defendants who stated that "business strategies [would] lead to continued prosperity" made no misstatement, as they were "in no way insuring that dividend rates would remain constant, or that the stock price would not decline").

Finally, Plaintiffs make no specific allegations that Defendants did not reasonably believe these statements at the time they made them. Indeed, Plaintiffs point to no internal documents or data known to Defendants at the time of the statements that undermine or contradict Defendants' subjective belief in the accuracy of the projections. *In re Int'l Bus. Machs. Corp. Secs. Litig.*, 163 F.3d at 107; *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 266 (2d Cir. 1993) (affirming the dismissal of a complaint that "contain[ed] no allegations to support the inference that the defendants either did not have these favorable opinions on future prospects when they made the statements or that the favorable opinions were without a basis in fact").

Likely aware of this deficiency, Plaintiffs devote far more time to Defendants' alleged omissions, asserting that when Defendants "elected to . . . proffer positive information about the quality of the Company's technology offerings, they were under a duty to disclose the additional negative information . . . in order to make the positive information not misleading."

(Compl. ¶ 116.) But liability for an omission arises "only when an issuer's failure to include a material fact has rendered a published statement misleading." *Omnicare*, 135 S. Ct. at 1332; *see also Tongue*, 816 F.3d at 210. And establishing liability for an omission in the context of a statement of opinion "is no small task;" it is not enough to allege that the opinion was wrong or that the defendant failed to reveal its basis for the opinion. *Omnicare*, 135 S. Ct. at 1332. Rather, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.*

Whether an omission makes an expression of opinion misleading is a highly context-specific inquiry: a reasonable investor reads a statement "in light of all of its surrounding text, including hedges, disclaimers, and apparently conflicting information," while taking into account "the customs and practices of the relevant industry." *Id.* at 1330. Moreover, an opinion statement "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," because a reasonable investor would not expect "that *every* fact known to an issuer supports its opinion statement." *Id.* at 1329. A statement's specificity is one factor relevant to this inquiry: to paraphrase the Supreme Court, a reasonable investor would expect that a specific statement – like "I believe 1.3 million textbooks have been returned" – is based on a more detailed investigation than a general statement – such as "I believe we have enough supply to meet demand." *Id.* at 1329 n.8.

Here, Plaintiffs allege that Defendants' omissions regarding declining student enrollments, lower textbook demand, and digital product defects rendered their projections – that the industry would stabilize and that the Company would see growth in digital and services – misleading. (Compl. ¶¶ 120, 128, 139, 159.) However, while Defendants may have left out facts that ran counter to their projections, Plaintiffs fail to identify how these omissions made the opinion statements at issue misleading to a reasonable investor. *See Omnicare*, 135 S. Ct. at 1332 ("Section 11's omissions clause, after all, is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading."); *see also Tongue*, 816 F.3d at 212 (holding that a defendant does not have an obligation to disclose all facts that undermine "optimistic projections"). Each of the statements in question lacked specificity, using phrases like "good growth," "good progress," "greater access," and "more stable." (Compl. ¶¶ 124, 157.) Plaintiffs acknowledge that Defendants "never disclosed [Pearson's] actual return numbers during the Class Period, instead using vague descriptors on conference calls" (*id.* ¶ 101); that the cumulative returns charts lacked "any vertical axis that would allow for quantification" (*id.*); and that "the Company never sought to quantify the returns" (*id.* ¶ 164). In context, a reasonable investor would not understand the vague statements in question to be a reflection of every fact known to Defendants. Moreover, as *Omnicare* instructs, "[r]easonable investors understand opinion statements in light of the surrounding text." 135 S. Ct. at 1322. Here, Defendants acknowledged that "cyclical and policy[-]related forces were as bad as we expected they would be last year" (Compl. ¶ 126), and repeatedly stated that they

believed the market would "stabili[z]e" in the near future (*e.g.*, *id.* ¶¶ 138(b), 157(d)), implying to a reasonable investor that Defendants viewed the market to be relatively *un*stable at the time the statements were made.

Plaintiffs have insufficiently pleaded that Defendants made material misstatements or omissions in this time frame, and consequently, those claims fail.

ii. Late 2015 – Early 2016 Statements

Plaintiffs next allege that Defendants repeatedly made material misstatements or omissions between late 2015 and early 2016 regarding (1) Defendants' confidence that Pearson was performing strongly and was well-positioned to continue to do so (*id.* ¶¶ 174, 189, 195–197); (2) Defendants' belief that the market forces suppressing growth would stabilize moving forward (*id.* ¶¶ 180–181, 192, 195, 225); and (3) specific profit projections that Defendants chose not to adjust (*id.* ¶¶ 182, 217). These statements once again fail to qualify as material misstatements for the same reasons discussed in the previous subsection – namely, they are statements of opinion, and Plaintiffs have not sufficiently alleged that Defendants did not subjectively believe them or relied on incorrect facts when presenting them.

For example, Plaintiffs allege that Defendants made material misstatements regarding product returns during this time period. On October 21, 2015, the Company disclosed that "[c]yclical and policy[-] related factors made some of [its] largest markets weaker than [it] expected with, in particular, lower Community College enrol[l]ments and higher returns affecting the [U.S.] higher education market." (*Id.* ¶ 170.) In the February 2016 investor conference call, Defendant Fallon stated that the spike in returns was the result of one customer, Follett, who "didn't adjust their pricing as much as they needed to," and that if you removed Follett from the equation, "actually returns . . . were down on the prior year." (*Id.* ¶ 200.) Plaintiffs allege that these statements were materially false and misleading because Defendants knew that the increased returns reflected an ongoing industry-wide shift and not the actions of an anomalous customer. (*Id.* ¶¶ 200–201.) But these allegations are conclusory, and Plaintiffs have not alleged any facts to suggest that there was no anomalous customer or that, absent that customer, returns were actually higher than the prior year. (*Id.* ¶¶ 167, 187, 201.)

Furthermore, Plaintiffs mischaracterize Defendants' statements as a denial of market trends when in fact Defendants acknowledged that the increased returns were a result of *both* industry-wide shifts and a single customer. In the October 21, 2015 statement, the Company identified higher returns as a "cyclical and policy[-] related factor" affecting the U.S. market (*id.* ¶ 170), and in the February 2016 investor conference call, Defendant Freestone characterized higher returns as a "market trend" that was exacerbated by Follett's returns (*id.* ¶ 162). Again, it appears that Plaintiffs' real problem is with the inaccuracy of Defendants' predictions that the situation would improve. But Plaintiffs point to no hard data in Defendants' possession that contradicted their assessment of the industry. *See In re Time Warner*, 9 F.3d at 266. Consequently, these claims also fail.

Plaintiffs also contend that Defendants' public statements regarding Pearson's transition to digital products – specifically, that Pearson anticipated growth from new

products and features in the upcoming year (Compl. ¶¶ 174, 175, 190, 204), and that MyLab registrations had increased by three percent (*id.* ¶¶ 191, 204, 219) – were rendered misleading by omissions regarding Pearson's digital product defects, inadequate customer service, and increasing return numbers (*id.* ¶¶ 193, 206).

To be sure, Defendants did speak on the general topic of Pearson's return numbers and digital products, and when a company chooses to speak on a topic, it assumes "a duty to be both accurate and complete." *Caiola*, 295 F.3d at 331. Nevertheless, this omission fails to present a viable claim under Rule 10b-5. As another court in this district has noted: "[t]he requirement to be complete and accurate . . . does not mean that by revealing one fact . . . one must reveal all others that, too, would be interesting." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) (internal quotations and citation omitted). By praising MyLab's new features, Defendants did not bind themselves to revealing any and all problems with MyLab's old features. *See Shemian v. Research in Motion Ltd.*, No. 11-cv-4068 (RJS), 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014) (noting that general statements of praise are "too vague and inconsequential to give rise to any duty to disclose . . . the [product's] potential shortcomings").

Moreover, the omission of information regarding MyLab's technical defects and inadequate customer service centers does not render misleading Pearson's public statements about growth in registration numbers and new product features. The thrust of Defendants' public statements was that Pearson was continuing to generate new interest in MyLab. Plaintiffs allege no facts to undermine those assertions. That existing customers may have been frustrated by MyLab's technical problems does not render those public statements misleading or suggest that the prior technical problems were known by Defendants to be ongoing and insurmountable. *See Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 32 (S.D.N.Y. 2016) ("Simply put, voluntary and involuntary turnover are different concepts. . . . That a particular quantum of employees were terminated during the relevant time period . . . does not render misleading the Company's statement that it had a low *voluntary* turnover rate.").

In sum, Plaintiffs have failed to adequately allege any material misstatements or omissions in Defendants' public statements regarding projections, general market trends, or its market position in either early 2015 or in the year between the October 21, 2015 Interim Management Statement and the July 31, 2016 analyst call.

b. Pearson's Goodwill Valuations and Accounting Practices

Plaintiffs also allege that as a result of Defendants' failure to mention the "inventory correction" that would eventually lead to the Company taking two large impairment charges (Compl. ¶¶ 129, 140, 161), and its silence regarding the technical and customer service issues affecting Pearson's digital products (*id.* ¶¶ 130, 141, 160), Defendants repeatedly overstated Pearson's goodwill asset value during the Class Period (*id.* ¶¶ 133, 142–146, 165–167). Additionally, Plaintiffs assert that Pearson failed to timely perform a goodwill impairment test. (*Id.* ¶¶ 276–278.) The Court again disagrees.

Goodwill estimates are opinion statements: they "depend on management's determination of the 'fair value' of the assets

acquired and liabilities assumed, which are not matters of objective fact . . . [and] will vary depending on the particular methodology and assumptions used." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110–11 (2d Cir. 2011). Plaintiffs allege only that the goodwill impairment test, and the corresponding write-down, should have occurred earlier. This demonstrates nothing more than disagreement with Pearson's accounting methodology. But the securities laws do not allow fraud-by-hindsight claims. *See Novak*, 216 F.3d at 309. Accordingly, after-the-fact "allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d. Cir. 1995).

Additionally, Plaintiffs allege that Defendants violated various accounting standards (Compl. ¶¶ 135, 148, 153, 169, 211, 216, 262, 266) and failed to maintain adequate internal controls (*id.* ¶¶ 291–299). Both allegations are largely derivative of Plaintiffs' previously rejected claims, and in all but one instance are entirely conclusory. (*See id.* ¶¶ 134–135, 147–148, 152–153, 168–169.) As far as the one instance in which Plaintiffs *do* plead non-conclusory facts, they take one of Defendants' statements completely out of context. Specifically, Plaintiffs allege that Defendants violated SEC Regulation S-K – which requires companies to disclose "any known trends or uncertainties" that the registrant "reasonably expects" will have an "unfavorable impact on net sales" – when the Company stated in its 2015 Annual Report that "we plan to hold our dividend at the 2015 level while we rebuild cover, reflecting the board's confidence in the medium-term outlook for our business." (*Id.* ¶¶ 287–288.) As an initial matter, this statement does not demonstrate a failure to disclose "known trends or uncertainties." Moreover, Plaintiffs conveniently ignore that on the very same page of that report, Pearson stated: "This is a challenging time for businesses in global education . . . . Digital technology is revolutionizing education . . . [and] many students and institutions face cost pressures. These changes offer big opportunities for Pearson, but also present risks . . . ." (Pearson PLC Annual Report and Accounts 2015 at 2.)

Even if Plaintiffs had successfully pleaded a violation of these accounting standards, the law in the Second Circuit is clear that "[a]llegations of GAAP violations or accounting irregularities" are sufficient to state a securities fraud claim "[o]nly where such allegations are coupled with evidence of 'corresponding fraudulent intent.'" *Novak*, 216 F.3d at 309. As discussed more fully below in connection with scienter, Plaintiffs have failed to allege the existence of such intent here.

For these reasons, the Court finds that Plaintiffs have failed to allege an actionable misstatement or omission on the part of Defendants. As a result, Plaintiffs' 10(b) claims must be dismissed. But if that were not enough to justify dismissal, Plaintiffs have also failed to plead that Defendants acted with the requisite scienter.

2. Scienter

As discussed above, a plaintiff alleging fraud under Section 10(b) must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2), defined as a "mental state embracing intent to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 319 (citation omitted). Thus, Plaintiffs "must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference."

*Id.* at 328 (emphasis in original). Moreover, the Court must consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* at 314. In this Circuit, a plaintiff may establish a "strong inference" of scienter by pleading particularized facts that either: "(1) show[] that the defendants had both motive and opportunity to commit the fraud, or (2) constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Where "[a] plaintiff has failed to demonstrate that defendants had a motive to defraud[,] . . . he must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Recklessness has been defined as "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 142 (internal quotation marks and citations omitted; ellipsis in original). This standard requires a plaintiff to raise an inference of "conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence," *Novak*, 216 F.3d at 312 – and to "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements," *id.* at 308. "[S]cienter may [also] be found where there are specific allegations of various reasonably available facts, or red flags, that should have put the officers on notice that the public statements were false." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) (internal quotation marks omitted). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

a. Plaintiffs' Individual Accusations

Plaintiffs claim that Defendants "knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were false and misleading" and that they "had the opportunity to commit and participate in the wrongful conduct." (Compl. ¶¶ 300–301). They do so by insisting that (1) Defendants knew the inventory correction was caused by the "cumulative impact of prior years" and necessitated an earlier impairment to goodwill; (2) Defendants knew Pearson's digital products were plagued with defects; (3) Defendants actively communicated with retailers about product returns; and (4) Pearson eventually took a sizable goodwill impairment." (*Id.* ¶ 303 (internal quotation marks removed).)

However, beyond these conclusory assertions, Plaintiffs offer no details as to what Defendants knew – and how or when Defendants came to possess such information – that rendered their statements false when made. Nor have they alleged facts to suggest that Defendants did not subjectively believe that their projections, opinions, and valuations were correct when made. Additionally, Plaintiffs fail to plead any facts demonstrating the type of highly unreasonable conduct or extreme departure from the standards of ordinary care necessary to establish recklessness. Because "this case does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not provide *strong* evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 144.

At most, Plaintiffs' claims amount to allegations of negligence, both in terms of how Defendants arrived at the conclusions proffered in their different statements and in omitting information in tension with those disclosures. Such allegations, of course, fail to clear the recklessness bar of the scienter element. *See, e.g.*, *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 482 (S.D.N.Y. 2017) ("At most, the [complaint] alleges that Defendants may have been negligent in failing to disclose contrary information as to its predictions about the [product]. This, however, does not amount to recklessness, and Plaintiffs have therefore failed to plead the requisite scienter."). Here, "[t]he pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994). For Plaintiffs to successfully plead a securities fraud claim based on corporate optimism, they must demonstrate that "the company's disclosures were inconsistent with current data" – something they have failed to do. *Id.* Thus, while Plaintiffs, with the benefit of hindsight, insist that Defendants' opinions turned out to be incorrect, they fail to identify the "contrary facts . . . reports or statements," *Novak*, 216 F.3d at 309, that rendered Defendants' statements false at the time they were made. This is not sufficient to support a securities fraud claim.

Plaintiffs also allege that the individual Defendants must have been aware that their statements were false and misleading because, as "high-ranking officers of the Company who were each heavily involved with the Company's operations and finances and had day-to-day responsibilities," they would have had knowledge of the "problems affecting the Company and its products," including "that Pearson's digital products were plagued with severe quality and reliability problems." (Compl. ¶¶ 308–309.) But "accusations founded on nothing more than a defendant's corporate position are entitled to no weight," *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 366 (S.D.N.Y. 2011), and Plaintiffs offer no details as to what Defendants knew, and when they knew it, that would have made their statements knowingly false.

Finally, Plaintiffs base their scienter argument on the fact that textbook sales in North America were "core" to Pearson's business operations, and that, therefore, Defendants "are rightly presumed to have knowledge of [the actual state of the business] as a matter of law." (Compl. ¶¶ 319–320.) But "while the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, it is not independently sufficient to raise a strong inference of scienter." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 415 (S.D.N.Y. 2018) (alterations omitted), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). In any event, Plaintiffs clearly have failed to allege "specific . . . facts, or red flags, that should have put the officers on notice that the[ir] public statements were false." *In re Refco*, 503 F. Supp. 2d at 649 (internal quotation marks omitted).

b. Holistic Assessment

Although the Court has rejected all of Plaintiffs' scienter arguments individually, it must still consider whether the allegations and other proper sources of facts "give rise to a strong inference of scienter" when "taken collectively." *Tellabs*, 551 U.S. at 322–23. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one

could draw from the facts alleged." *Id.* at 324. Here, two principal inferences are available: either Defendants knew – or recklessly failed to realize, which amounts to the same thing – that their optimistic statements and projections concerning Pearson's economic well-being, the direction of the publishing industry, and the Company's goodwill asset value were materially false or misleading; or, in the alternative, Defendants exhibited misplaced optimism and/or questionable business analysis, in which case their statements and omissions are nonactionable. Based on the facts before it, the Court has no hesitation in concluding that the second inference is far more compelling than the first.

It is, of course, true that scienter allegations "need not be irrefutable," or "even the '*most* plausible of competing inferences,'" to withstand a motion to dismiss. *Id.* (emphasis added). But the Complaint's conclusory and hindsight-driven allegations are clearly insufficient to meet the heightened pleading standards of Rule 9(b) and the PSLRA. Put simply, the Court finds that any reasonable person would deem the inference of scienter to be far less compelling than, at most, nonactionable mismanagement and negligence on the part of Defendants. For this reason, the Court concludes that Plaintiffs have failed to adequately allege scienter, and that their claim under Section 10(b) and Rule 10b-5 must therefore be dismissed.

B. Alleged Violations of Exchange Act Section 20(a)

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act." *Blanford*, 794 F.3d at 305 (alteration in original) (quoting 15 U.S.C. § 78t(a)). However, because Plaintiffs' Section 20(a) claim "is necessarily predicated on a primary violation of securities law," and the Court has determined that Plaintiffs have failed to plead a primary violation, Plaintiffs' Section 20(a) claim must also be dismissed. *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).

C. Required Findings as to the Parties' Compliance with Rule 11

The PSLRA mandates that, at the end of any private securities action, the district court must "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of" Federal Rule of Civil Procedure 11(b). 15 U.S.C. § 78u-4(c)(1); *see also Rombach*, 355 F.3d at 178 (remanding for findings under Rule 11 because the PSLRA "mandates" such findings and "the imposition of sanctions" if "the court finds that any party or lawyer violated Rule 11(b)"). Although the Court does not hesitate to grant Defendants' motion to dismiss the Amended Complaint, the Court concludes that no party has violated Rule 11(b) and that sanctions are not warranted.

D. Leave to Amend

Finally, the Court considers Plaintiffs' request for leave to amend. (Opp'n at 30 n.17.) "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the [Court] to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). This is particularly true when leave is requested

informally in a brief filed in opposition to a motion to dismiss. *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) (internal citation omitted).

Here, in a footnote appended to the final sentence of their Opposition to Defendants' motion to dismiss, Plaintiffs state: "In the event the Court grants Defendants' motion in whole or in part, Plaintiffs respectfully request leave to amend." (Opp'n at 30 n.17.) Significantly, Plaintiffs offer no basis for their request for leave, nor do they attach a proposed amended complaint. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (noting that a court may deny leave to amend on notice grounds "where the request gives no clue as to how the complaint's defects would be cured" (internal quotation marks omitted)). Moreover, this is not the first complaint in this action, since Plaintiffs filed the Amended Complaint after their appointment as Lead Plaintiffs, supplanting the initial complaint. As Judge Lynch colorfully noted when he was on the district court, pleading is not "an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges." *First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 642 (S.D.N.Y. 2014) (internal citation omitted). Since, Plaintiffs have offered no explanation or justification for their contemplated amendment, their request to amend the Complaint is denied.

## IV. CONCLUSION

Digital technology has transformed many industries in the twenty-first century, and educational publishing is certainly no exception to that trend. As Defendants themselves noted in March 2016, those who "do not adapt rapidly to these changes . . . may lose business to 'faster' and more 'agile' . . . non-traditional competitors." (Compl. ¶ 205.) Defendants clearly were not as fast and agile as they needed to be, and their failure to adapt rapidly to a changing landscape is reflected in Pearson's stock price. But that failure – while potentially fatal to a company and its management and shareholders – is not fraud, and Plaintiffs' failure to allege any facts to the contrary ultimately dooms Plaintiffs' securities fraud claims. Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate the motion pending at document number 55 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: September 16, 2019
New York, New York